No. 26-1609

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JACK DICKINSON, *also known as the Portland Chicken*; LAURIE ECKMAN;
RICHARD ECKMAN; HUGO RIOS; MASON LAKE,
*on behalf of themselves and those similarly situated,*
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *President of the United States, in his official capacity*; KRISTI
NOEM, *Secretary, U.S. Department of Homeland Security (DHS), in her official capacity*;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Oregon

## MOTION FOR STAY PENDING APPEAL,
## IMMEDIATE ADMINISTRATIVE STAY, AND
## STAY OF DISTRICT COURT PROCEEDINGS

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney*
  *General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
DOUGLAS C. DREIER
BRENNA H. SCULLY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 880-6114*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION................................................................................................... 1

STATEMENT ......................................................................................................... 3

ARGUMENT ......................................................................................................... 6

I.     The Government Is Likely To Succeed On The Merits. ....................................... 6

      A.     Plaintiffs Lack Standing To Seek Prospective Relief. ................................ 6

      B.     Plaintiffs' First Amendment Retaliation Claims Are Meritless. ............... 10

      C.     The Injunction Is Overbroad And Unworkable. ..................................... 13

II.    The Remaining Stay Factors Decisively Favor The Government. ...................... 21

III.   The Court Should Stay District Court Proceedings Until The Government's Appeal Is Resolved. ........................................................ 22

CONCLUSION ................................................................................................... 24

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*AARP v. Trump,*
   605 U.S. 91 (2025) ................................................................................... 15

*Barnes v. Felix,*
   605 U.S. 73 (2025) ................................................................................... 21

*Black Lives Matter L.A. v. City of Los Angeles,*
   113 F.4th 1249 (9th Cir. 2024) .............................................................14-15

*Cantwell v. Connecticut,*
   310 U.S. 296 (1940) ................................................................................. 16

*Chicago Headline Club v. Noem,*
   No. 25-3023, 2026 WL 622677 (7th Cir. Mar. 5, 2026) ...........................7, 17

*Chicago Headline Club v. Noem,*
   No. 25-3023, 2025 U.S. App. LEXIS 34532 (7th Cir. Nov. 19, 2025) ........................ 1

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ..............................................................................6, 7, 9

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................................. 6, 8

*East Bay Sanctuary Covenant v. Biden,*
   993 F.3d 640 (9th Cir. 2021) ................................................................... 10

*Felarca v. Birgeneau,*
   891 F.3d 809 (9th Cir. 2018) ................................................................... 12

*Friends of the Everglades, Inc. v. Secretary of the U.S. Dep't of Homeland Sec.,*
   No. 25-12873, 2025 WL 2598567 (11th Cir. Sep. 4, 2025) ....................... 22

*Graham v. Connor,*
   490 U.S. 386 (1989) ................................................................................. 21

*Index Newspapers LLC v. U.S. Marshals Serv.,*
   977 F.3d 817 (9th Cir. 2020) ................................................................10, 13

*Laird v. Tatum,*
 408 U.S. 1 (1972) ............................................................................... 8

*Lewis v. Casey,*
 518 U.S. 343 (1996) ........................................................................... 8

*Los Angeles Press Club v. Noem,*
 799 F. Supp. 3d 1036 (C.D. Cal. 2025) ........................................ 14

*Los Angeles Press Club v. Noem,*
 No. 25-5975, 2025 U.S. App. LEXIS 33133 (9th Cir. Dec. 18, 2025) ................... 1, 13

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) ........................................................ 9-10

*Michigan Dep't of State Police v. Sitz,*
 496 U.S. 444 (1990) ......................................................................... 20

*Nelson v. City of Davis,*
 685 F.3d 867 (9th Cir. 2012) ........................................................ 12

*Nieves v. Bartlett,*
 587 U.S. 391 (2019) ......................................................................... 10

*Nken v. Holder,*
 556 U.S. 418 (2009) ........................................................................... 6

*Noem v. Vasquez Perdomo,*
 146 S. Ct. 1 (2025) ........................................................................ 6, 9

*North Carolina v. Covington,*
 581 U.S. 486 (2017) ......................................................................... 17

*Puente v. City of Phoenix,*
 123 F.4th 1035 (9th Cir. 2024) ................................... 2, 10-11, 12, 13, 15, 16

*Rizzo v. Goode,*
 423 U.S. 362 (1976) .................................................................. 8, 20-21

*Ryburn v. Huff,*
 565 U.S. 469 (2012) ......................................................................... 20

*Tincher v. Noem,*
   164 F.4th 1097 (8th Cir. 2026) ..............................................................1, 15, 21

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................................................2, 19

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ................................................... 2, 13, 14, 15, 21

*Updike v. Multnomah County,*
   870 F.3d 939 (9th Cir. 2017) ......................................................................... 6

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ...................................................................................... 14

**Statutes:**

6 U.S.C. § 202.............................................................................................. 3

6 U.S.C. § 211(c)(8) .................................................................................... 3

6 U.S.C. § 252(a)(3) .................................................................................... 3

40 U.S.C. § 1315(a)-(b)............................................................................... 3

**Rule:**

Fed. R. Civ. P. 23(a)(2).............................................................................. 14

iv

**INTRODUCTION**

The government respectfully requests a stay of the district court's preliminary injunction pending appeal and an immediate administrative stay pending resolution of this motion. The government further requests that this Court stay district court proceedings pending resolution of the appeal.

