No. 26-1609

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JACK DICKINSON, *also known as the Portland Chicken*; LAURIE ECKMAN;
RICHARD ECKMAN; HUGO RIOS; MASON LAKE,
*on behalf of themselves and those similarly situated*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *President of the United States, in his official capacity*; KRISTI
NOEM, *Secretary, U.S. Department of Homeland Security (DHS), in her official capacity*;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Oregon

## REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL AND STAY OF DISTRICT COURT PROCEEDINGS

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney
General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
DOUGLAS C. DREIER
BRENNA SCULLY
*Attorneys, Appellate Staff
Civil Division, Room 7211
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 880-6114*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................... 1

    I.  The Stay Factors Decisively Favor The Government. ............................ 1

        A.     Standing. ............................................................................................ 1

        B.     First Amendment Merits. ............................................................... 3

        C.     Equitable and Constitutional Limitations on District Court Authority. .. 6

    II.  The Remaining Stay Factors Decisively Favor The Government. ..................... 10

    III.  The Court Should Stay District Court Proceedings Until The Government's Appeal Is Resolved. .............................................................................. 11

CONCLUSION ......................................................................................................... 12

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Black Lives Matter L.A. v. City of Los Angeles*,
  113 F.4th 1249 (9th Cir. 2024) ..................................................................... 6-7

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ......................................................................................... 7

*Chicago Headline Club v. Noem*,
  168 F.4th 1033 (7th Cir. 2026) (per curiam) ............................................... 10

*Chicago Headline Club v. Noem*,
  No. 25-3023, 2025 U.S. App. LEXIS 34532 (7th Cir. Nov. 19, 2025) ........................ 1

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................................... 1

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................................... 2, 3

*Graham v. Connor*,
  490 U.S. 386 (1989) ...................................................................................... 12

*Index Newspapers LLC v. United States Marshals Service*,
  977 F.3d 817 (9th Cir. 2020) .......................................................................... 3

*International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*,
  389 U.S. 64 (1967) .......................................................................................... 9

*Los Angeles Press Club v. Noem*,
  Slip Op., No. 25-5975 (9th Cir. Apr. 1, 2026), Dkt.82.1 .................................. 3, 5, 6, 8

*Menotti v. City of Seattle*,
  409 F.3d 1113 (9th Cir. 2005) ........................................................................ 5

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ........................................................................................... 1

*Nelson v. City of Davis*,
  685 F.3d 867 (9th Cir. 2012) .......................................................................... 4

*Phillips v. U.S. Customs & Border Protection*,
  74 F.4th 986 (9th Cir. 2023) .......................................................................... 2

*Puente v. City of Phoenix*,
  123 F.4th 1035 (9th Cir. 2024) ................................................................ 4, 5, 7

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................ 9

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................... 6, 8, 10

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................ 7

*Willis v. City of Seattle*,
  943 F.3d 882 (9th Cir. 2019) .................................................................. 7

**Rules**

Federal Rule of Civil Procedure 23 ................................................................ 7

**Other Authorities**

Press Release, City of Portland,
  *PPB Helps Facilitate Safe Free Speech Gathering and March; Arrests Made at South
  Waterfront* (Mar. 29, 2026), https://perma.cc/2447-3FZB ........................................ 10

## INTRODUCTION

Plaintiffs' opposition fails to rehabilitate the district court's extraordinary injunction, which effectively prohibits the use of common crowd-control devices to disperse violent or disruptive crowds, and which even asserts the power to redesign the uniforms worn by Department of Homeland Security (DHS) officers. The government's motion to stay that overbroad, unworkable, and legally groundless injunction should be granted in full.

## ARGUMENT

### I. The Stay Factors Decisively Favor The Government.

#### A. Standing.

As our stay motion explained, the district court's past-is-prologue theory of standing is foreclosed by *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Mot. 6-9. Plaintiffs urge (Opp'n 10) this Court to confine *Lyons* to the Fourth Amendment context. But *Lyons* applies whenever a plaintiff seeks injunctive relief, including in the First Amendment context. *E.g.*, *Murthy v. Missouri*, 603 U.S. 43, 72 (2024); *Chicago Headline Club v. Noem*, No. 25-3023, 2025 U.S. App. LEXIS 34532, at *5 (7th Cir. Nov. 19, 2025) (staying analogous injunction while expressing "reservations" about the plaintiffs' ability to prove standing based on similar allegations). Plaintiffs also attempt (Opp'n 10-11) to reframe their injuries in terms of a subjective chill. But self-inflicted chilling effects do not liberate plaintiffs from the requirement that they prove an objective and certainly impending likelihood of being retaliated against in the

future. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416-18 (2013); *Phillips v. U.S. Customs & Border Protection*, 74 F.4th 986, 996 (9th Cir. 2023).

