No. 26-1609

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JACK DICKINSON, *also known as the Portland Chicken*; LAURIE ECKMAN;
RICHARD ECKMAN; HUGO RIOS; MASON LAKE,
*on behalf of themselves and those similarly situated*,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *President of the United States, in his official capacity*;
MARKWAYNE MULLIN, *Secretary, U.S. Department of Homeland Security (DHS), in his
official capacity*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Oregon

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney
  General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
DOUGLAS C. DREIER
BRENNA SCULLY
  *Attorneys, Appellate Staff
  Civil Division, Room 7211
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 880-6114*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF JURISDICTION ................................................................. 3

STATEMENT OF THE ISSUES ..................................................................... 3

STATEMENT OF THE CASE ......................................................................... 4

      I.     Statutory Background ................................................................ 4

      II.    Factual Background .................................................................. 7

      III.   Prior Proceedings .................................................................. 12

SUMMARY OF ARGUMENT ...................................................................... 14

STANDARD OF REVIEW ............................................................................ 17

ARGUMENT .................................................................................................. 17

      I.     Plaintiffs Have Failed to Establish Any of the Preliminary
           Injunction Factors. .................................................................. 17

           A.     Plaintiffs Are Unlikely to Prevail on Their First
                  Amendment Claims Because They Lack Standing to Seek
                  Prospective Relief. ........................................................ 18

           B.     Even If Plaintiffs Had Standing, They Are Unlikely to
                  Prevail on the Merits of Their First Amendment Claim ............... 25

           C.     The Injunction Is Overbroad and Unworkable. ............................ 29

           D.     The Remaining Equitable Factors Decisively Favor the
                    Government. .................................................................. 39

      II.    The Class Certification Order Is Improper ................................. 40

CONCLUSION ............................................................................................... 47

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                 **Page(s)**

*AARP v. Trump*,
605 U.S. 91 (2025) (per curiam) .................................................................. 32

*Ahmad v. City of St. Louis*,
995 F.3d 635 (8th Cir. 2021) ....................................................................... 46

*Barnes v. Felix*,
605 U.S. 73 (2025) ....................................................................................... 38

*Black Lives Matter L.A. v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024) ..................................................... 32, 42, 44

*Boardman v. Pacific Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ..................................................................... 39

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) ..................................................................................... 34

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ....................................................................... 39

*Chicago Headline Club v. Noem*,
168 F.4th 1033 (7th Cir. 2026) (per curiam) ......................................... 1, 20

*Chicago Headline Club v. Noem*,
No. 25-3023, 2025 U.S. App. LEXIS 34532 (7th Cir. Nov. 19, 2025) .............. 1, 35

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ............................................................. 15, 18, 19, 22, 23

*Civil Rts. Educ. & Enf't Ctr. v. Hospitality Props. Tr.*,
867 F.3d 1093 (9th Cir. 2017) ................................................................. 44-45

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ......................................................................... 18, 21, 22

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) ....................................................................................... 34

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ....................................................................... 24

*Farley v. Lincoln Benefit Life Co.*,
    150 F.4th 1197 (9th Cir. 2025) ...................................... 45-46

*Felarca v. Birgeneau*,
    891 F.3d 809 (9th Cir. 2018) ............................................ 26

*General Tel. Co. v. Falcon*,
    457 U.S. 147 (1982) .......................................................... 41

*Graham v. Connor*,
    490 U.S. 386 (1989) .......................................................... 38

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) (en banc) ...................... 39

*Index Newspapers LLC v. U.S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) .................................... 24, 28

*Laird v. Tatum*,
    408 U.S. 1 (1972) .............................................................. 21

*Lewis v. Casey*,
    518 U.S. 343 (1996) .......................................................... 21

*Los Angeles Press Club v. Noem*,
    799 F. Supp. 3d 1036 (C.D. Cal. 2025) ........................ 30

*Los Angeles Press Club v. Noem*, --- F.4th ----,
    No. 25-5975, 2026 WL 889142 (9th Cir. Apr. 1, 2026) .............. 1, 24, 25, 28, 30, 33

*Los Angeles Press Club v. Noem*,
    No. 25-5975, 2025 U.S. App. LEXIS 33133 (9th Cir. Dec. 18, 2025) ............. 29, 30

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .................................... 23, 40

*Michigan Dep't of State Police v. Sitz*,
    496 U.S. 444 (1990) .......................................................... 38

*Missouri v. Biden*,
    83 F.4th 350 (5th Cir. 2023) (per curiam) .................... 22

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ...................................................... 21, 22

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.,*
  926 F.3d 528 (9th Cir. 2019) ........................................................ 40

*Nelson v. City of Davis,*
  685 F.3d 867 (9th Cir. 2012) ................................................ 26, 34

*Nieves v. Bartlett,*
  587 U.S. 391 (2019) ...................................................................... 25

*Noem v. Vasquez Perdomo,*
  146 S. Ct. 1 (2025) ................................................................. 18, 23

*Norbert v. City & County of San Francisco,*
  10 F.4th 918 (9th Cir. 2021) ....................................................... 17

*North Carolina v. Covington,*
  581 U.S. 486 (2017) (per curiam) .............................................. 35

*O'Connor v. Uber Techs., Inc.,*
  904 F.3d 1087 (9th Cir. 2018) .................................................... 17

*Paige v. California,*
  102 F.3d 1035 (9th Cir. 1996) .................................................... 40

*Parsons v. Ryan,*
  754 F.3d 657 (9th Cir. 2014) ...................................................... 42

*Phillips v. U.S. Customs & Border Prot.,*
  74 F.4th 986 (9th Cir. 2023) ....................................................... 21

*Puente v. City of Phoenix,*
  123 F.4th 1035 (9th Cir. 2024) ............................ 2, 15, 24, 25, 26, 27, 28, 31, 32, 34

*Rizzo v. Goode,*
  423 U.S. 362 (1976) ............................................................... 21, 38

*Ryburn v. Huff,*
  565 U.S. 469 (2012) (per curiam) .............................................. 37

*Tincher v. Noem,*
  164 F.4th 1097 (8th Cir. 2026) (per curiam) ..................... 1, 32, 38, 43

*Torres v. Madrid,*
  592 U.S. 306 (2021) ...................................................................... 25

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ................................................................ 2, 37

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ................................................ 2, 16, 29, 30, 32

*Updike v. Multnomah County,*
  870 F.3d 939 (9th Cir. 2017) ....................................................... 18

*Virginia House of Delegates v. Bethune-Hill,*
  587 U.S. 658 (2019) .................................................................... 19

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) .................................................. 31, 41, 43, 45, 47

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) .................................................................... 30

*Willis v. City of Seattle,*
  943 F.3d 882 (9th Cir. 2019) ....................................................... 42

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ....................................................................... 17

*Zorn v. Linton,*
  146 S. Ct. 926 (2026) (per curiam) .............................................. 34

**Statutes:**

6 U.S.C. § 202 ............................................................................. 4

6 U.S.C. § 211 ............................................................................. 4

6 U.S.C. § 252 ............................................................................. 4

8 U.S.C. § 1103 ........................................................................... 4

8 U.S.C. § 1357 ........................................................................... 4

19 U.S.C. § 1589a ........................................................................ 4

28 U.S.C. § 1292 ......................................................................... 3

28 U.S.C. § 1331 ......................................................................... 3

40 U.S.C. § 1315 .................................................................... 4, 5, 6

**Rules:**

Fed. R. App. P. 4 ........................................................................ 3

vii

Fed. R. Civ. P. 23 ........................................................ 2, 3, 16, 31, 32, 40, 42, 43, 45, 46

## INTRODUCTION

Beginning in 2025, the Department of Homeland Security (DHS) has endured a significant increase in violent, disruptive, or otherwise unlawful protests targeting its immigration-enforcement operations and specifically targeting an Immigration and Customs Enforcement (ICE) facility in Portland, Oregon. DHS officers sometimes responded by deploying nonlethal crowd-control devices such as pepper spray and tear gas. The district court subsequently entered a preliminary injunction as a remedy for First Amendment retaliation claims brought by a handful of individual plaintiffs. That injunction effectively prohibits DHS officers from using such devices in response to obstructive or otherwise unlawful protests at a particular governmental facility. This overbroad, programmatic, and essentially universal injunction is untethered from the First Amendment and should be vacated by this Court. *See, e.g.,* *Los Angeles Press Club v. Noem*, --- F.4th ----, No. 25-5975, 2026 WL 889142, at *7 (9th Cir. Apr. 1, 2026) (vacating injunction); *Chicago Headline Club v. Noem*, 168 F.4th 1033, 1042 (7th Cir. 2026) (per curiam) (same); *Tincher v. Noem*, 164 F.4th 1097, 1099-100 (8th Cir. 2026) (per curiam) (staying injunction); *Chicago Headline Club v. Noem*, No. 25-3023, 2025 U.S. App. LEXIS 34532, at *4-6 (7th Cir. Nov. 19, 2025) (same).

