**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JACK DICKINSON, also known as the Portland Chicken; LAURIE ECKMAN; RICHARD ECKMAN; HUGO RIOS; MASON LAKE, on behalf of themselves and those similarly situated, | No. 26-1609 <br><br> D.C. No. 3:25-cv-02170-SI District of Oregon, Portland |
| *Plaintiffs - Appellees*, | ORDER |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS), in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | |
| *Defendants - Appellants*. | |

Filed April 27, 2026

Before: Kenneth K. Lee, Ana de Alba, and Eric C. Tung,
Circuit Judges.

2 DICKINSON V. TRUMP

Order by Judge Lee;
Partial Concurrence and Partial Dissent by Judge de Alba

## SUMMARY[*]

### Stay Pending Appeal / Constitutional Rights

The panel granted the government's motion to stay the district court's preliminary injunction pending appeal, and its request to stay the district court proceedings pending appeal, in a suit brought by five plaintiffs—peaceful protestors who have been injured as a result of crowd-control tactics near the U.S. Immigration and Customs Enforcement (ICE) facility in Portland, Oregon—alleging that the government specifically targeted them in retaliation for exercising their First Amendment rights.

The district court preliminarily enjoined the government from using non-lethal crowd-control munitions unless someone poses an imminent threat of physical harm to law enforcement or other persons.

The panel granted the government's motion to stay the district court's preliminary injunction pending appeal because the government has made a substantial showing that it will likely succeed on the merits of the First Amendment retaliation claim.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

First, the district court erred in ruling that federal agents had the subjective intent to retaliate against the plaintiffs or that the government has an unwritten policy of retaliation.

Second, the district court's preliminary injunction is overbroad and unworkable. The injunction improperly grants relief to anyone protesting or reporting at the Portland ICE facility. Any relief must be tailored to the five plaintiffs only. The district court improperly certified a provisional class—all people who, since June 2025, have, desire to or will nonviolently protest against or report on DHS activities at the Portland ICE Building—that does not meet Fed. R. Civ. P. 23's commonality requirement. Under the injunction, the government cannot use common crowd-control tactics even if people vandalize federal property or block the entrance to the building to thwart law enforcement, unlawful activities that are not protected by the First Amendment. Finally, the district court acted beyond its authority in ordering a redesign of the ICE agents' uniforms so that they have more conspicuous and unique identifying markings.

Because the government made a strong showing that it will likely succeed on the merits and has satisfied the other stay factors, the panel stayed the district court's preliminary injunction.

The panel also granted the government's request to stay the district court's proceedings pending appeal. Because the merits of the First Amendment retaliation claim are not likely to succeed and the provisional class was improperly granted, discovery need not continue in the district court pending appeal.

Concurring in part and dissenting in part, Judge de Alba concurred to the extent that the panel concluded that the

plaintiffs have standing and otherwise dissented. She would hold that the government forfeited the arguments in both its motion to stay the preliminary injunction pending appeal and its motion for a stay of the district court's proceedings.

## COUNSEL

Kimberly S. Hutchison (argued) and Mark Fleming, Singleton Schreiber LLP, San Diego, California; Matthew B. Borden, J. Noah Hagey, Kory J. Debark, Megan Wachspress, and Hadley Rood, BraunHagey & Borden LLP, San Francisco, California; Kelly Simon and Eri Andriola, American Civil Liberties Union of Oregon, Portland, Oregon; J. Ashlee Albies, Albies & Stark LLC, Portland, Oregon; Jane L. Moisan, People's Law Project, Portland, Oregon; for Plaintiffs-Appellees.

Michael Shih (argued), Brenna H. Scully, Mark R. Freeman, Douglas C. Dreier, and August E. Flentje, Attorneys, Appellate Staff; Brad P. Rosenberg, Trial Attorney; John Bailey, Counsel; Eric D. McArthur, Deputy Assistant Attorney General; Yaakov M. Roth, Principal Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department Of Justice, Washington, D.C.; for Defendants-Appellants.

Jona J. Maukonen, Assistant Attorney-In-Charge; Robert A. Koch, Attorney-In-Charge; Civil & Administrative Appeals; Paul L. Smith, Solicitor General; Dan Rayfield, Oregon Attorney General; Office of the Oregon Attorney General, Salem, Oregon; for Amicus Curiae State of Oregon.

# ORDER

LEE, Circuit Judge:

The First Amendment enshrines the right of the people to peacefully protest our government's policies. But the First Amendment does not protect vandalism, criminal trespass, or obstruction of law enforcement. Such unlawful acts, however, have been commonplace around the U.S. Immigration and Customs Enforcement ("ICE") building in Portland over the past year. Numerous provocateurs—many wielding bats, shields, and strobe lights that disrupt vision— have hurled bricks, smashed security cameras, and blocked the driveway to prevent ICE cars from entering or exiting the building. In response, the government has used tear gas, pepper balls, and other non-lethal munitions to disperse the crowd.

Five plaintiffs sued the government, alleging that they are peaceful protesters who have been injured as a result of the crowd-control tactics. But they do not contend that they are collateral casualties caught in the crossfire—they claim that the government specifically targeted them in retaliation for exercising their First Amendment rights. The district court preliminarily enjoined the government from using non-lethal crowd-control munitions unless someone "poses an imminent threat of physical harm" to law enforcement or other persons.

We grant the government's request to stay the preliminary injunction pending appeal because it has made a substantial showing that it will likely succeed on the merits of the First Amendment retaliation claim. The plaintiffs have not shown that the agents had the subjective intent to retaliate or that the government has an unwritten policy

targeting them. Much of the evidence shows the government trying to clear the entrance to the ICE facility in the face of unrest and an unruly crowd. And while some individual incidents might indicate an arguably disproportionate use of force, they alone do not amount to an unwritten policy of retaliation.

In any event, the district court's injunction is too broad. Under the injunction, the government cannot use common crowd-control tactics even if people vandalize federal property or block the entrance to the building to thwart law enforcement. But such unlawful activities are not protected by the First Amendment, and thus the district court erred in handcuffing the government's ability to counter such illegal behavior. Finally, the district court acted beyond its authority in ordering a redesign of the ICE agents' uniforms so that they have more "conspicuous and unique identifying markings." Federal courts are not the couture of law enforcement officers.

Because the government has made a strong showing that it will likely succeed on the merits and has satisfied the other stay factors, we stay the district court's preliminary injunction.

## BACKGROUND

### I.  Factual Background

### A.  Unrest in Portland

Since June 2025, the Portland ICE facility has become the site of significant unrest. Between June 2025 and February 2026, at least 150 such protests have occurred at the ICE facility in Portland. Crowds as large as several thousand people have gathered outside the facility.

Although many protesters in Portland peacefully exercise their First Amendment right to protest governmental policies, others appear to have ulterior motives. Some carried bats and improvised weapons, and donned shields and ballistic vests. One protest involved hundreds of protesters flooding the vehicle entrance to the ICE facility and pounding on the building entry points, trying to penetrate the building and preventing cars from entering or exiting the building. In other protests, demonstrators damaged the security cameras; threw rocks, glass, bricks, metal, and deployed munitions canisters at law enforcement officers; hurled fireworks toward the facility; tore the plywood off the facility's guard shack; used wooden pallets and other debris to block the doors of the facility; banged on the front door of the facility building while trying to break the front gate by rocking it; pushed officers and tried to seize their shields; and weaponized high-powered strobe lights and lasers against officers to impair their vision and coordination.

One protester even threw a smoke canister on the facility's roof, causing a fire. One officer was dragged by a crowd while seeking to detain a subject. This unrest outside the Portland ICE facility is part of a larger trend: Nationwide, assaults on ICE officers and agents have spiked—around 1,300%, including a 3,200% increase in vehicle attacks and an 8,000% increase in death threats. DHS, Press Release (Jan. 12, 2026), https://perma.cc/LSC3-3J8X.

In response, federal law enforcement has at times used non-lethal munitions to disperse crowds. Some of these devices are chemical-based crowd-control agents that have varying dispersal impact zones. Each of the crowd-control munitions are intermediate or less lethal force weapons that

help officers de-escalate situations, especially when officers are largely outnumbered by the crowd. Chemical irritants allow officers to avoid physical confrontation with protesters. This results in fewer injuries and enables officers to control large, disorderly crowds.

## B. Peaceful protests amid the violence

The plaintiffs are Jack Dickinson, Laurie Eckman, Richard Eckman, Mason Lake, and Hugo Rios—three protesters and two freelance journalists. They allege that they were peaceful but that at a handful of protests, U.S. Department of Homeland Security ("DHS") officers targeted them with crowd-control devices in retaliation for exercising their First Amendment rights. More specifically, they claim that at certain protests, they were shot by pepper balls, pepper-sprayed, or tear-gassed in response to their First Amendment activity. But declarations by supervisory DHS officials and related use-of-force reports show that, at those protests, officers consistently faced violent, disruptive, or otherwise unlawful behavior. The plaintiffs appear to have been near those other protesters acting violently or unlawfully.