Beginning in 2025, the Department of Homeland Security (DHS) has been confronted by a significant increase in violent, disruptive, or otherwise unlawful protests targeting its immigration-enforcement operations. DHS officers sometimes responded by deploying nonlethal crowd-control devices such as pepper spray and tear gas. District judges across the Nation have issued broad, programmatic injunctions restricting the use of such devices. But the courts of appeals, including this Court, have repeatedly stayed those injunctions as overbroad or unworkable. *See Los Angeles Press Club v. Noem*, No. 25-5975, 2025 U.S. App. LEXIS 33133 (9th Cir. Dec. 18, 2025); *Chicago Headline Club v. Noem*, No. 25-3023, 2025 U.S. App. LEXIS 34532 (7th Cir. Nov. 19, 2025); *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026) (per curiam).

This Court's intervention is again required. Plaintiffs in this case—five individual journalists and protesters—allege that, at a handful of protests at an Immigration and Customs Enforcement (ICE) facility in Portland, Oregon, certain DHS officers targeted them with crowd-control devices in retaliation for their First Amendment activity. The district court entered a sweeping preliminary injunction

that effectively prohibits the use of common crowd-control devices to disperse violent or disruptive crowds at the facility. The injunction applies even when such crowds are blockading the facility and attacking federal property. The injunction separately requires the government to consult with plaintiffs on how to alter officers' helmets and uniforms so each officer can be identified at a distance.

This extraordinary injunction should be stayed pending appeal. The government is likely to prevail on the merits because plaintiffs lack standing and have failed to demonstrate retaliatory intent by DHS. Moreover, the injunction exceeds the district court's authority. The injunction improperly provides relief to countless nonparties in defiance of *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025). Its provisions lack any basis in the First Amendment, which permits officers to use "tear gas, other chemical irritants," and similar devices to disperse a violent or disruptive crowd. *Puente v. City of Phoenix*, 123 F.4th 1035, 1042, 1062-63 (9th Cir. 2024). And the injunction is unworkable and offends the separation of powers because it operates as a detailed law-enforcement manual, enforceable by contempt, that transforms the district court into a "roving commission" "exercis[ing] general legal oversight of the . . . Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).

The equities decisively favor a stay as well. Plaintiffs' asserted harms are too speculative even to support standing. On the other side of the ledger, the injunction irreparably injures the government and the public by impairing officers' ability to control protests that have turned violent.

2

## STATEMENT

**A.** Congress charged ICE and U.S. Customs and Border Protection, agencies within DHS, with enforcing and administering federal immigration laws. *See* 6 U.S.C. §§ 202, 211(c)(8), 252(a)(3). Congress also tasked DHS with protecting federal property and "persons on the property." 40 U.S.C. § 1315(a)-(b).

**B.** Beginning in 2025, DHS has been confronted by a significant increase in violent, disruptive, or unlawful protests directed at its immigration-enforcement operations. Near Dallas, a man opened fire on an ICE field office, killing two detainees and injuring another. In Los Angeles, violent protesters repeatedly attacked federal officers with concrete chunks and commercial-grade fireworks. In Chicago, cartels and criminal organizations reportedly placed "bounties" on senior DHS officers operating in the area.

This case arises from protests targeting DHS's operations in Portland, Oregon. Between June 2025 and February 2026, at least 150 such protests occurred at the ICE facility in Portland. Doc.155, at 6. Although "many" protests "remained peaceful," others turned "violent." Doc.116-1, at 2. As DHS's declarants explained in district court, the facility was regularly surrounded by crowds that sometimes numbered in the hundreds or even thousands. Doc.116-1, at 3-9. Rioters repeatedly attempted to breach the facility and damage federal property, assaulted federal officers with improvised weapons such as rocks and fireworks, and blockaded the facility—on one

3

occasion with a prop guillotine, Doc.116-1, at 5—to prevent vehicles from entering or leaving. *See generally* Doc.116-1, at 3-9 (describing protests); Doc.116-2, at 4-7 (same).

In response to this unrest, DHS officers sometimes responded with nonlethal crowd-control devices. Doc.116-1, at 3-9. These devices enable officers to avoid "physical confrontation with protesters" that could endanger everyone involved. Doc.116-1, at 3. They also allow "a small number of officers" "to control large violent crowds." *Id.* In DHS's experience, their use "results in fewer injuries to suspects, violent protestors, and officers." *Id.*

C.     Plaintiffs are three protesters and two journalists who attended protests at the ICE facility. As relevant here, they allege that DHS officers targeted them with crowd-control devices in retaliation for exercising their First Amendment rights. The district court entered a temporary restraining order severely restricting DHS officers' ability to use crowd-control devices at the ICE facility. Doc.155, at 3.