To satisfy that requirement, plaintiffs rely (Opp'n 11-12) on the inferred existence of an unwritten DHS policy embracing retaliation. That inference is not supported by the record. There is no dispute that DHS policies prohibit retaliation. And although at least 150 protests occurred at the Portland ICE facility between January 2025 and February 2026, the district court did not find that all or even most interactions between DHS officers and protesters involved retaliatory force.

Plaintiffs state (Opp'n 13) that the record contains direct evidence of such a policy. But none of their cited sources supports the conclusion that DHS maintains an unwritten policy of retaliation notwithstanding the agency's express prohibition on retaliation. Doc.116-5, at 1. Plaintiffs' circumstantial case for the existence of such a policy is unpersuasive as well. Plaintiffs note (Opp'n 13-14) that the record does not indicate that any DHS officer has been disciplined for actions at the Portland ICE facility. That argument is circular because it presupposes plaintiffs' conclusion that the officers acted unlawfully. It also ignores the fact that several investigations into use-of-force incidents at the facility are ongoing. Doc.160, at 274-77. Plaintiffs cite (Opp'n 14) senior DHS officials' statements, but those simply reflect the officials' general satisfaction with DHS operations in Portland. They are not inconsistent with, and do not purport to override, DHS policies prohibiting retaliation. Plaintiffs rely (Opp'n 11-12) on the testimony of their expert, Gil Kerlikowske. That DHS has

2

charted a different path from the one Mr. Kerlikowske would prefer does not mean DHS has an unwritten policy of retaliation.

This Court is not bound by the stay panel's decision in *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020). Plaintiffs' assertions notwithstanding (Opp'n 12 & n.3), this Court has never cited the relevant portions of *Index Newspapers* as precedent. And the panel's standing analysis is inapplicable here because it was predicated on a different record and a materially different injunction.

The Court's recent decision in *Los Angeles Press Club v. Noem* does not alter the analysis. The Court did not conclude (and, consistent with *Clapper*, could not conclude) that allegations of subjective chill standing alone are sufficient to support standing; rather, the Court relied on specific factual findings demonstrating "a reasonable fear that government reprisals are likely to occur." Slip Op. 12, No. 25-5975 (9th Cir. Apr. 1, 2026), Dkt. No. 82.1. As explained, this record does not support a determination of an objective and certainly impending likelihood that plaintiffs will be retaliated against in the future.

### B. First Amendment Merits.

On the merits, our stay motion explained (Mot. 11-12) that the district court's causation analysis rests on a flawed premise: that the officers who used crowd-control devices against plaintiffs necessarily acted with retaliatory intent because the devices were deployed in a manner the court deemed "excessive." Doc.155, at 20-21. But the fact that an officer may have used too much force under the circumstances

3

does not necessarily prove that the officer acted due to subjective antipathy to the First Amendment activity at issue. Plaintiffs do not acknowledge—much less attempt to address—this point, which is fatal to the court's analysis.

Even if excessive-force findings could substitute for the subjective-causation inquiry as a legal matter, the district court's particular findings would not help plaintiffs here. Plaintiffs simply reiterate (Opp'n 14-15) those findings—which the court entered without any supporting record citations—as if they were incontrovertible. Yet those findings were based on the wrong legal standard. Mot. 16-17 (explaining that the court's excessive-force analysis cannot be reconciled with *Puente v. City of Phoenix*, 123 F.4th 1035, 1062 (9th Cir. 2024)). The court even cited a Fourth Amendment case—notwithstanding plaintiffs' decision not to raise Fourth Amendment claims in their preliminary-injunction motion, Doc.155, at 18—to conclude that DHS officers used too much force under the First Amendment, Doc.155, at 21 (citing *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012)). Plaintiffs' opposition does not merely ignore the court's confusion; it cites the same case for the same wrong principle. Opp'n 21.

In any event, district court's findings cannot be sustained even on their own terms. As our stay motion explained, those findings are clearly erroneous because the court simply disregarded contradictory evidence indicating that, on multiple occasions, DHS deployed crowd-control devices only after protests had turned violent or disruptive. Mot. 3-4 (citing declarations describing incidents where protesters

assaulted federal officers, damaged federal property, attempted to storm the ICE facility, and barricaded the facility). Plaintiffs' opposition does not acknowledge these flaws. But the facts underlying each alleged incident of retaliation are critical to determining the propriety of DHS officers' actions. For example, to the extent plaintiffs were exposed to crowd-control devices while near violent or disruptive protesters, such exposure was most likely motivated not by retaliation but by officers' legitimate desire to protect federal personnel, federal property, and the public. After all, crowd-control devices such as tear gas are designed to disperse and may therefore impact not only violent protesters but peaceful protesters nearby. And the First Amendment does not immunize the public from the incidental effects of law-enforcement officers' efforts to restore order. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1134-35 (9th Cir. 2005); *accord Puente*, 123 F.4th at 1046-47, 1063-64 (rejecting First Amendment retaliation claim even where one plaintiff alleged that she was hit while peacefully recording).