Plaintiffs in this case—two journalists and three protesters—allege that, at a handful of protests at an ICE facility in Portland, Oregon, certain DHS officers targeted them with crowd-control devices in retaliation for their First Amendment activity. The district court declined to look at evidence showing this occurred during

1

disruptive and violent protests and entered a sweeping preliminary injunction that effectively prohibits the use of common crowd-control devices to disperse violent or disruptive crowds at the facility. The injunction applies even when such crowds are blockading the facility and attacking federal property. The injunction separately requires the government to consult with plaintiffs on how to alter officers' helmets and uniforms so each officer can be identified at a distance.

This extraordinary injunction should be vacated. The government is likely to prevail on the merits because plaintiffs lack standing and have failed to demonstrate subjective retaliatory intent by DHS. Moreover, the injunction exceeds the district court's authority. The injunction improperly provides relief to countless nonparties inconsistent with *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025), and the flawed and uncarefully issued class certification does not cure that defect, as plaintiffs failed to demonstrate commonality or indivisible remedy. *Contra* Fed. R. Civ. P. 23(a)(2), (b)(2). The injunction's provisions lack any basis in the First Amendment, which permits officers to use "tear gas, other chemical irritants," and similar devices to disperse a violent or disruptive crowd, actions the injunction prohibits. *Puente v. City of Phoenix*, 123 F.4th 1035, 1042, 1062-63 (9th Cir. 2024). And the injunction is unworkable and offends the separation of powers because it operates as a detailed law-enforcement manual, enforceable by contempt, that transforms the district court into a "roving commission" "exercis[ing] general legal oversight of the … Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).

2

The equities decisively favor the government as well. Plaintiffs fail to demonstrate irreparable harm in the absence of an injunction. Their asserted harms are too speculative even to support standing. On the other side of the ledger, the injunction irreparably injures the government and the public by impairing officers' ability to control protests that have turned violent or unlawful. The government respectfully requests this Court to vacate the district court's injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. 2-ER-190. As explained below, however, plaintiffs lack standing to seek prospective injunctive relief. *Infra* pp. 18-25. On March 17, 2026, the government timely appealed the district court's injunction. 2-ER-229; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether plaintiffs have standing to seek prospective relief based on discrete incidents by individual actors occurring over the course of several months.

Whether the First Amendment entitles plaintiffs to a preliminary injunction that effectively prohibits the use of common crowd-control devices to disperse violent or disruptive crowds at a governmental facility.

Whether the class-wide preliminary injunction is improper, unworkable, overbroad, and inconsistent with Federal Rule of Civil Procedure 23.

3

## STATEMENT OF THE CASE

### I. Statutory Background

As relevant here, DHS's mission in Portland encompasses two main components: the enforcement of federal immigration laws and the protection of federal property and personnel.

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Customs and Border Protection (CBP), a component within DHS, is charged with "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8). ICE, another component within DHS, is charged with enforcing and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See, e.g.*, *id.* §§ 202, 252(a)(3). CBP and ICE officers have criminal and civil arrest authority. *See, e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a. Both CBP and ICE have law enforcement authority that extend beyond the borders of federal properties. *See, e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a.

Congress has also charged the Secretary of Homeland Security with "protect[ing] the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government … and the persons on the property." 40 U.S.C. § 1315(a). To fulfill this responsibility, the Secretary has designated DHS employees for "duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the

4

property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1). These officers—including officers of the Federal Protective Service (FPS), a component within DHS—possess a wide range of law-enforcement powers. For example, they can "enforce Federal laws and regulations for the protection of persons and property," *id.* § 1315(b)(2)(A), "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property," *id.* § 1315(b)(2)(E), and "carry out such other activities for the promotion of homeland security as the Secretary may prescribe," *id.* § 1315(b)(2)(F).

DHS policies expressly forbid officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." 2-ER-144; *see* 2-ER-122. DHS policy permits officers to "use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the [law-enforcement officer] at the time force is applied." Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. DHS, to Agency Leaders 2 (Feb. 6, 2023), https://perma.cc/K996-RNFR (DHS Policy) (emphasis omitted). The general principle underlying DHS's use of force policy is "respect for human life and the communities … serve[d]." DHS Policy 3. DHS policy recognizes that "there may be a range of responses that are reasonable and appropriate under a particular set of circumstances." DHS Policy 2. DHS officers are instructed "to employ tactics and techniques that effectively bring an incident under control while promoting the safety

5

of [officers] and the public, and that minimize the risk of unintended injury or serious property damage." DHS Policy 3. Officers "do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat." *Id.*

DHS policy authorizes officers to deploy several types of nonlethal chemical irritants. DHS Policy 6, 12. Commonly known as pepper spray, oleoresin capsicum (OC) is "an oil-based irritant derived from chili peppers." 2-ER-122. OC can reach up to 20 feet when dispersed in an aerosolized format and up to six feet when released as dust from breakable pepper balls. 2-ER-123. OC may also be deployed in a hand-thrown grenade. 2-ER-123. A synthetic version of OC, pelargonic acid, can reach up to 15 feet from where deployed and 300 feet from a compressed air launcher or pepper ball launching system. 2-ER-122 n.1; 2-ER-122-23. Commonly referred to as tear gas, chlorobenzylidene malononitrile (CS) is also authorized by CBP and ICE, *see* 2-ER-135, but not by FPS, 2-ER-122-23. Federal officers may also use "[s]tinger" munitions, which may contain more than one of those agents. *See* 2-ER-135.

Chemical irritants "are an important de-escalation tool for law enforcement." 2-ER-141. "They permit [officers] to successfully disperse certain violent, hostile, or obstructive crowds" and "enable [officers] to safely mitigate these volatile situations without resorting to the use of further physical force or deadly force." 2-ER-141. Chemical irritants help officers "avoid having to resort to physical confrontation with protesters with hard techniques such as hands-on, batons, tasers[,] or other weapons."

6

2-ER-123. This "results in fewer injuries to suspects, violent protestors, and officers," and it "enables [officers] to control large violent crowds with a small number of officers." 2-ER-123.

## II. Factual Background

This case arises from protests targeting DHS's operations in Portland, Oregon. Between June 2025 and February 2026, at least 150 such protests occurred at the ICE facility in Portland. 1-ER-11. The federal response to these near daily protests is referred to as "Operation Skip Jack." 1-ER-11. Although "many" protests "remained peaceful," others turned "violent." 2-ER-121-22. When "the character of the protests changed and presented a threat to the safety and security of federal property and personnel," DHS officers were required "to take action to address potentially harmful situations." 2-ER-122.

Plaintiffs are Jack Dickinson, Laurie Eckman, Richard Eckman, Mason Lake, and Hugo Rios. They allege that, at a handful of protests, DHS officers targeted them with crowd-control devices in retaliation for exercising their First Amendment rights. 1-ER-23. Declarations by supervisory DHS officials and related use-of-force reports indicate that, at those protests, officers were consistently confronted with violent, disruptive, or otherwise unlawful behavior.

For instance, on September 1, 2025, protesters arrived at the ICE facility carrying "bats, improvised weapons, [and] shields," and they blocked the entrance and exit of the facility despite multiple warnings to clear the path. 2-ER-125. Pepper balls

7

were deployed after certain protesters removed three wooden boards from the fence at the facility. 3-ER-288. Later that night, protesters placed a prop guillotine in front of the facility, blocking the driveway. 3-ER-288. Although blocking the ICE facility's driveway is illegal, the federal government cannot count on the Oregon State Police or Portland Police Bureau to fulfill their ordinary law-enforcement duties. *See, e.g.*, 2-ER-56-60. That is because there are "sanctuary laws in the Oregon Revised Statute and also the City of Portland that prohibit [them] from facilitating immigration-related activity or enforcement." 2-ER-56. As a result of those laws—or at least the way the Oregon State Police and Portland Police Bureau interpret them—neither state nor local law enforcement generally assisted. 2-ER-56-60.

In response to protesters blocking the driveway, pepper balls were again deployed. 3-ER-288. During that night, after 10 p.m., plaintiff Hugo Rios was filming the protests by the driveway to the ICE facility. 2-ER-67-68. While filming, he "heard some automated [long range acoustic device] announcements that [he] heard every time [he] was there warning that they might deploy gas and talking about how trespassing was illegal and things like that." 2-ER-68. When DHS employed pepper balls to clear the crowd, Mr. Rios was hit. 2-ER-70. Mr. Rios walked away, 2-ER-71, and he testified that he has no intention of returning to the ICE facility, 2-ER-72.