For instance, on September 1, 2025, protesters arrived at the ICE facility carrying "bats, improvised weapons, [and] shields," and they blocked the entrance to the facility despite multiple warnings to clear the entryway. After several protesters removed three wooden boards from the fence at the facility, officers deployed pepper balls. Later that night, protesters placed a prop guillotine in front of the facility, blocking the driveway. Although blocking the ICE facility's driveway is illegal, the federal government could not rely on the Oregon State Police or Portland Police Bureau to fulfill their ordinary law-enforcement duties in clearing the

driveway. That is because there are "sanctuary laws in the Oregon Revised Statute and also the City of Portland that prohibit [them] from facilitating immigration-related activity or enforcement." So neither state nor local law enforcement generally assisted.

To clear the driveway, federal law enforcement again deployed pepper balls. During that night, after 10 p.m., plaintiff Hugo Rios was filming the protests by the driveway to the ICE facility. While filming, he "heard some automated [long range acoustic device] announcements that [he] heard every time [he] was there warning that they might deploy gas and talking about how trespassing was illegal and things like that." When DHS used pepper balls to clear the crowd, Mr. Rios was hit. Mr. Rios walked away, and he testified that he has no intention of returning to the ICE facility.

Then on September 13, protesters again obstructed the driveway to the facility. Federal agents ordered them to disperse, but they refused. ICE deployed pepper balls toward the ground to clear the group. About 90 minutes later, after more warnings were ignored, ICE again deployed pepper ball rounds to disperse trespassers from the driveway. When federal officers pushed out of the gate in line formation to clear the driveway and arrest a protester who had started a fire on the driveway, "multiple demonstrators surrounded them," "pushed the officers," and "attempted to seize their shields." One protester held an object that resembled a katana sword. After multiple warnings, DHS deployed pepper balls and tear gas. Plaintiff Mason Lake was at the protest and stood off to the side of the driveway to the federal building on the public sidewalk to document the protest. He was exposed to pepper spray.

On October 4, protesters again trespassed on federal property and refused to depart despite multiple dispersal orders. An individual shoved an officer and "threw a large, heavy object, striking the officer's upper body." During one instance when an officer sought to detain one protester who was obstructing the front entrance, the protester tried to bite his groin area and forcefully grabbed his penis, refusing to release their grip. Officers then used pepper balls and tear gas to disperse protesters. Plaintiffs Laurie and Richard Eckman were at the protest. Outside the Portland ICE building, the Eckmans stood with other protesters right by the federal property and just east of the driveway to the building. Mrs. Eckman was struck by a pepper ball, and Mr. Eckman was exposed to tear gas.

Two weeks later, protesters again blocked the driveway and were "aggressive and hostile, shining strobe lights directly at the [officers] to impair their vision and coordination." Plaintiff Jack Dickinson, who is known as the Portland Chicken because he wears a chicken suit to protests at the facility, was at the protest. Mr. Dickinson confirmed that he and others would intentionally block the ICE facility's driveway and refuse to comply with lawful instructions to clear the driveway. As the day progressed, the "crowd was becoming more agitated leading up to [them] throwing and kicking heavy cans at officers." Officers tried to apprehend a person who had thrown a canister at another officer earlier in the day, but the crowd surrounded the officers. Law enforcement deployed smoke canisters, and protesters threw them back at officers. Officers then deployed tear gas. Mr. Dickinson noted that the "chemicals also seeped into his mask, affecting [his] nose and throat."

These unruly protests continued into the new year. On January 19, Mr. Dickinson and about 20 others trespassed on

the ICE facility's driveway to block the entrance/egress. After the trespassers failed to heed warnings to depart, Federal Protective Service ("FPS") officers deployed pepper balls and pepper spray but the trespassers refused to depart. Four trespassers, including Mr. Dickinson, were taken into custody for failure to comply and trespassing. Mr. Dickinson noted that he decided to go "limp" if arrested. He noted that he got a "cut on my left knee, which ripped through three layers of outerwear" after officers arrested him and moved him towards the building while he was limp.

Just five days later, hundreds of protesters flooded the ICE facility's vehicle entrance and began pounding on the building's entry points. They tried to penetrate the building. After FPS issued multiple warnings that were ignored, FPS deployed pepper balls to disperse the crowds. But less than 80 minutes later, the protesters had created additional barricades with scooters and began moving toward the gate. Federal agents used pepper balls and tear gas to push the protesters back. Protesters then began to tamper with the facility's security cameras with rakes and rocks, which caused FPS to deploy further pepper balls and flash bangs. Mr. Dickinson attended the protest and noted that he was "only wearing a KN-95 mask," so he was "pretty exposed to the chemicals that were not adequately filtered through the mask." After tear gas was released, Mr. Dickinson stated that he picked up a sign and waved it to "try [to] diffuse some of the tear gas." Mr. Dickinson claims that "DHS fired in my direction because I was holding and waving the sign," and that he was hit in the right ankle with less-lethal munitions. He put the sign down after that.

Later on January 31, thousands of protesters gathered outside the ICE facility. Mr. Dickinson called this "the largest protest of its kind or in this area." Ten to fifteen

12 DICKINSON V. TRUMP

trespassers "entered the property and began banging on the guard shack and attempted to barricade the door and tear[] plywood off the guard shack." After warnings were issued to disperse, multiple trespassers produced umbrellas and formed a shield wall. Others ran to the vehicle gate with ropes, appearing to try to tie the gate shut. Federal officers deployed tear gas toward protesters destroying the guard shack. Protesters hurled rocks or other hard objects at law enforcement officers and at cameras on the building. Protesters also moved a dumpster toward the front gate, and a security guard observed protesters again prying plywood from the guard shack. Officers again used crowd-control devices to disperse the crowd and prevent further damage to federal property. Plaintiffs Mr. Eckman and Mrs. Eckman were at the protest. They originally attended an interfaith gathering at Elizabeth Caruthers Park, three blocks from the Portland ICE Building. After listening to speeches at the park, they walked towards the ICE Building with the crowd and were later exposed to tear gas.

## II. Procedural History

The plaintiffs sued President Donald J. Trump, then-DHS Secretary Kristi Noem, and the U.S. Department of Homeland Security, alleging that the defendants have unconstitutionally chilled their First Amendment rights to dissent and to document dissent. They claim that the defendants, through an unwritten policy, pattern, and practice, have used excessive force via non-lethal munitions against peaceful protesters in retaliation for exercising their First Amendment rights. The district court then entered a temporary restraining order severely restricting DHS officers' ability to use crowd-control devices at the ICE facility.

After extensive discovery and a three-day evidentiary hearing, the district court entered a preliminary injunction. First, the injunction prohibits DHS and its "agents and employees" from "direct[ing] or us[ing] chemical or projectile munitions, including but not limited to . . . pepper ball or paintball guns, tear gas or other chemical irritants, . . . and flashbang . . . grenades, *unless* the specific target of such a weapon or device poses an *imminent threat of physical harm*." (emphasis added).

Second, the injunction prohibits DHS officers from firing any such devices "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person." Third, the injunction sets forth special instructions governing the use of pepper spray and similar devices (which the injunction distinguishes from "chemical irritants"). DHS officers may not use "pepper spray . . . unless the specific target . . . exhibits, at a minimum, active resistance," defined to exclude "trespassing, refusing to move, refusing to obey an order to disperse, and 'going limp.'" The injunction also bans the use of pepper spray "against groups of people where bystanders foreseeably would be affected." Pepper spray may only be "used against specific individuals actively engaged in violent unlawful conduct, actively resisting arrest, or as reasonably necessary in a defensive capacity."

Finally, the preliminary injunction also requires the parties to "confer regarding how" DHS officers "can place conspicuous and unique identifying markings . . . on the uniforms, vests, and/or helmets" of the agents deployed to the Portland ICE facility. "If the parties cannot reach agreement," the district court will itself decide how to redesign DHS officers' uniforms and will modify the preliminary injunction "appropriately." The district court

14                    DICKINSON V. TRUMP

denied the government's motion to stay the injunction pending appeal.

The same day that the injunction was issued, the district court certified a provisional class of "[a]ll people who, since [June 2025], have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." The injunction covers all individuals who happen to be "in the vicinity of" the Portland ICE facility, whether or not an individual is a member of the class or not. The district court denied the government's motion to stay the injunction pending appeal.