After extensive discovery and a three-day evidentiary hearing, Doc.155, at 3-5, the district court entered a preliminary injunction. The injunction prohibits DHS and its "agents and employees" from "direct[ing] or us[ing] chemical or projectile munitions, including but not limited to . . . pepper ball or paintball guns, tear gas or other chemical irritants, . . . and flashbang . . . grenades, unless the specific target of such a weapon or device poses an imminent threat of physical harm." Doc.156, at 2. Additionally, the injunction prohibits DHS officers from firing any such devices "at the head, neck, or torso of any person, unless the officer is legally justified in using

4

deadly force against that person." *Id.* Finally, the injunction sets forth special instructions governing the use of pepper spray and similar devices (which the injunction distinguishes from "chemical irritants"). DHS officers may not use "pepper spray . . . unless the specific target . . . exhibits, at a minimum, active resistance," defined to exclude "trespassing, refusing to move, refusing to obey an order to disperse, and 'going limp.'" Doc.156, at 2-3. The injunction also bans the use of pepper spray "against groups of people where bystanders foreseeably would be affected." Doc.156, at 3. Pepper spray may only be "used against specific individuals actively engaged in violent unlawful conduct, actively resisting arrest, or as reasonably necessary in a defensive capacity." *Id.*

The preliminary injunction further requires the parties to "confer regarding how" DHS officers "can place conspicuous and unique identifying markings . . . on the uniforms, vests, and/or helmets" of the agents deployed to the Portland ICE facility. Doc.156, at 3. "If the parties cannot reach agreement," the district court will itself decide how to redesign DHS officers' uniforms and will modify the preliminary injunction "appropriately." Doc.156, at 3-4.

The same day that the injunction issued, the district court certified a provisional class of "[a]ll people who, since [June 2025], have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." Doc.154, at 2 (quotation marks omitted).

5

The district court denied the government's motion to stay the injunction pending appeal. Doc.155, at 33.

## ARGUMENT

The government is entitled to a stay because it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

**I.     The Government Is Likely To Succeed On The Merits.**

**A.     Plaintiffs Lack Standing To Seek Prospective Relief.**

Plaintiffs lack standing to seek prospective relief based on allegations that certain DHS officers previously retaliated against them for their First Amendment activities. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring in grant of stay application) (citing *Lyons*, 461 U.S. 95). Plaintiffs must instead demonstrate a "real and immediate threat of repeated injury," *Updike v. Multnomah County*, 870 F.3d 939, 947 (9th Cir. 2017) (quotation marks omitted), and may not rely on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

*Lyons* illustrates these principles. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97-98. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the

plaintiff would be subjected to another chokehold "without any provocation or resistance on his part"—even though the police department allegedly had a policy of "routinely apply[ing] chokeholds" in such situations. *Id.* at 105.

*Lyons* forecloses plaintiffs' standing here.[1] The district court erroneously concluded that plaintiffs have standing because, at a few previous protests at the ICE facility, DHS officers targeted the named plaintiffs with crowd-control devices in retaliation for exercising their First Amendment rights. Doc.155, at 18; *see* Doc.155, at 6-8 (describing four instances of alleged retaliation against Jack Dickinson); Doc.155, at 8-9 (describing one instance against Richard Eckman and Laurie Eckman); Doc.155, at 9 (describing three instances against Mason Lake); Doc.155, at 9-10 (describing one instance against Hugo Rios). Those findings—which were not accompanied by any record citations, and which disregarded DHS's declarations and incident reports providing a fuller description of some of the protests in question— were clearly erroneous. *See infra* pp. 11-12; *cf. Chicago Headline Club v. Noem*, No. 25-3023, 2026 WL 622677, at *5 (7th Cir. Mar. 5, 2026) (per curiam) (vacating similar preliminary injunction while expressing concern that the district court "tilt[ed] all the testimonial evidence . . . in the plaintiffs' favor" by finding "the government's witnesses categorically not credible"). But even accepting those findings, the court's

---

[1] According to the district court, the government failed to challenge the standing of two of the five named plaintiffs. Doc.155, at 16. That is incorrect, as the government's opposition to plaintiffs' motion makes clear. Doc.116, at 17-21.

past-is-prologue theory of standing is irreconcilable with *Lyons*. Article III's "actual-injury requirement would hardly serve [its] purpose" if a handful of allegations of past injury could permit "imposition of systemwide relief." *Lewis v. Casey*, 518 U.S. 343, 357, 359 (1996); *accord Rizzo v. Goode*, 423 U.S. 362, 373 (1976) (denying injunctive relief where the district court found 20 constitutional violations by police officers "occurring at large in a city of three million inhabitants").

To avoid *Lyons*, the district court recharacterized plaintiffs' asserted injuries in terms of a "First Amendment chill." Doc.155, at 16. But plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," including by alleging a "subjective chill" on protected speech. *Clapper*, 568 U.S. at 416-18 (quotation marks omitted) (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)). Because plaintiffs' fears of future injury are speculative, any alleged chilling effect cannot support their standing.

The district court also appeared to suggest that plaintiffs are likely to suffer future retaliation because DHS has a pattern or policy of retaliating against protesters. Doc.155, at 18. But there is no reasonable dispute that DHS expressly prohibits its officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Doc.116-5, at 1. Any officer who retaliates against protesters would violate these policies in a manner antithetical to the values DHS is committed to upholding. Indeed, DHS is currently reviewing several use-of-force incidents at the ICE facility. *See* Doc.116, at 23 (citing sealed exhibit).