The Court's *Los Angeles Press Club* decision does not demand a different result. The Court found "no clear error" in the district court's intent finding due to the court's "careful[] review[]" of "each" use-of-force "incident" and the court's "well-supported factual findings." *Los Angeles Press Club*, Slip Op. 14-15 (quotation marks omitted). The Court did not hold that the use of excessive force, standing alone, is always sufficient to infer retaliatory intent. Here, by contrast, the district court's findings were not accompanied by any record citations. And the findings reflect

significant legal errors respecting both the test for retaliatory intent and the test governing when crowd-control devices may be used to disperse crowds under the First Amendment.

### C. Equitable and Constitutional Limitations on District Court Authority.

The government's motion also showed that the injunction should independently be stayed because it is overbroad, untethered to plaintiffs' First Amendment claims, and unworkable. Plaintiffs have not persuasively rebutted any of these points.

**1.** The injunction is overbroad because it extends far beyond the named plaintiffs to protect anyone in the world who shows up at the Portland ICE facility. As the Supreme Court held in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and this Court recognized in *Los Angeles Press Club v. Noem*, No. 25-5975, Slip Op. 18-19, such relief goes well beyond the court's equitable and constitutional power.

Plaintiffs' opposition does not defend the district court's theory that the injunction's universal sweep is necessary to provide complete relief to plaintiffs. The opposition also does not defend the court's theory that the injunction is necessary to afford relief to a putative class. Plaintiffs rely (Opp'n 17-18) exclusively on the court's certification order. But because the lawfulness of every use of nonlethal force "hinge[s] on a wide array of facts and circumstances," "plaintiffs will face an uphill challenge in showing that common questions exist." *Black Lives Matter L.A. v. City of*

6

*Los Angeles*, 113 F.4th 1249, 1260 (9th Cir. 2024). To meet their burden, plaintiffs argue (Opp'n 17-18) that the class satisfies Rule 23's commonality requirement because DHS allegedly maintains an unwritten policy of retaliation. *But see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Yet plaintiffs have failed to show how "every [class member] has experienced the same challenged practice or suffered the same injury due to" that alleged policy. *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019). The breadth of the certified class—which includes (1) people who were affected by crowd-control devices at the ICE facility while behaving disruptively, (2) people who were affected by crowd-control devices at the facility while behaving peacefully, and (3) people who have never been to the facility at all—makes that showing all but impossible.

**2.** Plaintiffs have no persuasive defense of the injunction's substantive terms, which read like a use-of-force manual enforceable by contempt. Plaintiffs do not even attempt to connect those terms—which prohibit the use of crowd-control devices except in response to an imminent threat of physical harm—to any cognizable First Amendment doctrine. Nor could they, since the First Amendment clearly permits law-enforcement officers to disperse a crowd in response to "imminent lawlessness," including a threat of "'riot, disorder, [or] interference with traffic.'" *Puente*, 123 F.4th at 1062 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)); Mot. 16-17. Indeed, *Puente* rejected an identical First Amendment challenge to the use of crowd-control devices in similar circumstances. 123 F.4th at 1044-46, 1062-64.

And *Los Angeles Press Club* vacated a similar injunction in part because "exempt[ing] Plaintiffs [and non-parties] . . . from lawful, *non-retaliatory* dispersal orders is broader than necessary" to remedy alleged First Amendment retaliation. No. 25-5975, Slip Op. 19. Plaintiffs also do not defend the court's assertion of authority to redesign DHS officers' uniforms—a requirement that is likewise unmoored from the First Amendment.

Plaintiffs' sole argument (Opp'n 20) is that the injunction's restrictions on crowd-control devices are necessary to "remove the fear" that exposure to such devices allegedly instilled within them. But plaintiffs have not cited, and we are not aware of, any equitable principle requiring courts to grant whatever relief they deem necessary to assuage their subjective fears. To the contrary, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 854. The district court abused its discretion by prohibiting the use of crowd-control devices in circumstances far beyond what the First Amendment requires.

**3.** Finally, plaintiffs contend (Opp'n 20) that the injunction is workable based on three purported experts' policy opinions. But those opinions fail to grapple with the concerns articulated by DHS's declarants. Mot. 17-21. And plaintiffs ignore record evidence indicating that, at multiple protests at the ICE facility, violent and disruptive protesters often ignored verbal dispersal orders and warnings, leaving outnumbered officers with little choice but to deploy crowd-control devices to put an end to unrest. *See generally* Doc.116-1, at 3-9. Accepting plaintiffs' position would

8

mean that DHS officers could not use crowd-control devices even when thousands of protesters are attempting to breach the ICE facility, barricading its driveway to prevent entry and exit, and destroying government property. Officers' only recourse would be to invite the rioting crowd to behave lawfully before trying to arrest noncompliant protesters one by one. Doc.155, at 25. That conclusion is at odds with bedrock First Amendment principles and defies common sense.