On September 13, protesters again obstructed the driveway to the facility. 3-ER-268-69. DHS ordered them to disperse, but they refused. 2-ER-125-26. ICE

8

deployed a pepper ball toward the ground to disperse the group.  2-ER-125-26.

About 90 minutes later, after additional warnings were ignored, ICE again deployed

pepper ball rounds to clear trespassers from the driveway.  2-ER-126.  When FPS

officers pushed out of the gate in line formation to clear the driveway and arrest a

protester who had started a fire on the driveway, "multiple demonstrators surrounded

them," "pushed the officers," and "attempted to seize their shields."  2-ER-126.  One

protester held an object that resembled a katana sword.  3-ER-270.  After multiple

warnings, DHS deployed pepper balls and tear gas.  3-ER-270.  Plaintiff Mason Lake

was at the protest and was exposed to OC spray.  2-ER-80.

On October 4, protesters again trespassed on federal property and refused to

depart despite multiple dispersal orders.  2-ER-126.  An individual shoved an officer

and "threw a large, heavy object, striking the officer's upper body."  2-ER-126.  One

individual grabbed an officer by the penis and would not let go and also attempted to

bite the officer's groin area.  2-ER-101.  Officers used pepper balls and tear gas to

disperse protesters.  2-ER-102.  Plaintiffs Laurie and Richard Eckman were at the

protest, 2-ER-61, and Mrs. Eckman was struck by a pepper ball, 2-ER-62.

On October 18, protesters again blocked the driveway and were "aggressive

and hostile, shining strobe lights directly at the [officers] to impair their vision and

coordination."  2-ER-138.  Plaintiff Jack Dickinson, who is known as the Portland

Chicken because he wears a chicken suit to protests at the facility, was at the protest.

2-ER-177; 2-ER-74; 2-ER-76.  Mr. Dickinson confirmed that "part of the tactics" he

9

and others were using was to block the ICE facility's driveway and only slowly, if at all, "meander" out of the way, with one individual dressed in a sloth costume to underscore the point. 2-ER-77-78. Mr. Dickinson and others would refuse to comply with lawful instructions to clear the driveway. *See* 2-ER-79.

As the day progressed, "[t]he crowd was becoming more agitated leading up to … [them] throwing and kicking heavy cans … at officers." 2-ER-112-13. Officers attempted to apprehend an individual who had thrown a canister at another officer earlier in the day, but the crowd surrounded the officers. 2-ER-112-13. Law enforcement deployed smoke canisters, and protesters threw them back at officers. 2-ER-113. Officers then deployed tear gas. 2-ER-113.

On January 19, Mr. Dickinson and approximately 20 others trespassed on the ICE facility's driveway to block the entrance/egress. 2-ER-178-79; 2-ER-127. After the trespassers failed to heed warnings to depart, 2-ER-178, FPS officers deployed pepper balls and OC spray, but the trespassers refused to depart. 2-ER-127; *see* 3-ER-275. Four trespassers, including Mr. Dickinson, were taken into custody for failure to comply and trespassing. 2-ER-127; 2-ER-179-80.

On January 24, hundreds of protesters flooded the ICE facility's vehicle entrance and began pounding on the building entry points. 2-ER-127. They attempted to penetrate the building. 2-ER-127. After FPS issued multiple warnings that were ignored, FPS deployed pepper ball to disperse the crowds. 2-ER-127. But less than 80 minutes later, the protesters had created additional barricades with

10

scooters and began moving toward the gate. 2-ER-127. FPS used pepper balls and CBP used tear gas to push the protesters back. 2-ER-127. Protesters subsequently began to tamper with the facility's security cameras with rakes and rocks, which caused FPS to deploy further pepper balls and flash bangs. 2-ER-127; *see* 3-ER-279. Mr. Dickinson attended that protest as well. 2-ER-180.

On January 25, trespassers again blocked the ICE facility driveway. 2-ER-127. FPS issued warnings to vacate, but certain trespassers refused to comply. 2-ER-127. Four protesters were detained, and the remaining protesters were dispersed by pepper balls and CS gas. 2-ER-127. Mr. Dickinson likewise briefly attended that protest. 2-ER-182.

On January 31, thousands of protesters gathered outside the ICE facility. 2-ER-127; *see also* 2-ER-175 (Mr. Dickinson calling this "the largest protest of its kind or in this area"). Ten to 15 trespassers "entered the property and began banging on the guard shack and attempted to barricade the door and tear[] plywood off the guard shack." 2-ER-127-28. After warnings were issued to disperse, multiple trespassers produced umbrellas and formed a shield wall. 2-ER-128. Others ran to the vehicle gate with ropes, appearing to attempt to tie the gate shut. 2-ER-128. Federal officers deployed a taser and gas toward protesters who were destroying the guard shack. 2-ER-128. Protesters were throwing rocks or other hard objects at law enforcement officers and at cameras on the building. 2-ER-128. "[P]rotesters moved a dumpster toward the front gate, and a security guard observed protesters again prying plywood

11

from the guard shack." 2-ER-128. Officers again used crowd control devices to attempt to disperse the crowd and prevent further injury to federal property. 2-ER-128. The Eckmans were at the protest and were exposed to tear gas. 2-ER-64-65.

On February 1, approximately 100 trespassers crossed into the ICE facility's driveway. 2-ER-128. They used "wooden pallets and other debris to block the doors of the facility." 2-ER-128. Despite multiple warnings to disperse, the trespassers remained. 2-ER-128. "At approximately 6:40 p.m., protesters were banging on the front door of the building and trying to break the front gate by rocking it." 2-ER-128-29. "At approximately 6:48 p.m., protesters threw a smoke canister onto the roof of the facility," which "created a fire on the ICE facility's roof" that had to be quickly contained. 2-ER-129. In addition to detaining certain protesters, officers deployed pepper spray in their efforts to disperse the crowd. 2-ER-128-29.

## III. Prior Proceedings

This action was filed by five plaintiffs (Jack Dickinson, Laurie Eckman, Richard Eckman, Mason Lake, and Hugo Rios) on November 21, 2025. They allege that DHS officers targeted them with crowd-control devices in retaliation for exercising their First Amendment rights. 1-ER-23. On February 3, the district court entered a temporary restraining order severely restricting DHS officers' ability to use crowd-control devices at the ICE facility. 2-ER-169-71. On February 17, the court extended the temporary restraining order by two weeks. 2-ER-149.

12

After extensive discovery, the district court conducted a three-day evidentiary hearing and eventually issued a preliminary injunction. 1-ER-8-10. The preliminary injunction categorically prohibits DHS and its "agents and employees" from "direct[ing] or us[ing] chemical or projectile munitions, including but not limited to … pepper ball or paintball guns, tear gas or other chemical irritants, … and flashbang … grenades, unless the specific target of such a weapon or device poses an imminent threat of physical harm." 1-ER-3. Additionally, the injunction categorically prohibits DHS officers from firing any such devices "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person." 1-ER-3. Finally, the injunction sets forth special instructions governing the use of pepper spray and similar devices (which the injunction distinguishes from "chemical irritants"). DHS officers may not use "pepper spray … unless the specific target … exhibits, at a minimum, active resistance," defined to exclude "trespassing, refusing to move, refusing to obey an order to disperse, and 'going limp.'" 1-ER-3-4. The injunction also bans the use of pepper spray "against groups of people where bystanders foreseeably would be affected." 1-ER-4. Pepper spray may only be "used against specific individuals actively engaged in violent unlawful conduct, actively resisting arrest, or as reasonably necessary in a defensive capacity." 1-ER-4.

The preliminary injunction further requires the parties to "confer regarding how" DHS officers "can place conspicuous and unique identifying markings … on the uniforms, vests, and/or helmets" of the agents deployed to the Portland ICE

13

facility. 1-ER-4. "If the parties cannot reach agreement," the district court will itself decide how to redesign DHS officers' uniforms and will modify the preliminary injunction "appropriately." 1-ER-4-5.

The same day that the injunction issued, the district court certified a class (which the court called "provisional") of "[a]ll people who, since [June 2025], have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." 1-ER-41 (quotation marks omitted). The injunction covers all individuals who happen to be "in the vicinity of" the Portland ICE facility, regardless of whether an individual is a member of the class or not. 1-ER-3.