The federal government moved to stay the district court's preliminary injunction pending appeal and requested an immediate administrative stay pending resolution of this motion. The federal government also seeks a stay of the district court's proceedings until the appeal is resolved. We granted an immediate administrative stay pending resolution of the motion.

## STANDARD OF REVIEW

We "review an order regarding preliminary injunctive relief for abuse of discretion, but review any underlying issues of law de novo." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (citation omitted).

## DISCUSSION

**I. We stay the preliminary injunction because the government has made a strong showing that it will likely succeed on the First Amendment claim.**

We review the government's request for a stay pending appeal under these four factors: "(1) whether the stay

applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). Because the federal government has made a strong showing that it will likely succeed on the merits and has met the remaining stay factors, we grant the stay pending appeal.[1]

### A. The district court erred in ruling that there was a subjective intent to retaliate and an unwritten governmental policy of retaliation.

To succeed on a First Amendment retaliation claim, a plaintiff "must establish a [but-for] 'causal connection' between the government defendant's 'retaliatory animus' and [his or her] 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). A plaintiff must show that: (1) he or she was engaged in a constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating

---

[1] The government contends that the plaintiffs lack standing because the plaintiffs will not face any retaliation in violation of their First Amendment rights. The standing question substantially overlaps with the merits because the plaintiffs' standing claim largely turns on whether they are subject to recurring chill based on their First Amendment activity. For standing purposes at this early stage to the case, we think they have sufficiently alleged chilling effect to have standing. *See Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (noting that our circuit has "applied the requirement[] of . . . standing less stringently in the context of First Amendment claims" (citation omitted)).

16                    DICKINSON V. TRUMP

factor in the defendant's conduct. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

At issue is the third prong of a First Amendment retaliation claim. To meet that requirement, a plaintiff must show that the defendant had (1) subjective retaliatory intent and (2) a policy, pattern, or practice of First Amendment retaliation. *See O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016); *Menotti v. City of Seattle*, 409 F.3d 1113, 1148–49 (9th Cir. 2005). This is because the plaintiffs here sued President Trump, then-DHS Secretary Noem, and DHS itself—but not any individual ICE agents—for allegedly using excessive force via non-lethal munitions to chill their First Amendment rights.

The district court made two critical legal errors in finding that the plaintiffs likely will prevail on their First Amendment retaliation claim.

First, it erred in assuming that the government cannot use non-lethal munitions in response to imminent lawlessness. Based on that incorrect assumption, the district court held that the government's use of tear gas, pepper balls, and other devices to disperse the crowd in response to imminent lawlessness was "strong circumstantial evidence of Defendants' intent to punish the crowd for their expression."

But that assumption is not the law in our circuit. We recently emphasized that law enforcement can use non-lethal force in response to "imminent lawlessness" by protesters who claim they are exercising their First Amendment rights. *Puente v. City of Phoenix*, 123 F.4th 1035, 1062 (9th Cir. 2024). In that case, the Phoenix police used tear gas, "flash-bang grenades," and other chemical irritants to scatter a protesting crowd at a "Free Speech Zone" outside a political rally held by President Trump. *Id.* at 1042. Addressing a

First Amendment claim, we held that law enforcement officers can still use non-lethal munitions to disperse a protesting crowd if there are "objectively reasonable grounds to conclude that there [is] a 'clear and present danger of riot, *disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order*.'"   *Id.* at 1062 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)) (emphasis added). And that is what law enforcement appears to have done here in response to vandalism, the blocking of street traffic, and the trespassing on ICE property—all of which are "immediate threat[s] to public safety, peace, [and] order." *Id.*

The district court tried to distinguish *Puente* by saying that the case "involved a single protest event, as opposed to a systematic and sustained pattern of escalating violence over a period of months."  But *Puente* did not say that the First Amendment hinges on whether there is a single protest or a series of demonstrations.  In any event, that factual difference may cut the other way.  The government may be more justified in using tear gas and other non-lethal munitions in Portland to establish order, given the months-long siege of the ICE facility there.  Instead of following *Puente*'s standard for First Amendment claims, the district court relied on a legally and factually inapt Fourth Amendment excessive force case.  *See Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (Fourth Amendment violation when officer shot a pepper ball at the eye of a college student at the Picnic Day festivities at the University of California at Davis).

In sum, the district court's erroneous legal assumption improperly colored its analysis: It incorrectly concluded the five plaintiffs were likely being intentionally targeted for

their First Amendment rights because there purportedly was no valid reason for the government to use tear gas and other non-lethal munitions. Once that foundational—and faulty—assumption is cast aside, the court's finding of intent to retaliate collapses. We are left with a more plausible explanation of events: As detailed earlier, the five plaintiffs (out of hundreds of protesters) were not intentionally targeted for their First Amendment activity but were rather unfortunate collateral casualties during a chaotic effort to quell disorder.

Second, even assuming subjective retaliatory intent in some cases, the plaintiffs have not shown an unwritten policy, pattern, or practice of First Amendment retaliation. The district court did not identify any direct evidence that DHS, as an agency, intentionally targeted the plaintiffs for their First Amendment activities.[2] To the contrary, DHS policies expressly prohibit its officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Any officer who retaliates against protesters would violate these policies.

Despite this express policy against retaliation, the district court inferred an unwritten DHS policy of retaliation based on individual DHS officers who used crowd-control munitions. The district court implored us to "review" the

---

[2] The district court also never addressed the conflicting and contextual facts offered by the government. Protesters repeatedly trespassed onto the ICE facility, blockaded the facility's gates, vandalized federal property, and attacked federal officers. Yet the district court did not acknowledge, much less address, this evidence—which further undermines the court's conclusion that DHS officers acted with retaliatory intent.

DICKINSON V. TRUMP                    19

"video evidence" submitted by the plaintiffs, describing them as "unambiguous and disturbing." We have reviewed the dozens of video clips—and we come to a different conclusion. As explained earlier, the district court's analysis appears to have been influenced by its erroneous legal assumption that law enforcement cannot use non-lethal munitions against protesters unless they pose imminent physical harm to the officers. Viewed from that lens (and putting aside the evidence of officers being threatened and assaulted), law enforcement agents' use of non-lethal chemical munitions against "peaceful" protesters unlawfully trespassing the ICE facility driveway or blocking street traffic might appear unjustified. But we have held that law enforcement can use such non-lethal munitions in the face of "disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Puente*, 123 F.4th at 1062. And when viewed under this proper legal lens, the use of such non-lethal force to disperse crowds engaging in unlawful behavior does not amount to an unwritten policy of retaliation but rather reflects law enforcement.

To be sure, a court might conclude that an officer used too much force to disperse a protest because, despite his "subjective apprehensions," the circumstances did not objectively "present[] a clear and present danger" of "imminent lawlessness." *Id.* at 1062. A court might also conclude that the officer used too much force because he misperceived "the tenor of [a] demonstration" as being more "infected with violence or obstruction" than it was. *Id.* (citation omitted).[3] But even if the officers' actions were not

---

[3] A couple of videos submitted by the plaintiffs appear to show one person being tackled and another sprayed. Lacking the full context from

justified, they would not compel the conclusion that the officers acted because of subjective antipathy to First Amendment activity.[4] By conflating these inquiries, the district court only reinforced *Puente*'s conclusion that the First Amendment retaliation framework is a "poor fit" for the plaintiffs' claims. *Id.* at 1063.

Finally, our recent decision in *Los Angeles Press Club v. Noem* does not require a different result because its factual record differs significantly. No. 25-5975, 2026 WL 889142, at *2 (9th Cir. Apr. 1, 2026). In that case, our court held that "[b]ecause direct evidence of officers' subjective motives is rarely available, Plaintiffs may rely on circumstantial

---

these short clips, one might argue that the force used appears unprovoked and excessive. But the individuals do not appear to be any of the plaintiffs. And even if the use of force was unjustified against these two individuals in the videoclips, we do not know the motives of the agents involved. Nor can we infer an unwritten policy or practice of retaliation based on just these two incidents out of the hundreds of encounters at the Portland ICE facility over the past year. The dissent also cites additional incidents of seemingly excessive force. But those incidents occurred in the broader context of unlawful activity such as protesters blocking the ICE facility's driveway or the main street leading to the facility. And as noted earlier, law enforcement can use such non-lethal munitions in the face of "disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Puente*, 123 F.4th at 1062. Finally, and again, even if the officers used excessive force in response to the unlawful activity, it does not mean that they had the subjective intent to retaliate for First Amendment expression.