8

Nor does the record support the district court's apparent conclusion that DHS maintains an unwritten policy of retaliation notwithstanding DHS's written policies. Doc.155, at 13, 18. Protesters have regularly confronted DHS officers at the ICE facility. But the record does not indicate that DHS officers used retaliatory force against plaintiffs at all or even most of these protests—as they presumably would have done if an unwritten policy condoning retaliation existed. To the contrary, "[t]here have been many instances since June 2025 when the actions of protesters remained peaceful and did not require a law enforcement response" from DHS officers. Doc.116-1, at 2. The allegations of lead plaintiff Jack Dickinson underscore this point. Mr. Dickinson claims to have "participated in about 150 protests at the Portland ICE Building" beginning in June 2025, "typically attending four or five protests per week." Doc.155, at 6. Yet Mr. Dickinson estimates that he was "exposed" to crowd-control devices just "one third of [those] times," Doc.26, at 5, and the court identified just four of those exposures as retaliatory, Doc.155, at 6-8.[2]

_____

[2] In all events, *Lyons* establishes that plaintiffs would lack standing even if DHS did have an unwritten policy of retaliation (which it does not). The *Lyons* plaintiff likewise alleged that the police department had a policy of "routinely apply[ing] chokeholds" in certain situations. 461 U.S. at 105. Yet the Supreme Court nevertheless held that the plaintiff lacked standing to seek injunctive relief. *Accord Vasquez Perdomo*, 146 S. Ct. at 1 (granting stay of preliminary injunction pending appeal); *id.* at 3 (Kavanaugh, J., concurring in grant of stay application) (explaining that merely alleging the existence of a policy does not satisfy *Lyons* because plaintiffs must also show an imminent likelihood of injury pursuant to that policy). To the extent this Court has held that a plaintiff can satisfy *Lyons* simply by demonstrating a pattern of officially sanctioned behavior, *see, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 998

*Continued on next page.*

9

*Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020), does not alter the conclusion. The stay panel's decision lacks precedential force because its "predictive analysis" turned on the "probabilistic" standard governing motions to stay a preliminary injunction pending appeal, not a "pure question[] of law" already settled by "binding authority." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 & n.3 (9th Cir. 2021). And the decision lacks persuasive force because it was based on a different factual record. As explained, this record undermines plaintiffs' assertions of imminent future injury because DHS officers did not uniformly deploy force when confronted by violent or disruptive protests.

## B. Plaintiffs' First Amendment Retaliation Claims Are Meritless.

Even if plaintiffs had standing, their First Amendment retaliation claims are likely to fail on the merits. To succeed, plaintiffs "must establish a [but-for] 'causal connection' between the government defendant's 'retaliatory animus' and [their] 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). The Court has cautioned that the retaliation "framework, with its focus on subjective causation, is a poor fit for the crowd-dispersal context," in part because applying the framework "will often raise 'particularly difficult' causation questions." *Puente v. City of Phoenix*,

---

(9th Cir. 2012), those holdings are incompatible with *Lyons*, and the government respectfully preserves this objection for further review.

123 F.4th 1035, 1063 (9th Cir. 2024). This case throws that mismatch into sharp relief.

The district court failed to identify any direct evidence that DHS, as an institution, intentionally targeted plaintiffs for their First Amendment activities. This failure is unsurprising because DHS policies expressly forbid such conduct. Instead, the court attributed to DHS the allegedly retaliatory intent of individual DHS officers who used crowd-control devices against plaintiffs. Doc.155, at 20-21. As explained, *supra* pp. 8-9, the handful of incidents identified by the court do not support such an inference. And the court's analysis of the officers' subjective motives was itself inadequate. The court simply assumed that, because the officers employed crowd-control devices in a manner the court deemed "excessive," *but see infra* pp. 16-17 (explaining why the court applied the wrong use-of-force standard), the officers must have possessed the requisite retaliatory intent, Doc.155, at 20-21. But the court erred by assuming that every allegedly improper use of force—undertaken in circumstances that are often uncertain and chaotic—was motivated by retaliatory animus on the part of the individual officers.

This Court's decision in *Puente* illustrates the point. *Puente* reaffirms that, under the First Amendment, law-enforcement officers may disperse a protest if it "presents a clear and present danger of imminent lawlessness." 123 F.4th at 1062. This inquiry "must be evaluated under an objective standard." *Id.* Thus, a court might conclude that an officer used too much force to disperse a protest because, notwithstanding his

11

"subjective apprehensions," the circumstances did not objectively "present[] a clear and present danger." *Id.* A court might also conclude that the officer used too much force because he misperceived "the tenor of [a] demonstration" as being more "infected with violence or obstruction" than it was. *Id.* (quotation marks omitted). But neither conclusion would compel the conclusion that, for purposes of a First Amendment retaliation claim, the officer acted due to subjective antipathy to the First Amendment activity at issue. By conflating these inquiries, the district court only reinforced *Puente*'s conclusion that the First Amendment retaliation framework is a "poor fit" for plaintiffs' claims. *Id.* at 1063.

Plaintiffs' allegations of excessive force are more appropriately addressed under the Fourth Amendment's excessive-force standards (or any other doctrines that might apply to individual officer misconduct). *See, e.g.*, *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018). But plaintiffs' preliminary injunction motion conspicuously declined to invoke the Fourth Amendment or any other applicable excessive-force doctrine. Doc.155, at 18. *See generally Puente*, 123 F.4th at 1050-62 (rejecting excessive-force claims in analogous circumstances). That the district court inexplicably cited a Fourth Amendment case to conclude that DHS officers improperly dispersed protesters under the First Amendment just highlights the extent of the court's confusion. *See* Doc.155, at 21 (citing *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012)).

The district court emphasized that, in *Index Newspapers*, the stay panel held that a different set of plaintiffs was likely to prevail on their First Amendment retaliation

12

claims. Doc.155, at 20-21. But that decision (which predates *Puente*) is not precedential and lacks persuasive force because it was based on a different factual record. The court also relied on opinion testimony from plaintiffs' experts. Doc.155, at 21-22. But those witnesses' policy preferences regarding the handling of violent or disruptive crowds are inconsistent with *Puente*, 123 F.4th 1035, and "obviously do not bind federal law enforcement agencies"—which are "entitled to set different enforcement priorities and to follow different directives regarding lawful crowd control tactics," *Index Newspapers*, 977 F.3d at 850-51 (O'Scannlain, J., dissenting).