The injunction compounds these problems by casting the district court as the overseer of DHS officers' day-to-day law-enforcement activities, in defiance of the separation of powers. Mot. 19-20. Plaintiffs dismiss (Opp'n 22) that constitutional defect by asserting that "the function of courts is to protect First Amendment rights," notwithstanding Supreme Court precedent establishing that it is *not* the function of Article III courts to "exercise general legal oversight of the . . . Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Plaintiffs also characterize (Opp'n 22) these concerns as "hypothetical." But even the threat of potential contempt impermissibly burdens officers—particularly because the injunction is so broad as to permit anyone exposed to crowd-control devices at the ICE facility to pursue a contempt action, yet so vague as to leave officers guessing as to how the court might interpret its terms. Mot. 20-21; *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one.").

9

## II. The Remaining Stay Factors Decisively Favor The Government.

As our stay motion established, Mot. 21, the injunction irreparably harms the government because it "impermissibly infringes on separation of powers principles" by "effectively establish[ing] the district court as the supervisor of all Executive Branch activity" near the ICE facility. *Chicago Headline Club v. Noem*, 168 F.4th 1033, 1040 (7th Cir. 2026) (per curiam); *accord CASA*, 606 U.S. at 859. The injunction also endangers federal officers, federal property, and the public by restricting officers' ability to respond to the violent or disruptive protests that have continued to occur at the facility. Press Release, City of Portland, *PPB Helps Facilitate Safe Free Speech Gathering and March; Arrests Made at South Waterfront* (Mar. 29, 2026), https://perma.cc/2447-3FZB (describing a protest on March 28, 2026, which local authorities eventually declared an unlawful assembly, where protesters "engaged in criminal activity," vandalized the facility, damaged the facility's front gate, and threw "large rocks" at officers).

Plaintiffs do not acknowledge the first of these harms at all. And plaintiffs attempt to downplay the second, Opp'n 8-9, by quoting an out-of-context excerpt from the testimony of the Director of Federal Protective Service Region 10 regarding the district court's temporary restraining order (TRO). The Director opined that, based on "the current level of activity"—defined as limited to graffiti and "attempts to take down plywood covering the [ICE facility] windows"—"it's safe to comply" with the TRO. Hr'g Ex. 25, at 233-34. But the Director explained that, if "the level

10

of activity changes," whether "it would be possible to safely comply with the [TRO]" "would depend on what type of . . . illegal activity or violence was committed." *Id.* at 234-35. Far from conceding that the injunction is workable, the Director's testimony only underscores the danger of limiting DHS officers' ability to respond to dynamic situations involving violent or disruptive conduct. Plaintiffs' asserted injuries, which are insufficient even to support standing, carry comparatively little weight.

### III. The Court Should Stay District Court Proceedings Until The Government's Appeal Is Resolved.

Finally, the Court should stay district court proceedings until the government's appeal is resolved. Plaintiffs do not deny that the court is about to embark upon a discovery expedition that would impose extraordinary burdens on DHS. Nor do plaintiffs deny that judicial economy would be maximized by deferring discovery until this Court offers guidance on their dubious legal theories, not least their theory of standing—which raises the question whether their lawsuit may proceed at all. Plaintiffs' only response (Opp'n 23) is that a stay is unwarranted because they would like to pursue claims not raised in their preliminary-injunction motion. Doc.155, at 18 (listing six additional claims). But those claims arise from the same facts and challenge the same conduct as plaintiffs' First Amendment retaliation claims. For example, alleged retaliation forms the basis, at least in part, of plaintiffs' claims under the Administrative Procedure Act and the Declaratory Judgment Act. And plaintiffs' due-process claim adds nothing given the existence of specific constitutional

11

standards governing the lawfulness of DHS's actions. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Accordingly, proceedings below should be stayed notwithstanding plaintiffs' overlapping (and in some cases redundant) claims.

## CONCLUSION

For these reasons and the reasons set forth in the government's stay motion, the preliminary injunction should be stayed pending appeal. The Court should also stay district court proceedings pending resolution of the government's appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
DOUGLAS C. DREIER

/s/ Brenna Scully
BRENNA SCULLY
*Attorneys, Appellate Staff*
*Civil Division, Room 7211*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 880-6114*
*brenna.scully@usdoj.gov*

April 2026

12

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(1)(d) and 32-3 because it contains 2,786 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Brenna Scully*
BRENNA SCULLY