The district court denied the government's motion to stay the injunction pending appeal. 1-ER-38. This appeal followed. The government moved for a stay of the injunction pending appeal, an administrative stay, and a stay of district court proceedings pending appeal. A divided panel of this Court entered an administrative stay. The government's stay motion, which was argued on April 7, 2026, remains pending.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction, issued in response to five individual plaintiffs' claims of First Amendment retaliation, functions like a detailed law-enforcement operations manual and micromanages how DHS agents respond to violent, disruptive, and otherwise unlawful protests. But these plaintiffs have no standing to seek that sort of structural injunction. Nor can the detailed strictures of

14

the injunction be reasonably drawn from the First Amendment. And, if nothing else, the injunction is both untenably overbroad and dangerously unworkable. For all these reasons, this Court should vacate it.

At the threshold, plaintiffs lack standing to seek prospective injunctive relief. The district court's standing analysis hinges on its findings that, on a handful of occasions spanning several months in 2025 and 2026, DHS officers intentionally targeted plaintiffs with crowd-control devices in retaliation for plaintiffs' First Amendment activity. Those findings were clearly erroneous because the court ignored an obvious alternative explanation for plaintiffs' past injuries—namely, that they resulted from officers' nonretaliatory attempts to control violent or unlawful protests. But plaintiffs would lack standing even accepting the district court's findings because, as the Supreme Court held in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), plaintiffs cannot establish standing based on incidents that occurred in the past and that plaintiffs can only speculate may recur in the future.

The injunction is also groundless on the merits for three reasons. First, as this Court explained in *Puente v. City of Phoenix*, 123 F.4th 1035, 1063 (9th Cir. 2024), claims of First Amendment retaliation, which focus on subjective causation, are a poor fit for the crowd-control context and raise particularly difficult causation questions. Second, the district court's analysis of retaliatory intent is flawed because it used the wrong test for excessive force and erroneously equated excessive force with subjective retaliatory intent without acknowledging other pertinent facts and circumstances. Third, even if

15

plaintiffs could demonstrate that individual officers acted with excessive force, the record does not support an inference of retaliation on the part of DHS.

Even if plaintiffs were entitled to some form of injunctive relief, such relief must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). But this injunction covers every DHS officer in the vicinity of the ICE facility in Portland, and it prevents officers from engaging in certain conduct for reasons unrelated to the First Amendment retaliation claim that plaintiffs brought. The injunction imposes a host of unworkable restrictions on federal officers' ability to control violent or unlawful protests.

The district court's flouting of *CASA* cannot be excused by its provisional certification of an ill-defined class of "[a]ll people who … have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." 1-ER-53 (quotation marks omitted). The provisionally certified class violates Federal Rule of Civil Procedure 23(a)(2)'s commonality requirement, violates 23(b)(2)'s indivisible remedy requirement, and is an impermissible attempt to circumvent *CASA*. Moreover, the injunction is not even limited to members of the hopelessly broad class. The court abused its discretion by entering an injunction that far exceeds the constitutional and equitable limits on the court's authority.

The remaining equitable factors likewise favor the government. The injunction significantly impedes officers' ability to control violent or unlawful protests and

16

unacceptably increases the risk of serious injury both to the officers and to the public. On the other side of the ledger, plaintiffs' alleged harms are insufficient even to support their standing to obtain injunctive relief, much less outweigh the harms engendered by the injunction's interference with federal officers attempting to protect themselves and the public from rioters.

## STANDARD OF REVIEW

This Court "review[s] an order regarding preliminary injunctive relief for abuse of discretion, but review[s] any underlying issues of law de novo." *Norbert v. City & County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (quotation marks omitted). The Court "review[s] a class certification determination for legal error under a de novo standard, and if no legal error occurred, … will proceed to review the decision for abuse of discretion." *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018) (quotation marks omitted).

## ARGUMENT

### I.  Plaintiffs Have Failed to Establish Any of the Preliminary Injunction Factors.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The district court's injunction should be vacated because plaintiffs have failed to satisfy any of these factors. Plaintiffs not only lack standing to seek prospective injunctive relief based on their alleged past injuries, their First Amendment claims are also likely to fail on the merits. Nor do the injunction's expansive terms—which impose intrusive universal restrictions on DHS agents' ability to respond to violent riots—bear any reasonable relation to plaintiffs' First Amendment claims. Finally, the injunction is both untenably overbroad and dangerously unworkable.

### A. Plaintiffs Are Unlikely to Prevail on Their First Amendment Claims Because They Lack Standing to Seek Prospective Relief.

At the threshold, plaintiffs lack standing to seek prospective injunctive relief based on allegations that individual officers retaliated against them for their First Amendment activities in the past. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Such standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring in the grant of the application for stay) (citing *Lyons*, 461 U.S. 95). Plaintiffs must instead demonstrate a "real and immediate threat of repeated injury," *Updike v. Multnomah County*, 870 F.3d 939, 947 (9th Cir. 2017) (quotation marks omitted), and may not rely on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). And that means they must show a real and immediate threat of future retaliation that violates the First Amendment, not just the future use of crowd control devices at protests.

18

*Lyons* illustrates these principles. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. *Lyons*, 461 U.S. at 97-98. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part"—even though the police department allegedly had a policy of "routinely apply[ing] chokeholds" in such situations. *Id.* at 105.

*Lyons* forecloses plaintiffs' standing here.[1] The district court erroneously concluded that plaintiffs have standing because, at a few previous protests at the ICE facility, DHS officers allegedly targeted the named plaintiffs with crowd-control devices in retaliation for exercising their First Amendment rights. 1-ER-23; *see* 1-ER-11-13 (describing four instances of alleged retaliation against Jack Dickinson); 1-ER-13-14 (describing one instance against Richard Eckman and Laurie Eckman); 1-ER-14 (describing three instances against Mason Lake); 1-ER-14-15 (describing one instance against Hugo Rios). Those findings—which were not accompanied by any record citations, and which disregarded DHS's declarations and incident reports providing a

---

[1] According to the district court, the government failed to challenge the standing of two of the five named plaintiffs. 1-ER-21. That is incorrect, as the government's opposition to plaintiffs' motion makes clear. 2-ER-115-19; *see also* 2-ER-173 (merely stating that "at this stage"—*i.e.*, during the rushed temporary restraining order hearing—the government was not challenging two plaintiffs' standing). In any event, "standing to litigate cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662-63 (2019).

fuller description of some of the protests in question, *see supra* pp. 7-12—were clearly erroneous. *Cf. Chicago Headline Club v. Noem*, 168 F.4th 1033, 1040 (7th Cir. 2026) (per curiam) (vacating similar preliminary injunction while expressing concern that the district court "tilted all the testimonial evidence … in the plaintiffs' favor" by finding "the government's witnesses categorically not credible").

As described above, *supra* pp. 7-12, in response to the unrest outside Portland's ICE facility, DHS officers sometimes responded with nonlethal crowd-control devices. 2-ER-122-28. These devices enable officers to avoid "physical confrontation with protesters" that could endanger everyone involved. 2-ER-123. They also allow "a small number of officers" "to control large violent crowds." 2-ER-123. In DHS's experience, their use "results in fewer injuries to suspects, violent protestors, and officers." 2-ER-123. Most of the time, officers did not intervene with the protesters; indeed, by plaintiffs' own acknowledgment, at least two-thirds of the time, DHS officers did not intervene. 2-ER-77. The protests where crowd-control devices were used each involved violent, disruptive, or otherwise unlawful activity. *See supra* pp. 7-12. Peaceful protesters do not throw heavy objects at officers or attempt to bite their groins. Protesters complying with the law do not trespass on federal property or refuse to leave after being instructed. DHS's use of force was generally authorized under DHS policy. *See* DHS Policy 2-3, 6, 12. To the extent particular officers may have exceeded the bounds of DHS policy on particular occasions, investigations into officer conduct have ensued. *See, e.g.*, 2-ER-82; 3-ER-258-61. But at the very least,

20

potential violations of the use-of-force policy do not become First Amendment violations merely because they occur against protesters.

Even accepting the district court's findings, the court's past-is-prologue theory of standing is irreconcilable with *Lyons*. Article III's "actual-injury requirement would hardly serve [its] purpose" if a handful of allegations of past injury could permit "imposition of systemwide relief." *Lewis v. Casey*, 518 U.S. 343, 357, 359 (1996); *accord Rizzo v. Goode*, 423 U.S. 362, 373 (1976) (denying injunctive relief where the district court found 20 constitutional violations by police officers "occurring at large in a city of three million inhabitants").