[4] The dissent cites the declaration of Gil Kerlikowske, a former Commissioner of U.S. Customs and Border Protection, who contends that federal officers have used excessive and unnecessary force to retaliate against First Amendment activity. But whether (1) the officers had subjective retaliatory intent and (2) the government has a policy, pattern, or practice of First Amendment retaliation are legal determinations that an expert cannot opine on.

evidence to establish retaliatory intent." *Id.* at *5. But the court did not hold that the use of excessive force, standing alone, is always sufficient to infer retaliatory intent. And the court did not conclude that allegations of subjective chill standing alone are enough to support standing. Rather, the court relied on specific factual findings and an "'avalanche' of circumstantial evidence to conclude that Plaintiffs' First Amendment activity was a 'substantial motivating factor' for Defendant's actions." *Id.* (citation omitted). "The record," the court said, "contains extensive evidence that federal officers repeatedly targeted journalists and peaceful legal observers who stood far from any protesters or bad actors." *Id.*

Not so here. The record here does not contain an "avalanche of circumstantial evidence" or "extensive evidence" that the federal officers "repeatedly targeted" peaceful individuals standing far away from the disruptive activity near the ICE facility. Instead, the record reveals law enforcement's response to a substantial degree of violence, obstruction of law enforcement, and unrest—with protesters repeatedly trespassing onto the ICE facility, blockading the facility's gates, vandalizing federal property, and attacking federal officers.[5]

---

[5] The dissent claims that the *Los Angeles Press Club* injunction is similar to the one here because of its "prohibition against 'firing [kinetic impact projectiles] or other crowd control weapons at the head, neck, groin, back, or other sensitive areas.'" But as noted, the injunction there was justified based on an "avalanche of circumstantial evidence" showing that federal officers targeted peaceful individuals standing far away from disruptive activity in retaliation of First Amendment activity. That is not the case here, as the record shows significantly more unrest and unlawful activity.

22                  DICKINSON V. TRUMP

### B. The injunction is grossly overbroad and unworkable.

The government has also made a substantial showing that it will likely prevail on the merits because the injunction's scope exceeds the district court's authority.

### i. Any relief must be tailored to the five plaintiffs only.

The injunction improperly grants relief not only to the five named plaintiffs but to anyone protesting or reporting at the Portland ICE facility. That cannot be reconciled with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which reaffirmed that Article III courts lack equitable authority to grant "relief that extend[s] beyond the parties." *Id.* at 843.

We have reaffirmed that principle just recently. In *Los Angeles Press Club*, we held that the preliminary injunction there was overbroad, having several provisions that expressly apply to non-parties and are broader than necessary to afford "complete relief *to the plaintiffs before the court*." 2026 WL 889142, at \*7 (citing *CASA*, 606 U.S. at 852 (emphasis in original)). The injunction there prohibited the defendants from firing tear gas canisters or flash-bang grenades aimed at striking "any person." *Id.* By their explicit terms, those provisions were not limited to providing relief only to the individual plaintiffs or non-parties whose protection plaintiffs have shown to be necessary to give relief to plaintiffs. That made the injunction overbroad.

Similarly, the district court's injunction here is overbroad. The district court justified the injunction's breadth as necessary to provide complete relief to the named plaintiffs. But the *Los Angeles Press Club* decision rejected

this very argument when it granted in part the government's stay motion. *See Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1070–71 (C.D. Cal. 2025) (attempting to justify overbroad injunction using complete-relief principle). "Complete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 854; *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge . . . is not mechanically obligated to grant an injunction for every violation of law."). Indeed, "complete relief" is not a free pass around *CASA*. And like the injunction that *Los Angeles Press Club* deemed overbroad, the injunction here improperly extends not merely to the five plaintiffs but to anyone in the world who wishes to protest at the Portland ICE facility.

### ii. The district court's provisional class was improperly certified.

Besides relying on the "complete relief" principle, the district court justified its universal relief by provisionally certifying a class of "[a]ll people who, since" June 2025, "have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building."

The provisional class was improperly certified because it does not meet Rule 23's commonality requirement. *See* Fed. R. Civ. P. 23(a)(2). Class certification is "not to be granted lightly." *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024). Rule 23 does not impose a mere pleading standard; plaintiffs cannot plead their way to class certification through just allegations and assertions. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, the plaintiffs must "affirmatively demonstrate" by a preponderance of actual evidence that they satisfy all the Rule 23 prerequisites. *White v. Symetra*

24                     DICKINSON V. TRUMP

*Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (quoting *Wal-Mart*, 564 U.S. at 350). In doing so, plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Id.* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). This demanding requirement applies equally to so-called provisional classes, even assuming that they are valid. *See Newberg & Rubenstein on Class Actions* § 4:30 (6th ed.).[6]

Here, the district court did not engage in the required "rigorous analysis" to determine whether the Rule 23(a) commonality requirement has been met. *Wal-Mart*, 564 U.S. at 351. To meet their burden, the plaintiffs argue that the proposed class satisfies Rule 23's commonality requirement because DHS allegedly maintains an unwritten policy of retaliation. But that must be "affirmatively demonstrate[d]," not merely alleged. *Wal-Mart*, 564 U.S. at 350. Moreover, even assuming such an unwritten policy of retaliation could be shown, the plaintiffs have failed to show how "every [class member] has experienced the same challenged practice or suffered the same injury due to" that alleged policy. *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019).

Indeed, the problem is that there is no commonality across the class provisionally certified. The district court certified all people who "have, desire to, or will nonviolently protest against or report on DHS activities." The provisional class thus includes (a) protesters who peacefully hold signs

---

[6] The text of Rule 23 says nothing about provisional classes, but courts have asserted the power to provisionally certify a class. *See, e.g.*, *Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025).

on the sidewalk 250 feet away from the ICE facility, (b) people who block the ICE driveway to prevent cars from entering or exiting the building, (c) people who "passively" resist arrest by trespassing, refusing to abide by law enforcement orders, and "going dead weight," and (d) even those who vandalize the ICE building. But there is little in common between an Antifa provocateur who destroys the security camera at the ICE facility and a peaceful protester who holds a sign several hundred feet away on the public sidewalk. Simply put, the plaintiffs here have not shown the existence of common evidence that can resolve in "one stroke" the class members' claims that hinge on a wide array of facts. *See Black Lives Matter*, 113 F.4th at 1260 (9th Cir. 2024) (quoting *Wal-Mart*, 564 U.S. at 350). That is error.

Even those class members who were allegedly retaliated against "will face an uphill challenge in showing that common questions exist," *Black Lives Matter*, 113 F.4th at 1258–60, because First Amendment retaliation claims must be evaluated based on "all of the circumstances" (including the mental state of the federal officers who acted), *Puente*, 123 F.4th at 1062–63. These "fact-specific" and "individualized considerations" require "separate analyses" and are therefore not "amenable to class treatment." *Black Lives Matter*, 113 F.4th at 1258–60.

### iii. The injunction is too broad and inconsistent with First Amendment doctrine in allowing agents to use force only if agents face "imminent threat of physical harm."

As explained, under the First Amendment, officers may disperse a crowd not only in response to an imminent threat of physical harm but also in response to "imminent lawlessness," including a threat of "riot, disorder, [or]

26                    DICKINSON V. TRUMP

interference with traffic." *Puente*, 123 F.4th at 1062 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). For example, the First Amendment allows officers to use crowd-control munitions if protesters block the street, criminally trespass on government property, or thwart law enforcement efforts. But the district court's injunctive order prohibits officers from using crowd-control devices to stop those unlawful acts. Instead, the injunctive order allows law enforcement to use such crowd-control munitions only if the "specific target . . . poses an imminent threat of physical harm," and then further prohibits officers from using pepper spray except when the "specific target . . . exhibits, at a minimum, active resistance" (defined to exclude all manner of disruptive acts).

The injunctive order is overbroad. Despite our disagreement with the dissent on other issues, we are unanimous on this point. Under the guise of the First Amendment, the district court's order bars law enforcement from using crowd-control munitions to curb unlawful acts unless there is imminent physical harm to federal agents. But there is no First Amendment right to criminally trespass, impede law enforcement efforts, block traffic, or vandalize government buildings. *See Puente*, 123 F.4th at 1062 (allowing government to use non-lethal force to combat unlawful behavior).

Finally, the injunction's requirement that federal agents' uniforms be redesigned with "conspicuous and unique identifying markings (using numbers and/or letters) . . . so that they can be identified at a reasonable distance . . ." is beyond the court's power. The dissent agrees with us here too. No one disputes that the law enforcement officers have identifying information on their uniforms, though perhaps not to the plaintiffs' liking. But like the *Los Angeles Press*

*Club* injunction, the injunction here and its power to design DHS officers' uniform is "attenuated from the First Amendment injury" that the plaintiffs allege.  2026 WL 889142, at *7 (9th Cir. Apr. 1, 2026) ("An injunction that exempts Plaintiffs, non-party journalists, and non-party legal observers from lawful, *non-retaliatory* dispersal orders is broader than necessary to 'remedy the specific harm alleged' in Plaintiffs' First Amendment claims.").