## C.     The Injunction Is Overbroad And Unworkable.

The government is also likely to prevail on the merits because the injunction's terms exceed the district court's authority for three independent reasons.

1.     First, the injunction improperly grants relief not only to the five named plaintiffs but to anyone protesting or reporting at the Portland ICE facility. That cannot be reconciled with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which reaffirmed that Article III courts lack equitable authority to grant "relief that extend[s] beyond the parties," *id.* at 843. Recently, this Court unanimously stayed an analogous order enjoining DHS officers' use of crowd-control devices in Los Angeles "to the extent that" the injunction's provisions "apply to protesters who are not parties to [the] litigation." *Los Angeles Press Club v. Noem*, No. 25-5975, 2025 U.S. App. LEXIS 34532, at *4 (9th Cir. Dec. 18, 2025). The Court should follow the same course here.

13

The district court justified the injunction's breadth as necessary to provide complete relief to the named plaintiffs. Doc.155, at 28-29. But "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 854; *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge . . . is not mechanically obligated to grant an injunction for every violation of law."). The *Los Angeles Press Club* stay panel rejected this very argument when it granted in pertinent part the government's stay motion. *See Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1070-71 (C.D. Cal. 2025) (attempting to justify overbroad injunction using complete-relief principle).

To evade these limits on its authority, the court certified a provisional class covering "[a]ll people who, since" June 2025, "have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." Doc.154, at 14 (quotation marks omitted). That certification order is fatally flawed, not least because it flouts Rule 23's commonality requirement. *See* Fed. R. Civ. P. 23(a)(2). There are no questions common to this hopelessly broad class because it includes (1) people who were allegedly targeted with crowd-control devices despite not behaving in an obstructive or disruptive manner, (2) people who were allegedly targeted with such devices but who did act obstructively or disruptively, and (3) people who have not encountered DHS officers at all, much less been subjected to crowd-control devices. Even those class members who were allegedly retaliated against "will face an uphill challenge in showing that common questions exist," *Black Lives Matter L.A. v.*

14

*City of Los Angeles*, 113 F.4th 1249, 1258-60 (9th Cir. 2024), because First Amendment retaliation claims must be evaluated based on "all of the circumstances" (including the mental state of the federal officers who acted), *Puente*, 123 F.4th at 1062-63. These "fact-specific" and "individualized considerations" require "separate analyses" and are therefore not "amenable to class treatment." *Black Lives Matter*, 113 F.4th at 1258-60.

Anticipating the failure of its class-certification gambit, the district court attempted to justify the injunction's breadth as "necessary and appropriate" to afford relief to a putative class. Doc.155, at 27 (citing *AARP v. Trump*, 605 U.S. 91 (2025) (per curiam)). But the relief contemplated by *AARP* is not available here because such relief is appropriate only where necessary "to preserve [a court's] jurisdiction," 605 U.S. at 97, and where the underlying legal question "is the same" for named plaintiffs and purported class members, *id.* at 98; *see CASA*, 606 U.S. at 849-50 (holding that injunctive relief to nonparties is improper if it "circumvent[s] Rule 23's procedural" requirements). Neither prerequisite is present here, where the court failed to identify any threat to its jurisdiction and where the putative class would not satisfy Rule 23. *See Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) (per curiam) (rejecting analogous reliance on *AARP* where the putative class "ha[d] *no* chance of getting certified" because its members' First Amendment retaliation "claims involve different conduct, by different officers, at different times, in different places, in response to different behavior" (emphasis in original)).

15

**2.** Second, the preliminary injunction is overbroad because its provisions—which operate like a detailed law-enforcement manual—are unmoored from plaintiffs' First Amendment retaliation claims.

As the terms of the injunction make clear, the district court apparently believed that the First Amendment prohibits officers from using crowd-control devices such as tear gas and pepper balls except when the "specific target . . . poses an imminent threat of physical harm," and prohibits officers from using pepper spray except when the "specific target . . . exhibits, at a minimum, active resistance" (defined to exclude all manner of disruptive acts). Doc.156, at 2-3. The court cited no legal authority supporting those policy assumptions, and this Court has repeatedly rejected them.

It is black-letter law that, under the First Amendment, officers may disperse a crowd not only in response to an imminent threat of physical harm but also in response to "imminent lawlessness," including a threat of "riot, disorder, [or] interference with traffic." *Puente*, 123 F.4th at 1062 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). Accordingly, plaintiffs' retaliation claims would not justify categorically prohibiting DHS officers from deploying common law-enforcement tools such as tear gas, flashbangs, and pepper balls except when "the specific target . . . poses an imminent threat of physical harm." Doc.156, at 2. They also would not justify categorically prohibiting DHS officers from deploying pepper spray except when "the specific target of that weapon exhibits, at a minimum, active resistance." Doc.156, at 2-3. And they certainly would not authorize the district court to design

16

the uniforms of federal law-enforcement officers, as the court asserted the power to do. Doc.156, at 3-4. Yet the court nevertheless adopted these prescriptions and proscriptions as remedies for retaliation. *See Chicago Headline Club*, 2026 WL 622677, at *2 (noting that the Seventh Circuit stayed a similar injunction because, by "enumerat[ing] and proscrib[ing] the use of scores of riot control weapons and other devices in a way that resembles a federal regulation," the district court exceeded its authority (quotation marks omitted)).