To avoid *Lyons*, the district court recharacterized plaintiffs' asserted injuries in terms of a "First Amendment chill." 1-ER-21. But plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," including by alleging a "subjective chill" on protected speech. *Clapper*, 568 U.S. at 416-18 (quotation marks omitted) (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)); *see Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 996 (9th Cir. 2023). And *Lyons*' requirement that plaintiffs demonstrate that they "will be subject to" the illegal conduct in the absence of an injunction applies equally in the First Amendment context. *Murthy v. Missouri*, 603 U.S. 43, 72 (2024).

For instance, in *Murthy*, the plaintiffs alleged that certain government agencies pressured social-media platforms to suppress protected speech in violation of the First Amendment. 603 U.S. at 49. The district court entered a preliminary injunction,

21

which the Fifth Circuit affirmed. *Id.* In rejecting the federal government's argument that the plaintiffs "failed to demonstrate that the harm from these past injuries is ongoing or that similar injury is likely to reoccur in the future," the Fifth Circuit emphasized that the plaintiffs "stated in sworn declarations that their prior censorship has caused them to self-censor and carefully word social-media posts moving forward," and it held that "this chilling of the [plaintiffs'] exercise of their First Amendment rights is, itself, a constitutionally sufficient injury." *Missouri v. Biden*, 83 F.4th 350, 367-68 (5th Cir. 2023) (per curiam), *rev'd sub nom.*, *Murthy*, 603 U.S. 43. The Supreme Court reversed and vacated the injunction because the plaintiffs lacked standing. *Murthy*, 603 U.S. at 76. The Court explained that "[i]t is 'no more than conjecture' to assume that [plaintiffs] will be subject to White House-induced content moderation." *Id.* at 72 (quoting *Lyons*, 461 U.S. at 108). The "plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Id.* at 73 (quoting *Clapper*, 568 U.S. at 416). So, too, here. Because plaintiffs' fears of future injury are speculative, any alleged chilling effect cannot support their standing.

The district court also appeared to suggest that plaintiffs are likely to suffer future retaliation because DHS has a pattern or policy of retaliating against protesters. 1-ER-23. But there is no reasonable dispute that DHS policy expressly prohibits its officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." 2-ER-144. Any officer who retaliates

22

against protesters would violate these policies in a manner antithetical to the values

DHS is committed to upholding. Indeed, DHS is currently reviewing several use-of-

force incidents at the ICE facility. *See* 2-ER-82; 3-ER-258-61.

Nor does the record support the district court's apparent conclusion that DHS

maintains an unwritten policy of retaliation notwithstanding DHS's written policies.

1-ER-17-18; 1-ER-23. Protesters have regularly confronted DHS officers at the ICE

facility. But the record does not indicate that DHS officers used retaliatory force

against plaintiffs at all or even most of these protests—as they presumably would

have done if an unwritten policy condoning retaliation existed. To the contrary,

"[t]here have been many instances since June 2025 when the actions of protesters

remained peaceful and did not require a law enforcement response" from DHS

officers. 2-ER-122. The allegations of lead plaintiff Jack Dickinson underscore this

point. Mr. Dickinson claims to have "participated in about 150 protests at the

Portland ICE Building" beginning in June 2025, "typically attending four or five

protests per week." 1-ER-11. Yet the court identified just four of those exposures as

retaliatory, 1-ER-11-13.[2] And there is no evidence in the record to suggest his other

---

[2] In all events, *Lyons* establishes that plaintiffs would lack standing even if DHS did have an unwritten policy of retaliation (which it does not). The *Lyons* plaintiff likewise alleged that the police department had a policy of "routinely apply[ing] chokeholds" in certain situations. 461 U.S. at 105. Yet the Supreme Court nevertheless held that the plaintiff lacked standing to seek injunctive relief. *Accord Vasquez Perdomo*, 146 S. Ct. at 1 (granting stay of preliminary injunction pending appeal); *id.* at 3 (Kavanaugh, J., concurring in the grant of the application for stay)

*Continued on next page.*

23

exposures—at around "one third of [those] times" he attended protests, 2-ER-178—had a possible retaliatory motive or were conducted in circumstances where crowd control measures were not justified under governing law. Law enforcement may disperse protests not merely if they are violent, but also if protesters are violating the law. *Puente v. City of Phoenix*, 123 F.4th 1035, 1062 (9th Cir. 2024).

*Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817 (9th Cir. 2020), does not alter the conclusion.[3] The decision lacks persuasive force because it was based on a different factual record. As explained, the record here undermines plaintiffs' assertions of imminent future injury because DHS officers did not uniformly deploy retaliatory force during protests that universally involved violent or disruptive protesters. Similarly, the Court's recent decision in *Los Angeles Press Club v. Noem*, --- F.4th ----, No. 25-5975, 2026 WL 889142 (9th Cir. Apr. 1, 2026), does not alter the analysis. The Court did not conclude (and, consistent with *Clapper*, could not conclude) that allegations of subjective chill standing alone are sufficient to support

_____

(explaining that merely alleging the existence of a policy does not satisfy *Lyons* because the plaintiffs must also show an imminent likelihood of injury pursuant to that policy). To the extent this Court has held that a plaintiff can satisfy *Lyons* simply by demonstrating a pattern of officially sanctioned behavior, *see, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012), those holdings are incompatible with *Lyons*, and the government respectfully preserves this objection for further review.

[3] The stay panel's decision lacks precedential force because its "predictive analysis" turned on the "probabilistic" standard governing motions to stay a preliminary injunction pending appeal, not a "pure question of law" already settled by "binding authority." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 & n.3 (9th Cir. 2021).

standing; rather, the Court relied on specific factual findings demonstrating "a reasonable fear that government reprisals are likely to occur." *Id.* at *4. As explained, this record does not support a determination of an objective and certainly impending likelihood that plaintiffs will be retaliated against in the future.

**B.      Even If Plaintiffs Had Standing, They Are Unlikely to Prevail on the Merits of Their First Amendment Claim.**

Even if plaintiffs had standing, their First Amendment retaliation claim is likely to fail on the merits. To succeed, plaintiffs "must establish a [but-for] 'causal connection' between the government defendant's 'retaliatory animus' and [their] 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

**1.**      As an initial matter, plaintiffs and the district court proceeded solely on a First Amendment retaliation claim, 1-ER-23, but the Court has cautioned that the retaliation "framework, with its focus on subjective causation, is a poor fit for the crowd-dispersal context," in part because applying the framework "will often raise 'particularly difficult' causation questions," *Puente*, 123 F.4th at 1063. In the Fourth Amendment context, "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for the courts rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.* at 1051 (citation modified) (quoting *Torres v. Madrid*, 592 U.S. 306, 317 (2021)). Yet a First Amendment retaliation claim turns this inquiry around, instead focusing on the subjective motivation of the individual officer. *Id.* at 1063.

25

As the Court noted in *Puente*, it is difficult to apply a retaliation standard to the crowd-control context. *See* 123 F.4th at 1063 (declining to resolve issue but recognizing that there are "strong arguments that a conventional First Amendment retaliation framework" should not apply). This case throws that mismatch into sharp relief and militates towards rejecting holding that a "retaliation claim may properly be asserted in the crowd-dispersal context *in addition* to a clear-and-present-danger claim." *Id.*

Plaintiffs' allegations of excessive force are more appropriately addressed under the Fourth Amendment's excessive-force standards (or any other doctrines that might apply to individual officer misconduct). *See, e.g.*, *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018). But plaintiffs' preliminary injunction motion conspicuously declined to invoke the Fourth Amendment or any other applicable excessive-force doctrine. 1-ER-23. *See generally Puente*, 123 F.4th at 1050-62 (rejecting excessive-force claims in analogous circumstances). That the district court inexplicably cited a Fourth Amendment case to conclude that DHS officers improperly dispersed protesters under the First Amendment just highlights the extent of the court's confusion and the inappropriateness of proceeding on a First Amendment retaliation theory here. *See* 1-ER-26 (citing *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012)).

**2.** If a retaliation theory is generally permitted in the crowd-control context, the district court's analysis of retaliatory intent is flawed because it used the wrong test for excessive force and erroneously equated excessive force with subjective retaliatory

intent. The court simply assumed that, because the officers employed crowd-control devices in a manner the court deemed "excessive," the officers must have intended to retaliate. 1-ER-25-26. The court erred by assuming that every allegedly improper use of force—undertaken in circumstances that are often uncertain and chaotic and in the face of violent, disruptive, or otherwise unlawful activity, including trespassing on federal property—was motivated by retaliatory animus on the part of the individual officers.