Federal courts may have the authority to require narrow tailoring of governmental policies, but we are not the tailors of the executive branch.  *See Chicago Headline Club v. Noem*, 168 F.4th 1033, 1037 (7th Cir. 2026) (noting that the Seventh Circuit stayed a similar injunction because, by "enumerat[ing] and proscrib[ing] the use of scores of riot control weapons and other devices in a way that resembles a federal regulation," the district court exceeded its authority (citation omitted)).

## II.  The remaining stay factors favor the government.

The remaining equitable factors likewise support a stay. The preliminary injunction irreparably harms the government by impeding officers' ability to enforce the law and protect themselves and the Portland ICE facility from attack and disruption.[7]  *See Tincher v. Noem*, 164 F.4th

---

[7] The dissent contends that the government failed to properly argue before the district court that it would suffer irreparable harm in the absence of a stay.  The dissent reasons that because the government's request for a stay pending appeal was "a short paragraph spanning less than one page embedded in its response to the Plaintiffs' motion for a preliminary injunction . . . unaccompanied by any reasoning," the government cannot now arguable irreparable harm.  We disagree.  To start, a temporary restraining order is generally not appealable.  *See* 28 U.S.C. § 1292(a)(1).  And in the government's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, the

28      DICKINSON V. TRUMP

1097, 1100 (8th Cir. 2026) (staying similar injunction because its "breadth and vagueness" may "cause federal agents to hesitate in performing their lawful duties," thereby "harm[ing] the government and undermin[ing] the public interest"); *CASA*, 606 U.S. at 861 ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration in original) (citation omitted)). The government need not wait for catastrophe or damage to happen before enforcing laws.

The injunction also irreparably harms the government because, by "prevent[ing] the Government from enforcing its policies against nonparties," it transgresses the separation

---

government explained at length in how the injunction irreparably harms the government and undermines the public interest by violating the separation of powers and improperly constraining officers' ability to respond to conduct that threatens officer and public safety.

The dissent, however, claims that this argument was only "in relation to Plaintiffs' motion for a preliminary injunction, not the government's request for a stay pending appeal." To the contrary, the government had argued "irreparable harm" extensively in response to the request for a preliminary injunction and requested a stay of the preliminary injunction. Indeed, the "irreparable harm" the government would face with the injunction is the same reason why it is requesting a stay of the injunction. As such, the government provided adequate notice. *See W. Watersheds Project v. U.S. Dep't of Interior*, 677 F.3d 922, 925 (9th Cir. 2012) ("There is no waiver if the issue was raised, the party took a position, and the district court ruled on it."). In any event, the argument is not forfeited where, as here, the district court denied the stay request on the same grounds as its grant of the preliminary injunction. *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) ("Because the issue was expressly addressed and decided by the district court, raised on appeal, and fully briefed by both parties, it is subject to review by this court.").

of powers by "effectively establish[ing] the district court as the supervisor of all Executive Branch activity" near the ICE facility. *Chicago Headline Club*, 168 F.4th at 1040; *CASA*, 606 U.S. at 859; *see also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (recognizing "the Government's interest in enforcing [the law]").

A stay is further warranted because the district court failed to address "what is workable," as foundational equitable principles demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (citation omitted). The injunction handcuffs DHS officers from deploying crowd-control devices at the Portland ICE facility even when crowds obstruct federal law enforcement activity, ignore lawful dispersal orders, threaten public safety, and trespass on or damage federal property. The injunction applies even when crowds number in the hundreds or thousands.

This is not merely unworkable—it is also extremely dangerous to both federal officers and the public. The injunction eliminates "key tools for deterring escalation" and "potentially allow[s] breaches or violence to occur that could . . . otherwise [be] prevented." That is because prohibiting the use of crowd-control devices in response to anything except imminent violence "forces officers to rely on physical intervention (hands on tactics) to manage breaches or remove individuals[,] . . . greatly increas[ing] the risk of injury to both officers and protesters, as physical confrontations are more likely to result in accidental harm, escalation, or use of higher levels of force." Requiring law enforcement officers to go "hands on" because they do not have crowd-control devices could be a tinder for a wildfire of violence.

The preliminary injunction also invites abuse. Violent actors "are often intermingled with" peaceful protesters and "may use protesters who are behaving peacefully as shields." But the injunction forbids officers from using most crowd-control devices (which are effective precisely because they affect a large area) unless the "specific target . . . poses an imminent threat of physical harm." And given the indeterminacy of the injunction's terms, the purported safe harbor for officers who "incidentally expose[]" someone "to a crowd-control device" if the device was "deployed in a manner that is fully consistent with" the injunction offers only illusory protection.

Moreover, the injunction has unrealistic expectations. The injunctive order is so broad that law enforcement officers will face the threat of criminal contempt if it turns out they fired chemical munitions that hit the "head, neck, or torso [of individuals] unless the officer is legally justified in using deadly force against that person." But the videos underscore how chaotic a protest can be, making it difficult for law enforcement to assess who exactly among a crowd of hundreds or thousands has crossed the line. The videos show a fast-changing mix of peaceful and obstructive conduct, with many protesters getting in officers' faces and blocking their vehicles as they conduct their activities, only for some of them to then rejoin the crowd and intermix with others who were merely recording and observing the scene. A wrong call could end in contempt. *See International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'*n, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one.").

In sum, federal courts cannot and should not superintend DHS officers' day-to-day decision making because we "do

not possess a roving commission" to "exercise general legal oversight of the . . . Executive Branch[]." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423–24 (2021). That principle applies even more to law-enforcement activities responding to safety risks, which inevitably involve "split-second judgments" and a balancing of factors in "tense, uncertain, and rapidly evolving" situations. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (citation omitted). Under the injunction, however, DHS officers' real-time judgments would be subject to judicial second-guessing in contempt proceedings based on whether officers complied with the injunction's vague terms—such as whether a protester engaged in "active resistance" or whether the officer's actions were "reasonably necessary" or "legally justified" in the eyes of the court. An officer could face contempt charges even for unintentionally striking someone with a crowd-control device if the target believed that the strike was retaliatory. Whether or not such charges are ultimately found to be meritorious, the mere threat of protracted contempt litigation imposes a significant additional burden on officers.

There are good reasons why courts should not micromanage day-to-day law-enforcement operations in this way. Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990). And "[t]he scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo*, 423 U.S. at 378. "[I]t is one thing to

32　　　　　　　　　　DICKINSON V. TRUMP

dissect and scrutinize an officer's actions with the '20/20 vision of hindsight,' 'in the peace of a judge's chambers.' It is quite another to make 'split-second judgments' on the ground, 'in circumstances that are tense, uncertain, and rapidly evolving.'" *Barnes v. Felix*, 605 U.S. 73, 89–90 (2025) (Kavanaugh, J., concurring) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The district court failed to heed those principles. *Accord Tincher*, 164 F.4th at 1099–100 (staying similarly prescriptive injunction).

## III.　The district court proceedings are stayed until the government's appeal is resolved.

We also grant the request to stay the district court's proceedings pending appeal. This relief is warranted because the district court has suggested that even more extensive discovery is to come for both class certification and the merits, noting that "[W]hatever additional discovery you all need and want, I'm going to probably allow it." Because the merits of the First Amendment retaliation claim are unlikely to succeed and the provisional class was improperly granted, discovery need not continue in the district court pending appeal.

\* \* \* \*

For these reasons, we grant the federal government's requests to stay the preliminary injunction pending appeal and to stay the district court proceedings.

---

de Alba, Circuit Judge, concurring in part and dissenting in part:

I concur in the order to the extent that it concludes that Plaintiffs have standing. I otherwise respectfully dissent. For the reasons discussed below, the government forfeited the arguments in both motions before this court. I would therefore deny the motions.

## I.

In relevant part, the preliminary injunction applies at the Portland U.S. Immigration and Customs Enforcement (ICE) facility and its vicinity and prohibits federal agents from directing or using chemical or projectile munitions unless the specific target of the munitions poses an imminent threat of physical harm to any person; firing any munitions at the head, neck, or torso of a person, unless the officer is legally justified in using deadly force against the person; and using aerosol restraint spray against a person, unless the specific target of the spray exhibits, at a minimum, active resistance.

The preliminary injunction specifies that none of its provisions shall prevent a federal officer from using "proportional force, including less lethal weapons, on any individual who poses an imminent threat of physical harm" to another person or from making "an otherwise lawful arrest." The injunction further specifies that federal officers shall not be liable for violating the preliminary injunction "if a person is incidentally exposed to a crowd-control device, provided that such device is deployed in a manner that is consistent" with the injunction.