The inappropriateness of the injunction is further underscored by DHS's declarations, which demonstrate that the protests at issue were blighted by violent or disruptive crowds. Protesters repeatedly trespassed onto the ICE facility, blockaded the facility's gates, vandalized federal property, and attacked federal officers. *See* Doc.116, at 8-15 (summarizing declarations). Yet the district court did not acknowledge, much less address, this evidence—which not only undermines the court's conclusion that DHS officers acted with retaliatory intent but also highlights the pernicious consequences of permitting the overbroad injunction to stand.

**3.** Third, the district court failed to account for "what is workable," as foundational equitable principles demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (quotation marks omitted). The injunction effectively bars DHS officers from deploying crowd-control devices at the Portland ICE facility even when crowds obstruct federal-law enforcement activity, ignore lawful dispersal orders,

17

threaten public safety, and trespass on or damage federal property. The injunction applies even when crowds number in the hundreds or thousands.

As DHS's declarants explained, such a regime is not merely unworkable; it is also extremely dangerous to both federal officers and the public. *See* Doc.116-1, at 10-12; Doc.116-2, at 9. The injunction eliminates "key tools for deterring escalation" and "potentially allow[s] breaches or violence to occur that could . . . otherwise [be] prevented." Doc.116-1, at 11. That is because prohibiting the use of crowd-control devices in response to anything except imminent violence "forces officers to rely on physical intervention (hands on tactics) to manage breaches or remove individuals[,] . . . greatly increas[ing] the risk of injury to both officers and protesters, as physical confrontations are more likely to result in accidental harm, escalation, or use of higher levels of force." Doc.116-1, at 10. Furthermore, the injunction invites wanton destruction of federal buildings, vehicles, and other property by requiring officers "to wait until the criminal acts progress to the point where [a physical] threat . . . is imminent." Doc.116-1, at 11.

Worse, the preliminary injunction is ripe for abuse. Violent actors "are often intermingled with" peaceful protesters and "may use protesters who are behaving peacefully as shields." Doc.116-1, at 11. But the injunction forbids officers from using most crowd-control devices (which are effective precisely because they affect a large area) unless the "specific target . . . poses an imminent threat of physical harm." Doc.156, at 2. And given the indeterminacy of the injunction's terms, the purported

18

safe harbor for officers who "incidentally expose[]" someone "to a crowd-control device" if the device was "deployed in a manner that is fully consistent with" the injunction, Doc.156, at 3, offers only illusory protection.

The district court papered over these problems by noting that the injunction leaves DHS officers free to invite protesters to refrain from acting unlawfully and then to "cite or . . . arrest" protesters who do not comply. Doc.155, at 25. As DHS's declarants explained, however, that approach will often be impractical or impossible. Officers are often outnumbered by protesters, "especially if multiple breach attempts or disturbances occur simultaneously." Doc.116-1, at 10. Moreover, violent rioters are "often intermingled with" law-abiding protesters and "may use protesters who are behaving peacefully as shields." Doc.116-1, at 11. In such circumstances, crowd-control devices serve as critical force multipliers by "enabl[ing]" "a small number of officers" "to control large violent crowds." Doc.116-1, at 3. These conclusions are borne out by the record, which shows that protesters repeatedly ignored officers' verbal orders to disperse and impeded officers' attempts to arrest violent or disruptive individuals. *See generally* Doc.116-1, at 3-9. Officers were able to put an end to unrest only after deploying crowd-control devices. *Id.*

The injunction exacerbates these practical flaws by placing the district court in the position of superintending DHS officers' day-to-day decision making. Federal courts "do not possess a roving commission" to "exercise general legal oversight of the . . . Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).

19

That principle applies with particular force to law-enforcement activities responding to safety risks, which inevitably involve "split-second judgments" and a balancing of factors in "tense, uncertain, and rapidly evolving" situations. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quotation marks omitted). Under the injunction, however, DHS officers' real-time judgments would be subject to judicial second-guessing in contempt proceedings based on whether officers complied with the injunction's vague terms—such as whether a protester engaged in "active resistance" or whether the officer's actions were "reasonably necessary" or "legally justified" in the eyes of the court. Doc.156, at 2-3. An officer could face contempt charges even for unintentionally striking someone with a crowd-control device if the target believed that the strike was retaliatory. Whether or not such charges are ultimately found to be meritorious, the mere threat of protracted contempt litigation imposes a significant additional burden on officers.

There are good reasons why courts should not micromanage day-to-day law-enforcement operations in this way. Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990). And "[t]he scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo*, 423 U.S. at

20

378. "[I]t is one thing to dissect and scrutinize an officer's actions with the '20/20 vision of hindsight,' 'in the peace of a judge's chambers.' It is quite another to make 'split-second judgments' on the ground, 'in circumstances that are tense, uncertain, and rapidly evolving.'" *Barnes v. Felix*, 605 U.S. 73, 89-90 (2025) (Kavanaugh, J., concurring) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The district court failed to heed those principles. *Accord Tincher*, 164 F.4th at 1099-100 (staying similarly prescriptive injunction).