This Court's decision in *Puente* illustrates the point. *Puente* reaffirms that, under the First Amendment, law-enforcement officers may disperse a protest if it "presents a clear and present danger of imminent lawlessness." 123 F.4th at 1062. This inquiry "must be evaluated under an objective standard." *Id.* Thus, a court might conclude that an officer used too much force to disperse a protest because, notwithstanding his "subjective apprehensions," the circumstances did not objectively "present[] a clear and present danger." *Id.* A court might also conclude that the officer used too much force because he misperceived "the tenor of [a] demonstration" as being more "infected with violence or obstruction" than it was. *Id.* (quotation marks omitted). But neither would compel the conclusion that, for purposes of a First Amendment retaliation claim, the officer acted due to subjective antipathy to the First Amendment activity at issue.

The district court emphasized that, in *Index Newspapers*, the stay panel held that a different set of plaintiffs was likely to prevail on their First Amendment retaliation

27

claims.  1-ER-25-26.  But that decision is not precedential and lacks persuasive force because it was based on a different factual record.[4]  The court also relied on opinion testimony from plaintiffs' experts.  1-ER-26-27.  But those witnesses' policy preferences regarding the handling of violent or disruptive crowds are inconsistent with the First Amendment standard and with *Puente*, 123 F.4th 1035, and "obviously do not bind federal law enforcement agencies"—which are "entitled to set different enforcement priorities and to follow different directives regarding lawful crowd control tactics," *Index Newspapers*, 977 F.3d at 850-51 (O'Scannlain, J., dissenting).  For instance, the First Amendment allows the dispersal of protesters when they are violating the law, not merely when they are violent.  *Puente*, 123 F.4th at 1062.  Yet the district court equated the use of crowd control devices with a First Amendment violation whenever such tools were used on protesters engaged in unlawful conduct but not "active[ly] resist[ing]" law enforcement.  1-ER-26-27.  That is inconsistent with *Puente*.

**3.**    Further, the district court failed to identify any direct evidence that DHS, as an institution, intentionally targeted plaintiffs for their First Amendment activities.  This failure is unsurprising because DHS policies expressly forbid such conduct.  2-ER-144.  Instead, the court attributed to DHS the allegedly retaliatory intent of individual DHS officers who used crowd-control devices against plaintiffs.  1-ER-25-

---

[4] Likewise, *Los Angeles Press Club* was based on a different factual record.  *Los Angeles Press Club*, 2026 WL 889142, at *5.

26. As explained, *supra* pp. 7-12, the handful of incidents identified by the court each involve situations where there was a clear and present danger of lawlessness and do not support such an inference. Again, peaceful protesters do not throw heavy objects at officers or attempt to bite their groin, and protesters complying with the law do not trespass on federal property or refuse to leave after being instructed. That law enforcement had to resort to crowd-control devices on several occasions does not demonstrate a collective intent to discriminate against the exercise of First Amendment rights but rather an intent to prevent protesters from trespassing at the ICE facility or otherwise engaging in violent, disruptive, and unlawful activity.

## C.     The Injunction Is Overbroad and Unworkable.

The government is also likely to prevail on the merits because the injunction's terms exceed the district court's authority for three independent reasons.

**1.**     First, the injunction improperly grants relief not only to the five named plaintiffs but to anyone protesting or reporting at the Portland ICE facility or even just merely "in the vicinity of" the facility. 1-ER-3. That cannot be reconciled with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which reaffirmed that Article III courts lack equitable authority to grant "relief that extend[s] beyond the parties," *id.* at 843. This Court unanimously stayed an analogous order enjoining DHS officers' use of crowd-control devices in Los Angeles "to the extent that" the injunction's provisions "apply to protesters who are not parties to [the] litigation." *Los Angeles Press Club v. Noem*, No. 25-5975, 2025 U.S. App. LEXIS 33133, at *4 (9th Cir. Dec. 18, 2025). The Court

then vacated that injunction because "several provisions expressly apply to non-parties and are broader than necessary to afford 'complete relief *to the plaintiffs before the court.*'" *Los Angeles Press Club*, 2026 WL 889142, at *7 (quoting *CASA*, 606 U.S. at 852).

The district court justified the injunction's breadth as necessary to provide complete relief to the named plaintiffs. 1-ER-33-34. But "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 854; *accord Los Angeles Press Club*, 2026 WL 889142, at *7; *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge … is not mechanically obligated to grant an injunction for every violation of law."). The *Los Angeles Press Club* stay panel rejected this very argument when it granted in pertinent part the government's stay motion. *See Los Angeles Press Club*, 2025 U.S. App. LEXIS 33133, at *4 (citing *CASA*, 606 U.S. 831); *see also Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1070-71 (C.D. Cal. 2025) (attempting to justify overbroad injunction using complete-relief principle). And the *Los Angeles Press Club* merits panel, when it vacated the injunction, reiterated that it was improper for the district court to "extend the scope of this prohibition beyond the specific Plaintiffs who brought suit or any non-parties necessary to give relief to Plaintiffs." 2026 WL 889142, at *7.

To evade these limits on its authority, the district court here certified a provisional class covering "[a]ll people who, since" June 2025, "have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE

30

Building." 1-ER-53 (quotation marks omitted). The injunction itself, however, is not limited even to members of the hopelessly broad class. The injunction makes no distinction whatsoever between class members and individuals covered by the injunction who happen to be "in the vicinity of" the ICE facility. 1-ER-3. Courts cannot be permitted to provisionally certify improper classes in an effort to circumvent *CASA*, especially not when their injunctions are not even limited to class members.

In any event, as explained further below, *infra* pp. 40-47, that certification order is fatally flawed, not least because it flouts Rule 23's commonality requirement and Rule 23(b)(2)'s indivisible-remedy requirement. *See* Fed. R. Civ. P. 23(a)(2), (b)(2). There are no questions common to this hopelessly broad class because it includes (1) people who were allegedly targeted with crowd-control devices despite not behaving in an obstructive or disruptive manner and (2) people who were allegedly targeted with such devices but who did act obstructively or disruptively. The constitutional limits on a response to people who are not obstructive and those who are obstructing or damaging property differ markedly. *See Puente*, 123 F.4th at 1062. The same is true with respect to the limits as between people who are targeted and those who are impacted incidentally. This is therefore a class that fails the most basic test as there is no "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation marks omitted).

Moreover, First Amendment retaliation claims must be evaluated based on "all of the circumstances," including the mental state of the federal officers who acted. *Puente*, 123 F.4th at 1062-63. These "fact-specific" and "individualized considerations" require "separate analyses" and are therefore not "amenable to class treatment" because they cannot "show[] that common questions exist." *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258-60 (9th Cir. 2024).

Anticipating the failure of its class-certification gambit, the district court attempted to justify the injunction's breadth as "necessary and appropriate" to afford relief to a "putative" class. 1-ER-32 (citing *AARP v. Trump*, 605 U.S. 91 (2025) (per curiam)). But the narrow relief contemplated by *AARP* is not available here because such relief is appropriate only where necessary "to preserve [a court's] jurisdiction," 605 U.S. at 97, and where the underlying legal question "is the same" for named plaintiffs and purported class members, *id.* at 98; *see also CASA*, 606 U.S. at 849-50 (holding that injunctive relief to nonparties is improper if it "circumvent[s] Rule 23's procedural" requirements). Neither prerequisite is present here, where the court failed to identify any threat to its jurisdiction and where the putative class would not satisfy Rule 23. *See Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) (per curiam) (rejecting analogous reliance on *AARP* where the putative class "ha[d] *no* chance of getting certified" because its members' First Amendment retaliation "claims involve different conduct, by different officers, at different times, in different places, in response to different behavior").

32

**2.** Second, the preliminary injunction is overbroad because its provisions—which operate like a detailed law-enforcement manual—are unmoored from plaintiffs' First Amendment retaliation claims. *See Los Angeles Press Club*, 2026 WL 889142, at *7 ("An injunction that exempts Plaintiffs, non-party journalists, and non-party legal observers from lawful, *non-retaliatory* dispersal orders is broader than necessary to 'remedy the specific harm alleged' in Plaintiffs' First Amendment claims."). The injunction here prohibits DHS from "direct[ing] or us[ing] chemical or projectile munitions … unless the specific target of such a weapon or device poses an imminent threat of physical harm to a law enforcement officer or other person," even if doing so is not in retaliation for First Amendment protected speech. 1-ER-3. Thus, the injunction applies even if officers' actions are lawful and justified and based upon reasons that have nothing whatsoever to do with the First Amendment. This is foreclosed by *Los Angeles Press Club*, which emphasizes that an injunction must be no broader than necessary to remedy the specific harm alleged—namely, First Amendment retaliation, not merely any injury from crowd-control devices. 2026 WL 889142, at *7.