Separately, the preliminary injunction requires that the parties confer regarding how the government "can place conspicuous and unique identifying markings . . . on the uniforms, vests, and/or helmets of the officers and agents deployed at the Portland ICE Building so that they can be identified at a reasonable distance."

## II.

On a motion for a stay of a preliminary injunction, "we review the district court's findings of fact for clear error, its legal conclusions de novo, and the injunction's scope for abuse of discretion." *Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817, 824 (9th Cir. 2020).

Our inquiry should begin and end with irreparable harm when the movant has not shown a likelihood of irreparable harm absent a stay. *See Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (concluding that, "if the [movant] has not made a certain threshold showing regarding irreparable harm[,] . . . then a stay may not issue, regardless of the [movant's] proof regarding the other stay factors") (quoting *Levia-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam)). However, we may analyze the scope of the injunction under the irreparable harm factor and, where the injunction is overbroad, we may issue a stay. *See Index Newspapers LLC*, 977 F.3d at 834–35.

While the majority largely focuses on the government's likelihood of success on the merits, we need not analyze this or any of the other stay factors as the government has failed to meet its burden of showing a likelihood of irreparable harm absent a stay. I address the government's irreparable harm and overbreadth arguments in turn.

### A.

"The bar for obtaining a stay of a preliminary injunction is higher than the *Winter* standard for obtaining injunctive relief." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020) (citing *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008)). In the context of a stay request, "simply showing some possibility of irreparable

DICKINSON V. TRUMP 35

injury" is insufficient. *Doe #1*, 957 F.3d at 1058 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "The demanding standard applicable here requires that the [government] show 'that irreparable injury is likely to occur during the period before the appeal is decided.'" *Index Newspapers LLC*, 977 F.3d at 824 (citing *Doe #1*, 957 F.3d at 1059). The government "cannot carry this burden by submitting conclusory factual assertions and speculative arguments that are unsupported in the record." *Am. Fed. of Gov't Emps. v. Trump*, 139 F.4th 1020, 1029 (9th Cir. 2025) (citation modified).

Below, the government requested a stay of the preliminary injunction pending appeal in a short paragraph spanning less than one page embedded in its response to Plaintiffs' motion for a preliminary injunction. The government merely argued, "Defendants have, at a minimum, satisfied the requirements for a stay pending appeal." This conclusory argument was unaccompanied by any reasoning. The government therefore failed to properly argue that it would suffer irreparable harm in the absence of a stay. *See* FED. R. CIV. P. 7(b)(1)(B) (requiring that motions "state with particularity the grounds for seeking the order"). The government cannot now argue irreparable harm. *See One Inds., LLC v. Jim O'Neal Dist., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009) ("A party normally may not press an argument on appeal that it failed to raise in the district court."); *see also id.* ("[A] party cannot treat the district court as a mere ill-placed bunker to be circumvented on his way to this court where he will actually engage his opponents.") (citation modified).

The majority claims that the government argued irreparable harm before the district court. Yet that argument was in relation to Plaintiffs' motion for a preliminary

injunction, not the government's request for a stay pending appeal. [1]   Different standards apply to motions for a preliminary injunction and motions for a stay pending appeal.  *See, e.g.*, *Index Newspapers LLC*, 977 F.3d at 824 ("The bar for obtaining a stay of a preliminary injunction is higher than the *Winter* standard for obtaining injunctive relief.").  The government did not explain how or why its irreparable harm argument in its response to Plaintiffs' motion for a preliminary injunction applies to and supports its request for a stay pending appeal or otherwise state that it was incorporating its argument in response to Plaintiffs' motion for a preliminary injunction in its request for a stay pending appeal.[2]  *Cf.* FED. R. CIV. P. 7(b)(1)(B).

Moreover, nowhere did the government move for a stay pending appeal, the government's request for a stay was therefore never fully briefed below, and the government does not argue on appeal that it would have been impractical for it to move for a stay pending appeal in the district court. *Cf.* FED. R. APP. P. 8(a) (stating that a party "must ordinarily *move* first in the district court" for a stay of a preliminary injunction unless the party shows that moving first in the district court would be "impractical") (emphasis added); D. Or. L.R. 7-1(b) ("Motions may not be combined with any response."); *Thigpen v. Roberts*, 468 U.S. 27, 32 (1984) (expressing "little hesitation" in deciding an issue for the

---

[1] Notably, the government's irreparable harm argument comprises a relatively short portion of the responsive brief (about two pages out of 39 pages).

[2] The majority contends that "the 'irreparable harm' the government would face with the injunction is the same reason why it is requesting a stay of the injunction."  It is unclear how the majority determined this as the government made no such argument.

first time because, among other things, the parties' briefs from below were before it).

The government ultimately failed to properly move for a stay, and argue irreparable harm, before the district court.[3]

Turning to the government's motion for a stay of the preliminary injunction pending appeal before this court, the government appears to make two irreparable harm arguments in a single paragraph, spanning less than one page: (1) the injunction "transgresses the separation of powers" by preventing the government from enforcing its policies against nonparties; and (2) the injunction impedes federal officers' ability to "protect themselves and the

---

[3] The majority contends that, because the district court denied the stay request on the same grounds as its denial of the preliminary injunction, the government's irreparable harm argument is therefore not forfeited. Yet the district court did not state that it was denying the request on the same grounds as its denial of the preliminary injunction. Instead, the district court addressed a different set of factors (the *Nken* factors) than those it considered with respect to the motion for a preliminary injunction (the *Winter* factors). And in disposing of the stay request, the district court did not address issues pertinent to the motion for a preliminary injunction, such as the scope of relief. In fact, with respect to whether the government showed a likelihood that it would be irreparably harmed absent a stay, the district court determined that this factor was not met for reasons the district court did not rely on in denying the motion for a preliminary injunction.

In any case, the majority cites *United States v. Corinthian Colleges* to support its contention that the government's irreparable harm argument is not forfeited. 655 F.3d 984 (9th Cir. 2011). Yet that case does not deal with a stay request and does not involve Federal Rule of Appellate Procedure 8(a), which states that a party "must ordinarily move first in the district court" for a stay of a preliminary injunction unless the party shows that moving first in the district court would be "impractical." As discussed above, the government did not so move and did not argue that so moving would have been impractical.

Portland ICE facility from attack and disruption." These arguments are unavailing.

With respect to the first argument, the district court provisionally certified a class consisting of: "All people who, since the beginning of Operation Skip Jack [in June 2025], have engaged in nonviolent protests at or near, or nonviolently reported about protests occurring at or near, the Portland ICE Building." Notably, beginning in June 2025, the U.S. Department of Homeland Security (DHS) assigned federal officers from the Federal Protective Service (FPS), ICE, and the U.S. Customs and Border Protection (CBP) to the Portland ICE facility, in an operation known as "Operation Skip Jack," ostensibly to protect the facility and those working in it.[4]

We review a district court's decision to certify a class under Federal Rule of Civil Procedure 23 for abuse of discretion. *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014). We review for clear error any findings of fact upon which the district court relied in its certification order. *Id.* "In a civil rights suit such as this one . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Id.* at 682 (citation modified); *see also id.* ("Under such circumstances, individual factual differences among class members pose no obstacle to commonality.") (citation modified).

Here, the district court properly determined that the government had an unwritten policy or practice of using

---

[4] The district court determined that the protection of the facility is under the "unified command of FPS" and the ICE and CBP agents were "cross-designated as FPS officers."

excessive force against nonviolent protesters and journalists at and in the vicinity of the Portland ICE facility in retaliation against the protesters and journalists for exercising their protected First Amendment rights.

At the outset, the majority claims that the district court never addressed the conflicting and contextual facts offered by the government. For its part, the government argues that the district court's findings were clearly erroneous because they were not accompanied by record cites and did not account for DHS "declarations and incident reports providing a fuller description of some of the protests in question." The district court, however, was not required to use record cites. Nor does the government specify what, exactly, the district court should have discussed and how such evidence could or would have changed the district court's determination. *See Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1007 n.1 (9th Cir. 2000) ("[I]t behooves parties to treat appellate panels not as if we were pigs sniffing for truffles.") (citation omitted).

Nonetheless, elsewhere in its motion, the government references the declarations of Roberto Cantu, the Deputy Director of the Federal Protective Service, Region 10 (which includes Oregon), and Timothy Sullivan, a Chief Patrol Agent of CBP's Special Operations Group. Cantu stated, for example, that "less lethal munitions . . . [are] key tools for deterring escalation before threats become imminent."[5] For his part, Sullivan stated that "less lethal devices can enable

---

[5] Notably, Cantu's declaration—which the majority relies on—detailed several use-of-force incidents involving protesters; however, Cantu admitted that his declaration was based largely on information contained in reports that others had prepared rather than on his personal knowledge or experience at the Portland ICE facility.