## II. The Remaining Stay Factors Decisively Favor The Government.

The remaining equitable factors likewise support a stay. The preliminary injunction irreparably harms the government by impeding officers' ability to protect themselves and the Portland ICE facility from attack and disruption. *See Tincher*, 164 F.4th at 1100 (staying similar injunction because its "breadth and vagueness" may "cause federal agents to hesitate in performing their lawful duties," thereby "harm[ing] the government and undermin[ing] the public interest"). The injunction also irreparably harms the government because, by "prevent[ing] the Government from enforcing its policies against nonparties," it transgresses the separation of powers. *CASA*, 606 U.S. at 859. On the other side of the ledger, plaintiffs have failed even to establish standing to seek prospective relief, much less irreparable harm warranting injunctive relief of this magnitude. That is particularly so given that DHS policies already forbid First Amendment retaliation. Accordingly, the equities decisively favor the government.

21

### III. The Court Should Stay District Court Proceedings Until The Government's Appeal Is Resolved.

The government respectfully requests that the Court stay proceedings below until the merits of the government's appeal are decided. *See Friends of the Everglades, Inc. v. Secretary of the U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *13 (11th Cir. Sep. 4, 2025) (granting motion to stay preliminary injunction pending appeal and staying "further merits proceedings below until resolution of th[e] appeal"). Such relief is warranted because, despite overseeing extensive discovery during preliminary-injunction proceedings—during which the government put forth approximately 11 witnesses for depositions and produced approximately 112 videos and 1,600 pages of documents, Rough Mar. 4 Tr., at 96—the district court has indicated that even more extensive discovery is to come, with respect to both class certification and the merits, Feb. 23 Tr., at 27-29.[3] Indeed, the court appears prepared to permit plaintiffs to seek whatever discovery they believe they need. *Id.* at 28 ("[W]hatever additional discovery you all need and want, I'm going to probably allow it."). Allowing this intrusive expedition to go forward would impose enormous costs on DHS given the breadth of the certified class, the number of DHS officers who may be involved, and the extended period over which the protests occurred. But a holding that plaintiffs likely

---

[3] The final transcript of the February 23 telephonic hearing has been prepared, but only the rough transcript of the March 4 hearing is available. Because neither transcript has yet been filed on the district court docket, we have attached the relevant excerpts as an addendum to this motion.

22

lack standing would vitiate the need for discovery. And a holding on the merits of plaintiffs' retaliation claims would likewise inform the scope of whatever discovery may be warranted. Accordingly, staying district court proceedings until this Court supplies further guidance on plaintiffs' dubious legal theories would maximize judicial economy.

## CONCLUSION

The Court should stay the district court's order pending appeal and grant an immediate administrative stay pending resolution of this motion. The Court should also stay district court proceedings pending resolution of the government's appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
DOUGLAS C. DREIER
  */s/ Brenna H. Scully*
BRENNA H. SCULLY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 880-6114*
  *brenna.scully@usdoj.gov*

March 2026

24

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(1)(d) and 32-3 because it contains 5,590 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Brenna H. Scully*
BRENNA H. SCULLY

**ADDENDUM**

ROUGH DRAFT TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JACK DICKINSON, et al.,                    )
                                           )
          Plaintiffs,                      )     3:25-cv-02170
                                           )
vs.                                        )     March 4, 2026
                                           )
DONALD TRUMP, President of the             )     Portland, Oregon
United States, in his official             )
capacity, et al.,                          )
                                           )
          Defendants.                      )

(Preliminary Injunction Hearing)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

**Add.1**

2

ROUGH DRAFT TRANSCRIPT

APPEARANCES

FOR THE PLAINTIFFS:      Matthew Borden
                         BraunHagey & Borden, LLP
                         747 Front Street, Fourth Floor
                         San Francisco, CA  94111

                         Kelly K. Simon
                         ACLU of Oregon
                         P.O. Box 40585
                         Portland, OR  97240

FOR THE DEFENDANTS:      Andrew Warden
                         Department of Justice Civil Division
                         1100 L Street, N.W.
                         Washington, DC  20005

***add remainder of appearances

COURT REPORTER:          Dennis W. Apodaca, RDR, FCRR, CRR
                         United States District Courthouse
                         1000 SW Third Avenue, Room 301
                         Portland, OR  97204
                         (503) 326-8182
                         dennis_apodaca@ord.uscourts.gov

**Add.2**

Rough Draft Transcript

indicate that DHS as a government agency he has a policy or custom and in fact we think that the evidence shows that when there is a use of force, in the vast majority of cases, there is some precipitating event or some violence and I'm going to step through some of the evidence of some of the violence that has been directed at individual officers or at the ICE building, I'm not talking about people yelling it at officers because that's clearly First Amendment protected activity. But I'm talking about throwing rocks.

THE COURT: I agree. And you want to arrest people for throwing rocks or even getting an officer You go right ahead. But we both seeing the videos on a number of occasions of someone either sitting -- not even in the middle of the driveway up on the side -- granted their trespassing want to arrest them. But they're sitting there on the side and an officer comes right up to them and raise them with the chemical munitions right in their face, or they're standing holding a sign, or they're leaving the demonstration as Mr. Eckman was, and an officer fires at him from eight feet behind. That's disturbing evidence.