The injunction is also unmoored from plaintiffs' First Amendment retaliation claims because it is based on Fourth Amendment standards. As the terms of the injunction make clear, the district court apparently believed that the First Amendment prohibits officers from using crowd-control devices such as tear gas and pepper balls except when the "specific target … poses an imminent threat of physical harm" and

33

prohibits officers from using pepper spray except when the "specific target …
exhibits, at a minimum, active resistance," which is defined to exclude all manner of
disruptive acts, such as "trespassing, refusing to move, refusing to obey an order to
disperse, and 'going limp' (or 'going dead weight')." 1-ER-3-4. The court cited no
legal authority supporting those policy assumptions, and this Court has repeatedly
rejected them. The court instead cited an inapplicable Fourth Amendment case. *See*
1-ER-26 (citing *Nelson*, 685 F.3d 867).

It is black-letter law that, under the First Amendment, officers may disperse a
crowd not only in response to an imminent threat of physical harm but also in
response to "imminent lawlessness," including a threat of "riot, disorder, [or]
interference with traffic." *Puente*, 123 F.4th at 1062 (quoting *Cantwell v. Connecticut*,
310 U.S. 296, 308 (1940)); *see also Zorn v. Linton*, 146 S. Ct. 926, 931 (2026) (per
curiam) ("Reasonable officials would not 'interpret *Amnesty America* to establish' that
using a routine wristlock to move a resistant protester after warning her, without
more, violates the Constitution." (citation modified) (quoting *District of Columbia v.
Wesby*, 583 U.S. 48, 63 (2018))). Accordingly, plaintiffs' retaliation claims would not
justify categorically prohibiting DHS officers from deploying common law-
enforcement tools such as tear gas, flashbangs, and pepper balls except when "the
specific target … poses an imminent threat of physical harm." 1-ER-3. They also
would not justify categorically prohibiting DHS officers from deploying pepper spray
except when "the specific target of that weapon exhibits, at a minimum, active

34

resistance" (whatever that means). 1-ER-3-4. And they certainly would not authorize the district court to design the uniforms of federal law-enforcement officers, as the court asserted the power to do. 1-ER-4-5. Yet the court nevertheless adopted these prescriptions and proscriptions as remedies for retaliation. *See Chicago Headline Club v. Noem*, No. 25-3023, 2025 U.S. App. LEXIS 34532, at *5 (7th Cir. Nov. 19, 2025) ("[T]he district court's order is too prescriptive. For example, it enumerates and proscribes the use of scores of riot control weapons and other devices in a way that resembles a federal regulation."). This is improper.

**3.** Third, the district court failed to account for "what is workable," as foundational equitable principles demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (quotation marks omitted). The injunction effectively bars DHS officers from deploying crowd-control devices at the Portland ICE facility even when crowds obstruct federal-law enforcement activity, ignore lawful dispersal orders, threaten public safety, and trespass on or damage federal property. The injunction applies even when crowds number in the hundreds or thousands.

As DHS's declarants explained, such a regime is not merely unworkable; it is also extremely dangerous to both federal officers and the public. *See* 2-ER-129-31; 2-ER-141. The injunction eliminates "key tools for deterring escalation" and "potentially allow[s] breaches or violence to occur that could … otherwise [be] prevented." 2-ER-131. That is because prohibiting the use of crowd-control devices in response to anything except imminent violence "forces officers to rely on physical

35

intervention (hands on tactics) to manage breaches or remove individuals[,] … greatly increas[ing] the risk of injury to both officers and protesters, as physical confrontations are more likely to result in accidental harm, escalation, or use of higher levels of force." 2-ER-130. Furthermore, the injunction invites wanton destruction of federal buildings, vehicles, and other property by requiring officers "to wait until the criminal acts progress to the point where [a physical] threat … is imminent." 2-ER-131.

Worse, the preliminary injunction is ripe for abuse. Violent actors "are often intermingled with" peaceful protesters and "may use protesters who are behaving peacefully as shields." 2-ER-131. But the injunction forbids officers from using most crowd-control devices (which are effective precisely because they affect a large area) unless the "specific target … poses an imminent threat of physical harm." 1-ER-3. And given the indeterminacy and vagueness of the injunction's terms, the purported safe harbor for officers who "incidentally expose[]" someone "to a crowd-control device" if the device was "deployed in a manner that is fully consistent with" the injunction, 1-ER-4, offers only illusory protection.

The district court papered over these problems by noting that the injunction leaves DHS officers free to invite protesters to refrain from acting unlawfully and then to "cite or … arrest" protesters who do not comply. 1-ER-30. As DHS's declarants explained, however, that approach will often be impractical or impossible. Officers are often outnumbered by protesters, "especially if multiple breach attempts

36

or disturbances occur simultaneously." 2-ER-130. Moreover, violent rioters are "often intermingled with" law-abiding protesters. 2-ER-129. In such circumstances, crowd-control devices serve as critical force multipliers by "enabl[ing]" "a small number of officers" "to control large violent crowds." 2-ER-123. These conclusions are borne out by the record, which shows that protesters repeatedly ignored officers' verbal orders to disperse and impeded officers' attempts to arrest violent or disruptive individuals. *See* 2-ER-122-28. Officers were able to put an end to unrest only after deploying crowd-control devices. 2-ER-122-28.

The injunction exacerbates these practical flaws by placing the district court in the position of superintending DHS officers' day-to-day decision making. Federal courts "do not possess a roving commission" to "exercise general legal oversight of the … Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). That principle applies with particular force to law-enforcement activities responding to safety risks, which inevitably involve "split-second judgments" and a balancing of factors in "tense, uncertain, and rapidly evolving" situations. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quotation marks omitted). Under the injunction, however, DHS officers' real-time judgments would be subject to judicial second-guessing in contempt proceedings based on whether officers complied with the injunction's vague terms—such as whether a protester engaged in "active resistance" or whether the officer's actions were "reasonably necessary" or "legally justified" in the eyes of the court. 1-ER-3-4. An officer could face contempt charges even for

37

unintentionally striking someone with a crowd-control device if the target believed that the strike was retaliatory. Whether or not such charges are ultimately found to be meritorious, the mere threat of protracted contempt litigation imposes a significant additional burden on officers.

There are good reasons why courts should not micromanage day-to-day law-enforcement operations in this way. Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990). And "[t]he scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo*, 423 U.S. at 378. "[I]t is one thing to dissect and scrutinize an officer's actions with the '20/20 vision of hindsight,' 'in the peace of a judge's chambers.' It is quite another to make 'split-second judgments' on the ground, 'in circumstances that are tense, uncertain, and rapidly evolving.'" *Barnes v. Felix*, 605 U.S. 73, 89-90 (2025) (Kavanaugh, J., concurring) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The district court failed to heed those principles and, in doing so, violated the separation of powers. *See Tincher*, 164 F.4th at 1099-100 (staying similarly prescriptive injunction).

38

### D. The Remaining Equitable Factors Decisively Favor the Government.

The injunction should also be vacated because the remaining equitable factors decisively favor the government. "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). Here, plaintiffs' allegations of injury are insufficient even to support their standing to obtain injunctive relief, much less demonstrate irreparable injury. *Cf. Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042-44 (9th Cir. 1999) (en banc) (holding that, even if the plaintiffs had standing to obtain prospective relief based on past injuries notwithstanding the Supreme Court's decision in *Lyons*, their alleged irreparable injury remained too speculative to support injunctive relief). And any harms to plaintiffs are outweighed by the harms the injunction inflicts on the government and the public interest, particularly given the injunction's sweeping breadth and unworkability. As explained above, *supra* pp. 35-38, the injunction's vague definitions and intrusive restrictions on the use of dispersal orders and crowd-control devices undermine officers' ability to protect themselves and the public. Accordingly, the balance of equities and public interest weigh counsel that no injunction should have issued.

39

## II.     The Class Certification Order Is Improper.

The Court should also reverse the district court's class certification order.  "As [the Court] ha[s] explained before, where an injunction provides class-wide relief, 'effective review of the injunction requires review of the class certification.'" *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) (quoting *Paige v. California*, 102 F.3d 1035, 1039 (9th Cir. 1996)).  In this posture, an order certifying a class "may be appropriately reviewed under a pendent jurisdiction theory." *Id.*

The district court's order certifying a class under Federal Rule of Civil Procedure 23(b)(2) must be reversed for three primary reasons.  First, plaintiffs lack standing as explained above and, therefore, cannot proceed as class representatives.  Second, plaintiffs cannot establish commonality.  Third, plaintiffs cannot establish the individual nature of the remedy as required for a Rule 23(b)(2) class.