[federal officers] to safely mitigate . . . volatile situations without resorting to the use of further physical or deadly force." The declarations discuss specific incidents involving protesters at the Portland ICE facility. Yet the district court noted that these declarations, and other evidence, were received and explained that while some protesters "may have engaged in criminal or non-criminal violations," this does not insulate the government from First Amendment liability.

Notably, among other evidence in the record, the district court considered declarations from "62 percipient nonviolent protester witnesses," all of whom "nonviolently and peacefully attended protest gatherings at the Portland ICE Building" and the declaration of Gil Kerlikowske, a former Commissioner of CBP and a former Chief of Police in Seattle, Washington, who—as the district court noted—is an expert in "public order policing," which is the "effective and constitutional policing and crowd control at large public events." The district court noted that Kerlikowske reviewed record evidence and acknowledged that, "At these types of events, individuals sometimes may commit crimes," but that "[m]ost of the events that [he] ha[d] seen have been small and peaceful protests in which anyone who endangers law enforcement could be easily identified and arrested"; however, if the protests grew "massive, chaotic and much more violent," there is "nothing in the proposed injunction that would prevent [federal officers] from arresting and charging such an individual."

As to the district court's determination of an unwritten policy or practice of First Amendment retaliation, the district court found that protesters were injured "more than once"; "agents involved [in excessive force incidents] were not put on leave and do not appear to have been held accountable in any way," which "allows them and others to continue to use

excessive force without correction"; and use-of-force incidents were "not infrequent" and "appear to have been escalating in frequency until the [district court] issued its [temporary restraining order]." The district court also found that protesters and journalists were "directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction," were "shot while standing apart from others," were "attacked after verbally engaging with officers," and had their "cameras or recording equipment hit directly by officers."

The district court relied, in part, on Kerlikowske's declaration as well. Namely, Kerlikowske stated that federal officers "have been using excessive and unnecessary force at the Portland ICE Building from June 2025 through the date of the [district court's] TRO [or temporary restraining order]," despite department and agency "written policies that prohibit excessive force and First Amendment retaliation"; that he saw "many violations of [department and agency] written policies, both in the videos and in the use-of-force reports but saw no corrective action being taken"; and federal officers' indiscriminate use of force unnecessarily injured Portland Police Bureau officers. (Citation modified.) The district court summarized Kerlikowske's declaration further, stating that Kerlikowske:

> identified a myriad of misuses of crowd control munitions at the Portland ICE Building, including federal officers using teargas on a peaceful crowd, shooting munitions from a roof into a crowd, using munitions on persons who posed no threat, using munitions or non-trivial force on

42 DICKINSON V. TRUMP

people who were not actively resisting, using volleys of munitions in a grossly disproportionate manner, failing to provide warnings and failing to engage in de-escalation approaches before using force, shooting pepper balls or teargas at people directly, targeting a person in the head (which, he noted, can be lethal), shooting at people across long distances (which, he noted, is dangerous due to loss of accuracy), and using munitions to retaliate against First Amendment activity.

The district court also found that "senior [government] officials" have "publicly condoned" violence against protesters at the Portland ICE facility. In fact, as the district court noted, "before President Trump's [September 2025] social medial post about 'war ravaged' Portland, audible warnings using DHS's Long Range Acoustic Devices . . . had been regularly given before DHS officers would fire tear gas and pepper-ball munitions, but afterward, there were fewer audible warnings and the use of tear gas and pepper-ball munitions against nonviolent and peaceful protesters became more frequent but also more unpredictable."

The majority notes that DHS policy prohibits officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." The policy also authorizes officers to use force "only when no reasonably effective, safe, and feasible alternative appears to exist." Yet, as the district court stated, Cantu opined that force federal officers used during an incident was "inappropriate" and "not reasonable," but the district court

noted that the officers involved in the incident "were not put on leave and do not appear to have been held accountable in any way." (Citation modified.) *See L.A. Press Club v. Noem*, No. 25-5975, 2026 WL 889142, at *5 (9th Cir. Apr. 1, 2026) ("Defendants cannot avoid potential liability by pointing to DHS policies that correctly set out the bounds for the use of less lethal munitions, when their actions were inconsistent with those policies.") (citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016)). And while the government argues that several officers are under investigation with respect to their use of force, Plaintiffs point out that the government's procedures require it to "immediately remove anyone who misuses force even before investigations." The government does not address this. Additionally, Plaintiffs represent that the "only training materials specifically provided to officers sent to Portland for Operation Skip Jack focus on using force." The government does not address this either.

Notably, the district court recommended that this court review the video evidence in this case, which the district court described as "both unambiguous and disturbing." That evidence shows, among other things, and in various incidents across the span of months:

- A protester holding a megaphone who is struck in the eye with a projectile, causing his eye to bleed.

- Two officers running straight into, and forcefully knocking down from behind, a protester who was standing still.

- An officer directly spraying, for several seconds, the air intake valve on the back

of an inflatable costume a seemingly peaceful protester is wearing, presumably in an attempt to fill the costume with the spray.

- An officer spraying chemical munitions directly into the face of a protester who is standing still and another officer beating the protester with a baton.

- An officer shoving a protester and then immediately spraying him directly in the face.

- An officer spraying two protesters—one of whom appeared to be speaking with the officer—directly in the face, causing the protesters to stumble and sit on the street, at which point one of the protesters screams in apparent agony.

- An officer shooting projectiles at a protester, even as the protester is walking out of the Portland ICE facility driveway.

- An officer shooting a projectile directly at a seemingly peaceful protester.

- An officer pushing two protesters who were standing still several times. One of the protesters—an older person—falls backward after the officer pushes him a final time. The protester struggles to

stand back up until he is hoisted up by two other protesters.

- An officer shoving protesters seemingly without provocation or warning.

- An officer throwing a chemical munition into an uncrowded location where no one is directly around the munition.

- An officer throwing a chemical munition over a crowd of protesters, seemingly indiscriminately, while calling the protesters "motherfuckers." Following this, officers throw multiple chemical munitions into the crowd, creating a chemical munitions haze so thick that it is not possible to see through. Even so, an officer throws a chemical munition into the haze.

- An officer launching a chemical munition so far and high it hits near the top of a building before ricocheting off and landing far from its initial impact site.

- An officer launching a chemical munition far across the street in the direction of Gray's Landing, an affordable housing complex.

- An officer throwing a chemical munition far into the street, not seemingly at any particular protester; officers throw multiple chemical munitions into the street afterward, often flying over

protesters and traveling long distances. One of the munitions appears to hit Gray's Landing.

- An officer throwing a chemical munition high up in the air, seemingly indiscriminately, over a crowd of seemingly peaceful protesters, and officers throwing multiple chemical munitions into the crowd thereafter, filling the screen with a chemical munitions haze.

- Officers throwing or shooting a chemical munition at a crowd of seemingly peaceful protesters.

- Officers throwing so many chemical munitions at a seemingly peaceful crowd of protesters that the street is filled with a chemical munitions haze that is nearly impossible to see through.

- A protester yelling, "You are so unorganized," and shortly afterward, an officer throwing a chemical munition at a crowd of protesters, close to where officers are as well, seemingly catching at least one of the officers off guard.

- Officers on the roof of the Portland ICE facility shooting projectiles seemingly

indiscriminately into a crowd of what appear to be peaceful protesters.

- An officer grabbing a peaceful protester and pulling her over the line of the Portland ICE facility grounds; shortly thereafter, multiple officers rush into the sidewalk where protesters are standing, the protester who was pulled over the line is thrown to the ground, other protesters are shoved, and the shots of projectiles ring.

- Officers throwing multiple chemical munitions into a crowd of seemingly peaceful protesters; one of the protesters juggles balls and others simply stand about or disperse.

- Multiple protesters standing or sitting still along the driveway of the Portland ICE facility while officers spray the protesters directly in the face and push and shoot the protesters with projectiles.

- Officers entering the Portland ICE facility driveway and shooting projectiles and throwing chemical munitions at protesters without any apparent warning or cause.

- Protesters dancing outside the Portland ICE facility, performing the Cha-Cha Slide, when the gates of the facility open and officers appear to immediately

48                    DICKINSON V. TRUMP

deploy a large number of chemical munitions, seemingly without warning.

- An officer launching a chemical munition at a crowd of seemingly peaceful protesters, which hits a protester or journalist taking photos of the protest.