MR. ROSENBERG: Well part of why I am here is to bring to the Court's attention some of the other evidence that has not been presented in the Court today. I would like to talk about the representative sample because we have had a very short period of time in which to engage in discovery. I

**Add.3**

Rough Draft Transcript

believe it has been just over a month or so. And just for the Court's awareness we have produced approximately 1618 pages of documents. We produced approximately 122 videos, either a body worn camera videos or videos from video cameras at the facility itself. And I believe plaintiffs have taken eleven depositions. They noted that many of those depositions have taken place in the last week. Another way to look at it is depositions filled approximately the last third or so or maybe the last quarter or so of the entire discovery period which is what the way these things oftentimes work.

But how did we land on this representative sample of approximately nine days, because it was never going to be feasible for us to be able to provide information across the eight or so month time period in the discovery context for plaintiffs in a preliminary injunction so the parties had to pick and choose.

And plaintiffs chose the dates, they chose the nine dates that they wanted to focus on. They had to identify those dates. And then once they identified those dates, the Government used various use of force reports from DHS the DHS components to plaintiffs and then based on those use of force reports and this is I think laid out in some of our status reports as well as the motion to compel, plaintiffs identified a number of witnesses that they wanted to depose. And that's a very feasible and practical way to move through the discovery

**Add.4**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JACK DICKINSON, et al.,                )
                                       )
            Plaintiffs,                )     3:25-cv-02170
                                       )
vs.                                    )     February 23, 2026
                                       )
DONALD TRUMP, President of the         )     Portland, Oregon
United States, in his official         )
capacity, et al.,                      )
                                       )
            Defendants.                )


(Telephonic Status Conference)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

**Add.5**

them documents they could send their way might be helpful for that. But we agree: If they are available for depositions this week, we don't expect them at the trial.

THE COURT: All right.

MS. HUTCHISON: I have one clarification on the trial point.

THE COURT: Yes.

MS. HUTCHISON: I think we put this on that motion to compel. I understand the Government's question on whether there is subpoena power to get them to testify live in person at the hearing, but I think it's within this court's power to command remote testimony live at the testimony as well, and that would be perfectly fine with us.

THE COURT: Okay. Thank you.

I think both sides raise some very fair points, especially since we are trying to keep everything on track for a preliminary injunction hearing beginning next Monday.

I also note, too, that this is not the normal situation where you deal with a preliminary injunction. Whichever way that goes, you then go to merits discovery, and that could take an awful long time before you get to a trial on the merits. It's different, because here we have a putative class. I note that either in the motion to compel or in plaintiffs' motion in support of preliminary injunction -- I can't remember which right now -- plaintiff

**Add.6**

said that shortly after next week, you intend to move promptly for class discovery, and then promptly thereafter, for class certification. I think that's an important thing as part of the life progress of this lawsuit.

So we will do the appropriate activity needed for preliminary injunction, which I'll describe in a few moments. But then whatever additional depositions that plaintiff needs -- whether that be of all the folks named in the various incident reports, whether it be a fairly robust, although painstakingly defined Rule 30(b)(6) notice, there will be plenty of time for all of that when you do your class discovery immediately after the preliminary injunction decision issues. One way or the other, you will need to move to your class discovery.

I'll expect both sides to be moving promptly and efficiently on that, because I do think it's very, very important in this litigation -- in this lawsuit -- to decide as soon as we reasonably can whether class certification is or is not appropriate.

So I'll want class discovery to move promptly on both sides. I will want class certification briefing to move promptly after each side has had appropriate class discovery. And I also note that here, because of the nature of some of the claims, including an informal policy of First Amendment retaliation and standing issues, I do think

**Add.7**

class discovery issues will merge with merits discovery issues by and large. So we are not going to separate class discovery and merits discovery. I think they're the same. And I'll want everybody to move fairly promptly on that. And to whatever additional discovery you all need and want, I'm going to probably allow it.

By the way, I'll just state right now: I'm lifting the limit of ten depositions. Given at what's at stake here, the important public issues, the nature of the defenses raised by the defendants, including standing and no official policy retaliation, I think that a limit of ten is not realistic. So I'm waiving the limit of ten. Whether I impose another limit or whether I impose a new limit down the road, we will talk about later when we do a more thorough case management conference and after you all do your Rule 26(a) conference. But I'm lifting the Rule 30(a)(2)(A)(i) limit of ten.

Now that said, I really do appreciate the need that you all this week need to both prepare for the preliminary injunction hearing and do additional discovery. As much as it pains me to do something that looks like I'm splitting the baby, that's what I'm going to do. I'm going to grant the motion to compel in part and order four of the eight additional depositions.

I'm hearing what Mr. Rosenberg says; that eight is

**Add.8**

just too burdensome in the remaining four days essentially -- four business days here. But I'm also sympathetic to plaintiffs' position that they want to dig deeper into some of these incident reports and their authors.

So of the eight named folks that plaintiffs seek in their motion to compel, you may have four of them. Plaintiff gets to choose which four. Mr. Rosenberg has offered -- and we will take him up on his offer -- immediately after this call, Mr. Rosenberg will let plaintiffs' counsel know, of those eight, who are in the Portland metro area now, who are out of state, and maybe where they are. So plaintiff can factor that into their decision in terms of who they want to depose, although my best guess is that plaintiffs will want to focus on the substance of the incident reports more than the location of the deponents, but I'll let plaintiffs make the decisions.

So that's the ruling on the motion to compel. Plaintiff may have four of the named folks at plaintiffs' choice but not all eight. But, of course, as I said, I fully expect that the remaining four, if plaintiff still wants them -- as well as a whole host of other people -- will be allowed during class discovery. So that takes care of the ruling on the motion to compel.

Does anyone have any questions before we move on?

**Add.9**