1.     As the Court has previously explained, "a class must be decertified when the class representatives are found to lack standing as to their individual claims." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019).  If the Court agrees that plaintiffs lack standing for the reasons explained above, then the class cannot be permitted to proceed. *Id.*

2.     Even if plaintiffs were permitted to proceed, the class must be decertified because plaintiffs cannot satisfy Rule 23(a)'s commonality requirement. *See* Fed. R. Civ. P. 23(a)(2).  This requires that the putative class's claims "depend upon a common contention … of such a nature that it is capable of classwide resolution—

40

which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. It is not enough to show that a complaint "raises common 'questions'" or that putative class members "have all suffered a violation of the same provision of law." *Id.* at 349-50 (quotation marks omitted). Instead, a party seeking class certification must "affirmatively demonstrate" that every class member "suffered the same injury." *Id.* at 350 (quotation marks omitted). "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (emphasis omitted) (citation modified). And "[d]issimilarities within the proposed class" can "impede the generation of common answers." *Id.* (quotation marks omitted).

The facts of *Wal-Mart* demonstrate that proving commonality is a significant burden, as the plaintiffs there "filed some 120 affidavits reporting experiences of discrimination—about 1 for every 12,500 class members," and the Supreme Court said that "[e]ven if every single one of these accounts is true, that would not demonstrate that the entire company 'operate[s] under a general policy of discrimination,' which is what respondents must show to certify a companywide class." 564 U.S. at 358 (second alteration in original) (citation omitted) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)).

41

Similarly, as this Court explained in *Willis v. City of Seattle*, 943 F.3d 882 (9th Cir. 2019), "[a]llegations of individual instances of mistreatment, without sufficient evidence, do not constitute a systemic deficiency or overarching policy of wrongdoing." *Id.* at 885. Rather, commonality requires the Court to be able to "determine 'in one stroke' whether a single policy or practice which the proposed class members are all subject to 'expose them to a substantial risk of harm.'" *Id.* (quoting *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014)).

For instance, in *Black Lives Matter*, 113 F.4th 1249, the plaintiffs alleged that the Los Angeles Police Department used excessive force against protesters and restricted their First Amendment rights in the wake of George Floyd's death in 2020. *Id.* at 1259-61, 1265. This Court vacated the district court's class-certification order for failure to adhere to the rigorous commonality analysis under Rule 23, emphasizing the plaintiffs' "fact-specific constitutional claims." *Id.* at 1254. The fact that the police department made a "command[] decision to employ less-lethal munitions" in response to protests was not sufficient basis to certify a class. *Id.* at 1258 (quotation marks omitted). The court emphasized that the merits of the plaintiffs' claims "depends on what force was used, what a particular class member was doing, what other protestors may have been doing, what the officers objectively observed, and a host of other factors." *Id.* at 1260. The court concluded the plaintiffs had not "shown the existence of common evidence that can resolve in 'one stroke' the class

42

members' claims that hinge on a wide array of facts and circumstances." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

Likewise, the Eighth Circuit recently held that a similar proposed putative class—composed of "[s]ix individuals who have 'observed' and protested Operation Metro Surge, the ongoing immigration-enforcement effort in the Twin Cities" who "sued on behalf of all persons who do or will in the future record, observe, and/or protest against it"—"ha[d] *no* chance of getting certified." *Tincher*, 164 F.4th at 1098-99 (citation modified). The evidence showed "observers and protestors engaging in a wide range of conduct, some of it peaceful but much of it not," and "federal agents responding in various ways." *Id.* at 1099. "Even the named plaintiffs' claims involve different conduct, by different officers, at different times, in different places, in response to different behavior." *Id.* Such differences precluded certification under Rule 23, because there were no "'questions of law or fact common to the class' that would allow the court to decide all their claims in 'one stroke.'" *Id.* (citation omitted) (first quoting Fed. R. Civ. P. 23(a)(2); and then quoting *Wal-Mart*, 564 U.S. at 350).

Here, the class that was certified comprises "[a]ll people who, since" June 2025, "have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." 1-ER-53 (quotation marks omitted). Plaintiffs fall far short of meeting commonality's demanding standard. Plaintiffs' claims cannot be decided in "one stroke" without evaluating the facts of each of their experiences, as well as

43

each proposed class member's experiences. *See Black Lives Matter*, 113 F.4th at 1259-61, 1265.

Defendants have demonstrated that there is no official policy authorizing retaliation in response to purely protected First Amendment activity. *See, e.g.*, 2-ER-144. Even if there were a common unwritten policy that contradicts official policy, which there is not, whether and to what extent that unwritten policy was followed during the numerous days covered by the allegations would necessarily involve a fact-specific inquiry, which also defeats commonality. To determine the members of the proposed class, a fact-finding hearing would be necessary for every single proposed class member to establish whether they were in fact merely observing and recording activity, as opposed to engaging in conduct that threatens federal officers and property. So too would the Court need to know the class members' state of mind, given that the class includes those who "desire to" to observe and report, even if they are nowhere near the ICE facility.

Plaintiffs fail to demonstrate that the factual differences among putative members—involving different days with different crowd activity accompanied by different responses based on the facts at the time—are immaterial. *See Black Lives Matter*, 113 F.4th at 1259-60. In these circumstances, class certification must be denied because plaintiffs have not demonstrated a "common offending policy" and proving liability for each class member would require separate mini-trials. *See Civil Rts. Educ. & Enf't Ctr. v. Hospitality Props. Tr.*, 867 F.3d 1093, 1104 (9th Cir. 2017)

44

(quotation marks omitted). As described above, the putative class is based on allegations about different days, different situations, and different conduct both by those protesting at the Portland ICE facility and those charged with its security, and class members include individuals at any protest at the ICE facility or even just desiring to attend a protest from their home on the opposite side of the country. In this context, commonality does not exist, and the class certification should be denied.

      **3.**      Even if plaintiffs could establish commonality, the class must be decertified because plaintiffs cannot satisfy Rule 23(b)(2)'s indivisible-remedy requirement. To proceed under Rule 23(b)(2), plaintiffs must demonstrate both that Rule 23(a)'s prerequisites, including commonality, are satisfied, but also that one of the conditions of Rule 23(b) is satisfied. Fed. R. Civ. P. 23(b). The court here certified a class under Rule 23(b)(2). 1-ER-51-53.

      "The key to the (b)(2) class is the *indivisible nature* of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or none of them." *Wal-Mart*, 564 U.S. at 360 (emphasis added) (quotation marks omitted). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* It "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*; *see also Farley v. Lincoln Benefit Life Co.*,

45

150 F.4th 1197, 1204-05 (9th Cir. 2025) (reversing Rule 23(b)(2) class-certification order due to the divisible nature of the remedy).

Here, the class includes "[a]ll people who, since" June 2025, "have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." 1-ER-53 (quotation marks omitted). And the remedy includes a collection of distinct chemical or projectile munitions. 1-ER-3.

Plaintiffs cannot evade the factual differences among putative members—involving different days with different crowd activity accompanied by different responses based on the facts at the time. This presents an impenetrable obstacle for plaintiffs because their proposed class would encompass (1) putative class members who assert a variety of First Amendment injuries caused by a wide array of allegedly unlawful conduct; (2) members who assert only some of those injuries, or who were exposed to only a subset of that allegedly unlawful conduct; and (3) members who protested, observed, recorded, or reported on the Portland ICE Facility without any basis to allege injury. In other words, plaintiffs "attempt to aggregate a plethora of discrete claims" of constitutional injury "into one super-claim" against defendants "without demonstrating that the class members have been harmed in essentially the same way." *Ahmad v. City of St. Louis*, 995 F.3d 635, 644 (8th Cir. 2021) (quotation marks omitted). Such an assorted class is "deficient" under Rule 23(b)(2). *Id.* Consequently, because the individual class members were harmed differently or not at all, each class member "would be entitled to a different injunction or declaratory

46

judgment against" defendants or no relief whatsoever. *Wal-Mart*, 564 U.S. at 360. The fact that no single, indivisible injunction could properly provide relief to the class as a whole further demonstrates that the class-certification order must be reversed.

## CONCLUSION

For these reasons, the district court's preliminary injunction and class-certification orders should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
*s/ Douglas C. Dreier*
DOUGLAS C. DREIER
BRENNA SCULLY
*Attorneys, Appellate Staff*
*Civil Division, Room 7211*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 880-6114*

April 2026

47

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that *Reach Community Development v. U.S. Department of Homeland Security*, No. 26-1575 (9th Cir.), is a related case in that it involves a partially overlapping injunction.

*s/ Douglas C. Dreier*

DOUGLAS C. DREIER

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,514 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

_s/ Douglas C. Dreier_
DOUGLAS C. DREIER