- Officers pushing crowds of protesters about a block from the Portland ICE facility and then throwing chemical munitions and flashbangs at the protesters and shooting them with pepper balls. This video is from Oregon Public Broadcasting, and the journalist narrating the video and who was on scene states, "It wasn't clear what the crowds did to provoke this."

To me, the videos are just as the district court describes: "unambiguous and disturbing." The videos support the district court's multiple other findings underpinning its determination of an unwritten policy or practice of First Amendment retaliation, and the district court properly found commonality.

The government nonetheless posits that the provisional class is "hopelessly broad" because it includes "(1) people who were allegedly targeted with crowd-control devices despite not behaving in an obstructive or disruptive manner, (2) people who were allegedly targeted with such devices but who did act obstructively or disruptively, and (3) people who have not encountered DHS officers at all, much less been subjected to crowd-control devices." For support, the government cites this court's decision in *Black Lives Matter*

*L.A. v. City of Los Angeles*, 113 F.4th 1249 (9th Cir. 2024). Yet, in *Black Lives Matter*, this court remanded the issue of certification to the district court because the district court had not "conduct[ed] any analysis" on commonality. *Id.* at 1260. As discussed above, the district court here did conduct such analysis, and the government does not meaningfully contest the district court's findings underpinning its determination.[6] *See Parsons*, 754 F.3d at 678.

The government's second irreparable harm argument— that the injunction impedes federal officers' ability to "protect themselves and the Portland ICE facility from attack and disruption"—is also unavailing. *Index Newspapers LLC* is instructive. There, the federal government sought a stay of a preliminary injunction restricting its use of force near a federal building in Portland, Oregon. *Id.* at 833. The government argued that the injunction was unworkable. *Id.* at 834. This court noted, however, that the City of Portland had agreed to operate under a similarly worded injunction, which "strongly undercut[]" the federal government's irreparable harm argument. *Id.* at 833, 836.

Here, the district court found that the government itself complied with a TRO that is materially similar to the preliminary injunction for 28 days "without any indication of problem or prejudice, let alone irreparable harm." This strongly undercuts the government's irreparable harm argument. In light of the government's compliance with the

---

[6] The majority's reliance on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and *Los Angeles Press Club v. Noem*, No. 25-5975, 2026 WL 889142 (9th Cir. Apr. 1, 2026), for the proposition that any equitable relief should be limited to the parties is misplaced because the district court in those cases had not properly provisionally certified a class whereas the district court here did.

50 DICKINSON V. TRUMP

temporary restraining order, the government does not show that the preliminary injunction is likely to impede federal officers' ability to "protect themselves and the Portland ICE facility from attack and disruption."

**B.**

Separate from its irreparable harm arguments, the government makes several arguments that the preliminary injunction is overbroad. To the extent that these arguments pertain to the irreparable harm factor, I address them here. *See Index Newspapers LLC*, 977 F.3d at 834–35. If we were to ignore the government's failure to properly raise its irreparable harm arguments before the district court, then I would stay three of the preliminary injunction's provisions as overbroad.

"It is an abuse of discretion to issue an overly broad injunction." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024). Although district courts have "considerable discretion in fashioning suitable relief and defining the terms of an injunction," such relief "must be tailored to remedy the specific harm alleged." *Washington v. Trump*, 145 F.4th 1013, 1037–38 (9th Cir. 2025) (citation modified).

In its motion before this court, first, the government faults as overbroad the preliminary injunction's provisions that prohibit officers from (1) directing or using chemical or projectile munitions "unless the specific target . . . poses an imminent threat of physical harm" and (2) using aerosol restraint spray "unless the specific target . . . exhibits, at a minimum, active resistance." The government argues that these provisions are overbroad because they are inconsistent with *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). I agree.

DICKINSON V. TRUMP 51

In *Puente*, this court determined that officers may—in the First Amendment context—disperse crowds of protesters when "the conduct of the persons in [a protest], taken as a whole, created objectively reasonable grounds to conclude that there was a clear and present danger" of "imminent lawlessness," including a threat of "riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Puente*, 123 F.4th at 1062. The abovementioned provisions are much more limited than what is permissible under *Puente*.

Additionally, the government argues that the injunction's provision regarding uniforms, vests, and/or helmets is overbroad. I agree. The provision does not appear "necessary to remedy the specific harm alleged in Plaintiffs' First Amendment claims," and Plaintiffs do not address how this provision is necessary for this purpose despite the government's argument that the provision is overbroad. *See L.A. Press Club*, No. 25-5975, 2026 WL 889142, at *7 (citation omitted). Accordingly, I would grant the government's motion to stay pending appeal with respect to the three provisions discussed above.

Separately, the majority faults as overbroad the injunction's provision against officers firing munitions "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person." The majority reasons that munitions can be hard to control. This speculative argument is no answer. *See Am. Fed. of Gov't Emps.*, 139 F.4th at 1029. In *Los Angeles Press Club*, this court concluded that a similar "prohibition against 'firing [kinetic impact projectiles] or other crowd control weapons at the head, neck, groin, back, or other sensitive areas' is directly tethered to the specific harms alleged by Plaintiffs and recognized by the district court—namely,

52                DICKINSON V. TRUMP

Defendants' aiming of crowd control weapons at sensitive areas of the body, including heads, in retaliation for First Amendment protected conduct." *L.A. Press Club*, No. 25-5975, 2026 WL 889142, at *8.  The court in *Los Angeles Press Club* further concluded, "Although federal policies already prohibit the intentional targeting of sensitive areas unless the use of deadly force is reasonable, the district court found that DHS officers failed to follow those policies in response to Plaintiffs' protected conduct, resulting in chilling of Plaintiffs' exercise of First Amendment rights." *Id.*

Similarly, here, the district court found that protesters and journalists were "directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction," and the prohibition is directly tethered to the specific harms alleged by Plaintiffs.[7]  Nor does the government appear to argue in its motion before this court that the prohibition is overbroad.  The government specifically references as overbroad the other provisions discussed above. *Cf. Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

Second, the government argues that the injunction failed to account for "what is workable," *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (citation

---

[7] The majority contends that, unlike here, *Los Angeles Press Club* involved an "avalanche of circumstantial evidence" showing that federal officers targeted peaceful individuals in retaliation of First Amendment activity.  As discussed above, here, the district court similarly relied on an avalanche of circumstantial evidence to determine that the government had an unwritten policy or practice of First Amendment retaliation.

modified), because it "bars DHS officers from deploying crowd-control devices at the Portland ICE facility even when crowds obstruct federal-law enforcement activity, ignore lawful dispersal orders, threaten public safety, and trespass on or damage federal property." To the extent that the government argues that the preliminary injunction's limitations on the use of crowd-control devices are overbroad, I agree for the same reasons and to the extent discussed above.

In sum, the government forfeited its motion to stay the preliminary injunction pending appeal. If we were to ignore this, then the preliminary injunction should be stayed only in part.

## III.

In a single paragraph, the government requests a stay of the district court's proceedings pending appeal because allowing further discovery during the pendency of appeal "would impose enormous costs on DHS" and, if the government's appeal of the preliminary injunction succeeds, "the scope of whatever discovery may be warranted" could be narrowed.

"The district court has broad discretion to stay proceedings as an incident to its power to control its own docket" in promoting judicial economy. *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (capitalization altered). That said, this court has "repeatedly admonished district courts not to delay trial preparation to await an interim ruling on a preliminary injunction." *See California v. Azar*, 911 F.3d 558, 583–84 (9th Cir. 2018). "Because of the limited scope of our review of the law applied by the district court and because the fully developed factual record may be materially different from that initially before the district court, our

54                    DICKINSON V. TRUMP

disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits." *Id.* (citation modified).

Here, the government did not move for a stay of the district court's proceedings below and does not show that moving for a stay below would have been impractical. The government has therefore forfeited its motion. *See One Inds., LLC*, 578 F.3d at 1158. Regardless, the government's arguments, without more, would apply in almost every case. Yet this court has "repeatedly admonished district courts not to delay trial preparation to await an interim ruling on a preliminary injunction." *See Azar*, 911 F.3d at 583–84. Considering this, the government's arguments are unavailing.[8]

*         *         *

For the reasons above, I concur in part and otherwise respectfully dissent.

---

[8] The majority grants the motion for a stay of the district court proceedings, reasoning that a stay is warranted because Plaintiffs' First Amendment retaliation claim is unlikely to succeed and the majority has decertified the provisional class. Yet, as discussed above, the government forfeited its motion to stay the preliminary injunction pending appeal and, regardless, reaching the merits is premature and the provisional class should not be decertified. *See Doe #1*, 957 F.3d at 1058.