Case No. 26-1609

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**JACK DICKINSON (a.k.a. "the Portland Chicken"), LAURIE ECKMAN, RICHARD ECKMAN, MASON LAKE, HUGO RIOS,** *on behalf of themselves and those similarly situated,*
*Plaintiffs-Appellees*

v.

**DONALD TRUMP, President of the United States,** *in his official capacity*; **KRISTI NOEM, Secretary, U.S. Department of Homeland Security (DHS),** *in her official capacity*; **UNITED STATES DEPARTMENT OF HOMELAND SECURITY,**
*Defendants-Appellants*

On Appeal from the United States District Court for the District of Oregon, Case No. 3:25-cv-02170 (SI)
Honorable Michael H. Simon

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

BRAUNHAGEY & BORDEN LLP
Matthew Borden
J. Noah Hagey
Kory J. DeClark
Megan Wachspress
Marissa Benavides
Hadley Rood
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
borden@braunhagey.com
hagey@braunhagey.com

ACLU OF OREGON
Kelly Simon
Eri Andriola
American Civil Liberties Union of Oregon
PO Box 40585, Portland, OR 97240
971-322-0869 |
ksimon@aclu-or.org
eandriola@aclu-or.org

SINGLETON SCHREIBER LLP
Kimberly Hutchison
Mark Fleming
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 771-3473

declark@braunhagey.com
wachspress@braunhagey.com
benavides@braunhagey.com
rood@braunhagey.com

ALBIES & STARK LLC
J. Ashlee Albies
1500 SW First Ave. Ste. 1000
Portland, OR 97201
ashlee@albiesstark.com

khutchison@singletonschreiber.com
mfleming@singletonschreiber.com

PEOPLE'S LAW PROJECT
Jane L. Moisan
1500 SW First Ave. Ste. 1000
Portland, OR 97201
jane@pdxplp.com

*Attorneys for Plaintiffs-Appellees*
*Jack Dickinson, Laurie Eckman, Richard Eckman,*
*Mason Lake and Hugo Rios*

## TABLE OF CONTENTS

Introduction ...................................................................................................1

Issues Presented ............................................................................................4

Statement of the Case.....................................................................................5

I.      Factual Background .............................................................................5

II.     Procedural Background .....................................................................14

Summary of the Argument............................................................................20

Standard of Review.......................................................................................22

Argument......................................................................................................23

I.      The district court did not abuse its discretion by issuing the preliminary injunction. ...................................................................24

        A.     The district court did not abuse its discretion by holding that Plaintiffs are likely to succeed on the merits of their First Amendment retaliation claim. ...........................24

               1.    The district court correctly held that Plaintiffs have standing. ..................................................................26

               2.    The district court did not abuse its discretion by holding that DHS is acting with retaliatory intent. ...................30

                    (a)   The district court found disturbing patterns of violence employed by DHS officers over the course of months that contradicts Defendants' attempt to normalize their behavior............30

                    (b)   The district court plausibly found DHS directed and ratified their officers' retaliatory violence, including finding DHS has a policy of retaliation..........34

                    (c)   *Puente* does not foreclose Plaintiffs' retaliation claim..................................................................36

        B.     The district court did not abuse its discretion by holding that Plaintiffs will suffer irreparable harm in the absence of the preliminary injunction. ...................................................44

C.      The district court did not abuse its discretion by holding that the balance of equities and public interest also favor Plaintiffs..........45

II.     The district court did not abuse its discretion in defining the scope of the preliminary injunction. ...........................................................................46

      A.      The district court did not abuse its discretion by provisionally certifying a class, so the scope of relief is consistent with *CASA*.......47

      B.      The provisions of the preliminary injunction are closely tethered to the harm, as required. .......................................................56

      C.      The district court's holding that the injunction is workable and safe was not an abuse of discretion. ...........................................57

Conclusion ...................................................................................................60

Certificate of Compliance ............................................................................62

# TABLE OF AUTHORITIES

## Cases

*AARP v. Trump*,
  605 U.S. 91 (2005).................................................................................47

*Abdullah v. U.S. Sec. Assocs. Inc.*,
  731 F.3d 952, 956 (9th Cir. 2013) ........................................................24, 49

*Black Lives Matter Los Angeles v. City of Los Angeles*,
  113 F.4th 1249 (9th Cir. 2024) .............................................................23, 54

*Bordheim v. Cry*,
  584 F.3d 1262 (9th Cir. 2009) ...............................................................27

*Castro v. County of Los Angeles*,
  833 F.3d 1060 (9th Cir. 2016) ...............................................................36

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983).............................................................................29, 30

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).............................................................................29

*Cmty. House, Inc. v. City of Boise*,
  490 F.3d 1041 (9th Cir. 2007) ...............................................................46

*Collins v. Jordan*,
  110 F.3d 1363 (9th Cir. 1996) ...............................................................60

*Dickinson v. Trump*,
  No. 26-1609, 2026 WL 1133353 (9th Cir. Apr. 27, 2026)....................20, 38, 43

*Doe v. Horne*,
  115 F.4th 1083 (9th Cir. 2024) ..............................................................23

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) .................................................................46

*Elrod v. Burns*,
  427 U.S. 347 (1976)..............................................................................44

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc) ...................................................... 24

*Gonzalez v. United States Immigr. & Customs Enf't*,
975 F.3d 788 (9th Cir. 2020) ........................................................................... 49

*Index Newspapers LLC v. U.S. Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020) ..................................................................... *passim*

*Los Angeles Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) .................................................................. *passim*

*Lozman v. Riviera Beach*,
585 U.S. 87 (2018) ...................................................................................... 34, 43

*Meese v. Keene*,
481 U.S. 465 (1987) ......................................................................................... 30

*Menotti v. City of Seattle*,
409 F.3d 113 (9th Cir. 2005) ........................................................................... 35

*NC State Bd. of Ed. V. Swann*,
43 U.S. 43 (1971) ............................................................................................. 57

*Nelson v. City of Davis*,
685 F.3d 867 (9th Cir. 2012) ........................................................................... 40

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ......................................................................................... 43

*Nordstrom v. Ryan*,
762 F.3d 903 (9th Cir. 2014) ........................................................................... 27

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ..................................................................... *passim*

*Puente v. City of Phoenix*,
123 F.4th 1035 (9th Cir. 2024) .................................................................. *passim*

*Ridgeway v. Walmart Inc.*,
946 F.3d 1066 (9th Cir. 2020) ......................................................................... 25

iv

*Sanderlin v. Dwyer*,
116 F.4th 905 (9th Cir. 2024) ...............................................................37

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*,
402 U.S. 1 (1971)...................................................................................57

*Thomas v. County of Los Angeles*,
978 F.2d 504 (9th Cir. 1992) .................................................................29

*Tincher v. Noem*,
164 F.4th 1097 (8th Cir. 2026) (per curiam) .........................................53

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022) ................................................................27

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)...............................................................................60

*Toussaint v. McCarthy*,
801 F.2d 1080 (9th Cir. 1986) ...............................................................57

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)...................................................................46, 47, 48

*Twitter, Inc. v. Paxton*,
56 F.4th 1170 (9th Cir. 2022) ................................................................29

*United States v. Working*,
224 F.3d 1093 (9th Cir.2000) (en banc) ...........................................23, 34

*Villa v. Maricopa County*,
856 F.3d 1224 (9th Cir. 2017) ...........................................................21, 26

*Wal-Mart v. Dukes*,
564 U.S. 338 (2011)...........................................................................50, 51

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) .................................................................44

*Washington v. Trump*,
145 F.4th 1013 (9th Cir. 2025) ..............................................................56

v

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7, 20 (2008)..................................................................................24

## Statutes

Administrative Procedures Act.......................................................................15

Foreign Intelligence Surveillance Act ...........................................................30

## Rules

Fed. R. Civ. P. 8(a)........................................................................................20

Fed. R. Civ. P. 23 .................................................................................*passim*

## Other Authorities

U.S. Const. Am. I ..................................................................................*passim*

U.S. Const. Am. IV ...............................................................................*passim*

U.S. Const. Am. V ..............................................................................15, 37, 38

Wright and Miller.,
*7AA Fed. Prac. & Proc. Civ.* § 1776 (3d ed.) ....................................55

## <u>INTRODUCTION</u>

Plaintiffs-Appellees are journalists and protesters who have been attending the ongoing protests at the ICE Building in Portland at 3410 Southwest Macadam in Portland, Oregon ("the Portland ICE Building"). After a three-day evidentiary hearing and reviewing 61 declarations, 11 depositions, and numerous videos, the district court found that the extensive record before it showed that Defendant-Appellants DHS and former Secretary Kristi Noem caused a unified command structure under the Federal Protective Service to engage in a pattern of retaliation against Plaintiffs and other nonviolent individuals protesting and reporting at the Portland ICE Building since June 2025 as part of "Operation Skip Jack."

The Portland protests have been overwhelmingly peaceful, involving expression like inflatable and fleece animal costumes, dance parties, knitting circles, Veteran memorabilia, aerobics classes, and an iconic fleece Chicken suit. And yes, sometimes the expression is angry and includes strong symbolism like a prop guillotine. The First Amendment protects this dissent from violent government retaliation. However, the record shows that Defendants assaulted children, pregnant women, church groups, and elderly people, attacked Plaintiff Jack Dickinson and other passive individuals sitting on the side of the building's driveway, fired teargas on all sides of thousands of peaceful demonstrators for no legitimate law enforcement purpose, shot 84-year-old Plaintiff Laurie Eckman in the head and

1

teargassed her months later, shot munitions under her husband Richard's walker as he was trying to get away, teargassed local law enforcement, teargassed a pastor, shot journalist Plaintiff Hugo Rios with 20 pepperballs when he was standing away from the crowd filming, pepper sprayed a woman trying to talk to them in the face, sprayed journalist Plaintiff Mason Lake at point blank range, and committed countless other dangerous and unprovoked violent acts against nonviolent individuals who were protesting against or reporting on DHS.

Despite clear and numerous incidents that violate DHS's written policies, no officer has been corrected or reprimanded for those violations. Operation Skip Jack leadership is only aware of four investigations that remain open, but they have withheld the details of those investigations. Instead, DHS leadership, including former Secretary Noem, have openly praised the tactics of Operation Skip Jack. The district court did not commit clear error in finding DHS's explanations non-credible and finding a policy, pattern and practice of using retaliatory force with chemical and impact munitions as a means of chilling First Amendment activity.

As four expert law enforcement officers testified, the preliminary injunction the district court issued was safe and workable. They testified that the terms of the injunction follow normal law enforcement protocols and track police policies. On this extensive record, the district court did not commit clear error in

rejecting Defendants' conclusory claims of harm. Nor did it abuse its discretion in awarding relief that largely tracks DHS's own written policies.

The district court also did not commit clear error in finding that DHS's practice and policy of using excessive force as a means of retaliation chilled the First Amendment rights of people who wanted to protest or report at the Portland ICE Building and placed every protester and reporter there at risk of harm. Accordingly, it did not abuse its discretion in provisionally certifying a class of people who intended to protest and report at the Portland ICE Building.

Plaintiffs filed this lawsuit to stop Defendants' chilling use of chemical and impact munitions against nonviolent people exercising their First Amendment rights at the Portland ICE Building. This Court's prior decisions regarding similar sustained patterns of First Amendment retaliation instruct that the injunction should be affirmed because Plaintiffs are likely to succeed on the merits of their claim, Plaintiffs easily show they will suffer irreparable harm without the injunction, the public has a strong interest in these types of injunctions, and the injunction is safe and workable remedy tailored to the injuries complained of. *See Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020); *Los Angeles Press Club v. Noem*, 171 F.4th 1179 (9th Cir. 2026). And just like in other cases that have come before this court challenging such systemic patterns of constitutional abuses,

3

certifying a class was appropriate. *See, e.g., Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014).

Therefore, this Court should affirm the district court's orders granting Plaintiffs' motions for class certification and a preliminary injunction.

## ISSUES PRESENTED

1. After a three-day evidentiary hearing, reviewing 61 declarations, 11 depositions, and numerous photographs and videos, did the district court commit clear error in finding that DHS had retaliatory intent when it repeatedly assaulted Plaintiffs and other nonviolent protesters and journalists during ongoing protests at the Portland ICE Building?

2. Based on the testimony of three police officers with decades of experience in public order policing and a crowd control expert (the former Commissioner of Customs and Border Protection) did the district court commit clear error in finding that enjoining DHS and its Secretary in a manner that largely tracked their own use-of-force policies was safe and workable for law enforcement?

3. Given its findings and credibility determinations that DHS did not follow its own written policies and instead had an unwritten policy, pattern, and practice of retaliating against protesters and journalists, did the district court abuse its discretion by provisionally certifying a class of nonviolent

4

people seeking to exercise their First Amendment rights to protest and news gather at the Portland ICE Building?

## STATEMENT OF THE CASE

### I.      Factual Background

On a near-daily basis since June 2025, people have been gathering at the Portland ICE Building at 3410 Southwest Macadam in Portland, Oregon to express dissent from Defendants ongoing policies and practices under the direction of President Trump. 24-SER-04609; 24-SER-04675. The federal government, including Defendants-Appellants, has responded to this public outcry with messages and policies casting these protests as war, domestic terrorism, and crime. 3-SER-00761; 8-SER-01746. However, the Portland protests are well known for their peaceful expressions like frog costumes, chicken suits, and disco dancing that make a mockery of the administration's false narrative. 2-SER-00341; 2-SER-00470; 3-SER-00718; 3-SER-00721; 3-SER-00761; 3-SER-00807; 4-SER-00833; 4-SER-00864; *see also* 24-SER-04646 (DHS officer agreeing he "would not call [Portland] war-ravaged").

Defendant-Appellant Department of Homeland Security ("DHS") has responded with violence. DHS has surged agents from all over the country to Portland and placed them under the unified command of the Federal Protective Service ("FPS") as a part of what it calls Operation Skip Jack. 24-SER-04609.

5

**DHS Operation Skip Jack Practices:**

DHS officers working as part of Operation Skip Jack in Portland have routinely fired large volumes of chemical and impact munitions at Plaintiffs and others nonviolently protesting and newsgathering at the Portland ICE Building. *See, e.g.,* 2-SER-00341; 9-SER-01911; 9-SER-01915. Defendants' arsenal includes munitions that can and have caused severe bodily injury and death. *See generally* 3-SER-00693—00714.

At this early stage in the litigation, Plaintiffs have only conducted limited discovery into the following dates per agreement between the parties given the expedited timeline leading to the preliminary injunction hearing:

- **On September 1,** Plaintiff Hugo Rios was documenting protests at the Portland ICE Building. 4-SER-00843. Mr. Rios stood across the street, separated from the protest crowd. 4-SER-00843. His camera view spanned the entire front of the building where the protest was occurring. He observed nothing that would warrant the use of munitions. 6-SER-01304. Mr. Rios observed protesters performing a line dance in front of the building when a large group of DHS agents came out to confront them. 4-SER-00843. The agents used chemical and impact munitions to push the crowd multiple blocks away from the federal building. On

6

their way back into the building, DHS agents shot Mr. Rios, who still stood away from the crowd and building, over twenty times. 4-SER-00843—00844. The munitions hit him all over his body from his feet up to his shoulders and damaged his professional camera. 4-SER-00843. In addition, Mr. Rios filmed one agent who was casually retreating back to the building roll chemical munitions directly at Mr. Rios's feet. 4-SER-00843; 26-SER-05188. Munitions continued to be deployed while the agents stood alone in the driveway without any protesters blocking it. 6-SER-01308—001309.

- **On September 13**, Plaintiff Mason Lake was documenting Defendants' response to protests at the Portland ICE Building. 7-SER-01456. Mr. Lake's video of the events captures the orange residue of a pepper spray cannister that was directed at Mr. Lake while he was attempting to film the arrest. 7-SER-01458—01459.

- **On October 4**, in the early afternoon, Laurie and Richard Eckman attended a protest outside the Portland ICE Building that expressed opposition to Defendants policies and practices. 4-SER-00900—00901. The Eckmans were standing off of federal property. 4-SER-00901. A video taken by Richard Eckman shows the crowd demeanor was calm. 9-SER-01924. Shortly after that video was taken and without

7

any announced warning, a large group of DHS agents came out of the driveway gates and fired tear gas, smoke, and pepper balls into the protest crowd. One overhead video shows protesters helping Mr. Eckman down the street away from the building as a tear gas cannister is fired at and trails him and his walker. 9-SER-01925. Before Mrs. Eckman had the opportunity to leave, she was shot near the right temple with a pepper ball, causing a serious head wound that saturated her clothing in her own blood. 4-SER-00901—00902. She also felt chemical residue enter her nose, and continues to suffer the pneumatic effects of the exposure to chemicals she experienced that afternoon. 6-SER-01256—01257. The Eckmans walked home and in the early evening went to the emergency room to treat Mrs. Eckman's concussion. 4-SER-00902. Several hours later, around approximately 10:00 PM, CBP use of force reports document another period of several uses of munitions. 2-ER-00103—00104. The Eckmans were not present at this time. 4-SER-00902. No similar documentation exists for the numerous uses of force that occurred when the Eckmans were present.

- **On October 18**, hundreds in Portland and across the country participated in No Kings rallies, including one outside the Portland ICE

8

Building. DHS agents there deployed a large volume of tear gas so severe that Plaintiff Jack Dickinson had to receive medical attention and suffered residual impacts throughout the next day. 3-SER-00762. Official CBP reports describe, "Most members of the crowd were carrying signs that read, 'Fuck ICE.'" 2-ER-110. Video of the events do not depict a sea of "Fuck ICE" signage. 9-SER-01915 (Ex. D to Albies Decl). Official CBP reports about the use of tear gas cannisters document responding to people attempting to pick up, throw, or kick already deployed cannisters. 2-ER-112-113. It is unclear from documentation which, if any of the cannisters, was the first cannister to be deployed and why that deployment occurred. A slowed down video shows a DHS agent fired a munition onto their own roof, prompting further munitions being fired into the protest crowd. 9-SER-01915. Members of the Portland Police Bureau were also impacted by these munitions, so much so that they were unable to perform law enforcement duties and were forced to leave the scene. 2-SER-00341; 2—SER-00349—00351.

- **On January 19,** Plaintiff Jack Dickinson and several others performed a sit-in on the outer edges of the Portland ICE building driveway, not blocking ingress or egress. 3-SER-00763; 7-SER-01411. DHS agents

9

responded to these protesters with several rapid-fire volleys of pepper balls fired at the feet and above the heads of the seated protesters. 3-SER-00764. DHS agents also came out with large pepper spray cans and showered the passive protesters. 3-SER-00764. A surveillance camera on the ICE building captured these events. 26-SER-5187. The FPS Incident Commander at this event described the seated protesters as "violent" in his official report. 23-SER-04478. However, an officer present that day disagreed with that characterization and admitted the protesters did not do or say anything threatening prior to the agents' use of pepper balls or pepper spray. 23-SER-04478.

- **On January 24,** two days after a DHS agent killed Alex Pretti, Mr. Dickinson attended a protest and was subjected to tear gas yet again. 3-SER-00765. DHS officers deployed munitions multiple times that night. 3-SER-00765. At least one witness describes a barrage of tear gas deployed without warning or apparent reason – no vehicles were seen entering or exiting the building and no arrests were being conducted. 3-SER-0076500766; 3-SER-00811. In fact, at the time the munitions were deployed, the crowd had voluntarily cleared the driveway, and the DHS officers fired into the crowd anyway. 3-SER-00766.

- **On January 25**, FPS reports no violence, threatening behavior, or property damage. 2-ER-127. Nonetheless, purportedly in response to trespass, DHS agents deployed both pepper balls and CS gas. *Id.* Additionally, DHS conducted arrests. *Id.* One person attempted to film an arrest when the arresting DHS officer was kneeling on the neck of the arrestee. 3-SER-00811. DHS agents shot the observer with pepper balls, ripping the observer's jacket. 3-SER-00811.

- **On January 31**, thousands of people marched the streets near the Portland ICE Building, including pregnant women, children and elderly people, expressing opposition to Defendants. 2-SER-00503; 2-SER-00555; 2-SER-00342. Among the people in the crowd were Plaintiffs Jack Dickinson, Laurie Eckman, and Richard Eckman. 2-ER-00175 (Dickinson); 3-SER-00599 (Eckmans). Members of the Portland Police Bureau were also present, blocking the streets so protesters could safely march. 2-SER-00342. A small group of people approached the gate of the ICE facility. 6-SER-01182. Body camera footage shows officers coming out of the gate and immediately begin lobbing tear gas cannisters in all directions and even when the gas cloud is so thick that visibility beyond the driveway is not possible. The officer wearing the body camera alone utilizes several grenade-style munitions in the three-

11

minute window the video spans, while numerous others can be seen deployed in the field of view. 9-SER-01928. The tear gas affected a large portion of the 3-to-4,000 people who had been peacefully marching who were nowhere near the gate. 6-SER-01183. For example, the Eckmans were over a block away and had to walk through tear gas clouds from cannisters deployed behind them to get further away from the ICE building. 3-SER-00600. That is because tear gas was being launched from the roof of the building well down the city streets. 9-SER-01911.

- **On February 1,** Defendants unleashed a volume of chemical munitions so great that it covered several blocks in thick gas. 3-SER-00535. Officers shot pepper balls from the roof, including hitting one member of the crowd in the stomach, causing them to double over. 2-SER-00480.

**DHS Operation Skip Jack Policies:**

DHS and its subcomponents have written policies regarding the use of force, including in the context of protests. For example, there is a Public Order Policing Directive that specifically covers "policy requirements for Federal Protective Service (FPS) management of Public Order Policing events, including First Amendment protected activities, demonstrations, protests, unlawful activities

resulting in civil disturbance, and other crowd management events." 5-SER-00945. This policy applies to DHS responses to protest at the Portland ICE Building. 12-SER-02438—02439. This policy prohibits actions like pepper spraying individuals, unless the individual is engaged in active resistance or more. 5-SER-00959. However, agents do not understand the difference between active and passive resistance. 17-SER-03567—03570; 19-SER-04005—04008; 18-SER-03726—03730. Supervisors in charge of Operation Skip Jack do not either. 12-SER-02460 (Roberto Cantu testifying that "[f]ailing to comply with lawful orders" and "playing limp" both qualify as active resistance); 24-SER-04760 (Erik Johnson testifying "it's very difficult to just—to give a…definition to passive resistance."). Instead of training on this particularly relevant policy, Operation Skip Jack focuses training for surged officers on munitions use. 5-SER-01057—01084.

Officers have repeatedly violated the FPS POP policy. *Compare* 5-SER-00959 (POP policy states ""OC spray shall not be used…against passively resistant individuals") *to* 26-SER-05184, 26-SER-05186 (videos of officers spraying passively resistant protesters in their faces prior to arresting them, when they were sitting still holding signs in the driveway), & 25-SER-04941 (video of officer spraying young woman in face who is speaking to officers in street, but not moving toward them); *compare* 5-SER-00958 (POP policy states "Impact projectiles shall not be fired indiscriminately into crowds") *to* 9-SER-01925 (video of day Laurie

13

Eckman was hit with impact projectile fired indiscriminately into crowd). However, they expect no reprimand or correction because they understand from their training that they did nothing wrong. 23-SER-04425 (testimony of officer depicted in video spraying protesters in driveway prior to arresting them confirming his understanding that, under the POP, he "may be permitted to use pepper spray against a person who is passively resistant if they were not obeying orders"); *see also* 19-SER-04025; 21-SER-04226—04227; 17-SER-03609-03610. In fact, supervisors at all levels, including former Secretary of DHS Noem, have praised the conduct of Operation Skip Jack. 24-SER-004640 (Noem); 24-SER-04648—04649 (FPS Region 10 Director testifying he has been "told that we're doing a good job by [his] chain of command" more than once during Operation Skip Jack).

As a matter of fact, DHS can only point to four alleged investigations of misconduct. 24-SER-04714. There has been no corrective action for any event, including related to those four purported investigations. 24-SER-04827—04828 (FPS Region 10 Director Erik Johnson—the highest-ranking supervisor at the Portland ICE Building who was made available for deposition—testified that there have only been two findings of improper use of force while he has been in this role with FPS, neither of which came from Operation Skip Jack). Johnson also testified that every use of force at the Portland ICE Building during Operation Skip Jack requires a packet to be prepared that documents the incident he personally reviews,

14

and he has never seen one that made him think there was a violation of policy. 24-SER-04707—004708.

## II.    Procedural Background

Plaintiffs filed their Complaint on November 21, 2025, and they filed the operative First Amended Complaint on December 10, 2025. ER-183. It contains seven separate causes of action: (1) First Amendment retaliation on behalf of a putative class, (2) viewpoint discrimination under the First Amendment on behalf of a putative class, (3) First Amendment right of access on behalf of a putative subclass, (4) Fourth Amendment excessive force claims for each of the named Plaintiffs as individuals, (5) Fifth Amendment due process claims for each of the named Plaintiffs as individuals, (6) claims under the Administrative Procedures Act, and (7) a request for declaratory relief. ER-220-227.

### Motion for Temporary Restraining Order:

Plaintiffs filed their motion for a temporary restraining order on January 27, 2026, which was based only on the First Amendment retaliation claim on behalf of the putative class. 2-ER-241. The motion was supported by 25 declarations submitted by the named Plaintiffs, two expert witnesses, and many civilians who had attended protests at the Portland ICE Building. 2-ER-242-243.

15

The district court issued a temporary restraining order on February 3, 2026. 2-ER-245. It also set a briefing schedule for an anticipated motion for preliminary injunction and scheduled an evidentiary hearing to begin on March 2, 2026.

**Motion for Preliminary Injunction and Provisional Class Certification:**

Plaintiffs timely filed a motion for preliminary injunction, along with 16 more declarations by civilians who had attended protests at the Portland ICE Building. 2-ER-247. Two amici submitted briefs in support of Plaintiffs: the State of Oregon and the City of Portland. 2-ER-248. Defendants opposed the motion and submitted four declarations, along with a DHS memo and DHS use of force policies. Plaintiffs filed a reply, supported by 31 additional declarations and exhibits they had obtained through limited, expedited discovery. Plaintiffs also filed a motion for provisional class certification, which asked the district court to define the class as "All people who, since the beginning of Operation Skip Jack, have, desire to, or will nonviolently protest against, or report on DHS activities at the Portland ICE Building."[1]

---

[1] Notably, this definition only includes individuals who are "nonviolent." Plaintiffs agree that "[p]eaceful protesters do not throw heavy objects at officers or attempt to bite their groin," and these individuals are not included in the class definition. AOB at 29. However, Defendants' also state that "protesters complying with the law do not trespass on federal property or refuse to leave after being instructed." AOB at 29. This type of behavior, while a technical violation of the law, can also be a nonviolent form of expression to which Defendants have responded with retaliation.

On March 1, 2026, the day after depositions completed, Plaintiffs moved for provisional class certification.

During a three-day evidentiary hearing on the preliminary injunction and overlapping class certification issues, the district court heard testimony from nine protesters and press witnesses and four experts, including two Portland Police Bureau commanders, an Oregon State Police captain, and a former Customs and Border Protection Commissioner. It also received eleven transcripts and videos of DHS agent depositions— eight DHS line officers and three DHS supervisors. It reviewed 61 civilian declarations along with extensive video and photographic evidence, as well as a declaration from a licensed emergency medicine physician and published researcher on the effects of crowd control munitions on human health.

Defendants offered no video evidence or live witnesses to the district court. They submitted declarations from four DHS supervisors—two of whom were deposed. During those depositions, the witnesses admitted that the declarations they had signed were based on their review of written reports, not their own first-hand knowledge of events. Nevertheless, Defendants' counsel asked minimal questions during those depositions and did not make those witnesses available during the evidentiary hearing.

**The District Court's Findings and Opinions:**

17

After careful consideration of the robust evidentiary record, the district court issued the preliminary injunction, 1-ER-2, and granted provisional class certification, ER-40.

The District Court found that Plaintiffs and class members are nonviolent protesters and reporters who were needlessly assaulted by Defendants. ER-11-ER-16. It found that "Plaintiffs provided numerous videos, which were received in evidence and unambiguously show DHS officers spraying OC Spray directly into the faces of peaceful and nonviolent protesters engaged in, at most, passive resistance and discharging tear gas and firing pepper-ball munitions into crowds of peaceful and nonviolent protestors." 1-ER-16; *see also id*. n.5 (finding the videos to be "unambiguous and disturbing").)

The Court also found that "Plaintiffs present strong evidence from both law enforcement and former law enforcement experts." 1-ER-26. It credited the testimony of Portland Police Bureau Commander Franz Schoening, who "testified that it was his impression that the amount of force used by federal officers at the Portland ICE Building is not a good indication of the level of violence or unrest caused by protests at that location." *Id*. "Commander Schoening called the DHS force used on one specific occasion that he personally observed 'startling' and remarked that it certainly departed from what he would describe as best practice or legal. Commander Schoening also described another occasion when PPB Officers

18

were struck by munitions fired by federal officers despite Commander Schoening not seeing any violent conduct or behavior that would have otherwise precipitated that use of force." 1-ER-26-27; *see also* 6-SER-01112—01114; 6-SER-01123—01135.

The Court likewise credited the testimony of expert, Gil Kerlikowske, the former Commissioner of CBP, including his opinion "that DHS has shown a repeated pattern of excessive force against those present at the Portland ICE Building." 1-ER-27. It found that Mr. Kerlikowske "identified a myriad of misuses of crowd control munitions at the Portland ICE Building, including federal officers using tear gas on a peaceful crowd, shooting munitions from a roof into a crowd, using munitions on persons who posed no threat, using munitions or non-trivial force on people who were not actively resisting, using volleys of munitions in a grossly disproportionate manner, failing to provide warnings and failing to engage in de-escalation approaches before using force, shooting pepper balls or tear gas at people directly, targeting a person in the head (which, he noted, can be lethal), shooting at people across long distances (which, he noted, is dangerous due to loss of accuracy), and using munitions to retaliate against First Amendment activity." 1-ER-27; *see also* 7-SER-01508—01510; 7-SER-01512—01516; 3-SER-00611 (¶¶17-67); 1-SER-00215 (¶¶5, 10-24).

**Defendants' Appeal and Motion for a Stay:**

Defendants filed a notice of appeal of both orders and moved to stay the preliminary injunction, as well as all district court proceedings, pending appeal.

On April 27, 2026, a panel of this Court granted Defendants' motion to stay in its entirety. *Dickinson v. Trump*, No. 26-1609, 2026 WL 1133353 (9th Cir. Apr. 27, 2026). [2]

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in issuing a preliminary injunction to protect a properly certified class of protesters and journalists who exercise their First Amendment rights at the Portland ICE Building. Based on its review of a robust evidentiary record, it found that Defendants have had a sustained policy, pattern, and practice under unified command since June 2025 of attacking individuals with chemical and impact munitions in retaliation for exercising their First Amendment rights at that specific location. 1-ER-46. That finding was not clear error.

Defendants first challenge the issuance of the preliminary injunction. They claim that Plaintiffs lack standing, but this Court's precedent soundly rejects that

---

[2] Because the preliminary injunction was based only on Plaintiffs' First Amendment retaliation claim, the prior panel's decision to stay all district court proceedings—a request that Defendants never made to the district court—was improper. *See* Fed. R. Civ. P. 8(a); *see also Dickinson*, 2026 WL 1133353, at \*22 (de Alba, J., concurring in part).

argument given that Plaintiffs are currently suffering the harm of First Amendment chill and are likely to be harmed again by Defendants' actions in the absence of an injunction. *See Villa v. Maricopa County*, 856 F.3d 1224, 1229 (9th Cir. 2017).

Defendants next argue that Plaintiffs cannot prove a likelihood of success on their First Amendment retaliation claim. Placing great weight on *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024)—a Fourth Amendment case—they argue the district court erroneously equated excessive force with subjective retaliatory intent and wrongfully attributed individual officers' retaliatory animus to DHS. But the district court's finding of retaliatory intent was based on a sustained pattern of using chemical and impact munitions indiscriminately against crowds and nonviolent individuals, alongside evidence that no officer has ever been disciplined for his actions—and in fact, that high-level government officials have praised the work being done by DHS at the Portland ICE Building. Those findings are supported by evidence in the record and are thus not clear error. They provide ample support for the district court's conclusion that DHS as an agency has retaliatory intent. Combined with evidence of the irreparable harm of First Amendment chill and of the risk of future harm in the form of continuation of the sustained pattern of using chemical and impact munitions inappropriately at the Portland ICE Building in the absence of an injunction, and while considering the public interest in constitutional rights and the equities, the district court did not abuse its discretion by holding all

21

factors that must be considered when deciding whether to issue a preliminary injunction weigh in Plaintiffs' favor.

Defendants also argue that the injunction is unsafe, unworkable, and overly broad by applying to what it views as an improperly certified class. But the district court's findings that the injunction is safe and workable were based on credible expert testimony from three different supervisory law enforcement officers and a former CBP Commissioner. The provisions regarding the uniforms were based on its direct observations in the array of videos admitted, which show the inability for civilians to decipher existing identifiers. And the provisions limited the use of chemical and impact munitions largely track DHS's own policies that they are violating.

Finally, the application to all class members was based on the district court's rigorous analysis of Rule 23's requirements for class certification. All class members allege that, "under unified FPS command, Defendants have an unwritten policy and have engaged in pattern and practice of using excessive force directed at nonviolent, peaceful protesters at the Portland ICE Building for the purpose, at least in part, or chilling the exercise of constitutional rights of free speech and free press." 1-ER-46. The district court rightly found that determining whether that allegation is true is an issue capable of classwide resolution. Likewise, determining whether Defendants pattern of behavior is objectively chilling is an issue that the district court found can

22

be resolved with a single stroke. The district court also rightly held that all class members would be protected by an injunction that prohibits Defendants from retaliating against them with chemical and impact munitions for exercising their First Amendment rights at the Portland ICE Building. 1-ER-52. The district court did not abuse its discretion by certifying the class when Rule 23's requirements were satisfied.

## STANDARD OF REVIEW

This Court reviews the district court's grant of a preliminary injunction for abuse of discretion. *Doe v. Horne*, 115 F.4th 1083, 1099 (9th Cir. 2024). It similarly reviews the scope of the injunction for abuse of discretion. *Index Newspapers,* 977 F.3d at 824. It reviews legal conclusions de novo and rejects "only clearly erroneous factual findings—those which are illogical, implausible, or without support…in the record." *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1186-87 (9th Cir. 2026) (quotations and citations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir.2000) (en banc) (citations and quotation marks omitted).

This Court also reviews class certification orders for abuse of discretion. *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1257 (9th Cir. 2024) (citation omitted). "A district court abuses its discretion if it commits legal

23

error, 'relies on an improper factor,' 'omits a substantial factor,' or 'commits a clear error of judgment' when weighing factors." *Id.* (quoting *Abdullah v. U.S. Sec. Assocs. Inc.*, 731 F.3d 952, 956 (9th Cir. 2013)).

## ARGUMENT

Defendants have engaged in a sustained pattern of using chemical and impact munitions against individuals at the Portland ICE Building in retaliation for exercising their First Amendment rights. The district court did not abuse its discretion either by issuing the preliminary injunction to prohibit future retaliation in that location or by certifying the class of individuals who have been harmed by that unlawful behavior.

**I.      The district court did not abuse its discretion by issuing the preliminary injunction.**

When evaluating whether to grant a preliminary injunction, a district court considers whether Plaintiffs have established (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in Plaintiffs' favor, and (4) that the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit permits a sliding scale approach to the *Winter* factors wherein "a stronger showing of one element may offset a weaker showing of another." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,* 82 F.4th 664, 695 (9th Cir. 2023) (en banc). For example, where the equities

24

and public interest tip sharply in favor of Plaintiffs, as it does here, Plaintiffs need "raise only serious questions" on the merits. *Id.* The district court did not abuse its discretion when it determined that each of these factors weighed in favor of a preliminary injunction.

> **A.  The district court did not abuse its discretion by holding that Plaintiffs are likely to succeed on the merits of their First Amendment retaliation claim.**

To prevail on a First Amendment retaliation claim, Plaintiffs must show that (1) they were engaged in a constitutionally protected activity, (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the Defendants' conduct. *Index Newspapers*, 977 F.3d at 827.

Defendants concede the first two factors. *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1076 (9th Cir. 2020) ("When an appellant fails to clearly and distinctly raise an argument in its opening brief, this court considers the argument abandoned."). But they still argue that the district court abused its discretion when it held that Plaintiffs have a likelihood of success on the merits. As a threshold matter, they assert that Plaintiffs lack standing. AOB at 18-25. Then, Defendants seem to argue that retaliation claims should be unavailable in the context of protests, pointing to dicta in *Puente,* 123 F.4th at 1063, that suggests, as Defendants argue, that such claims "are more appropriately addressed under the Fourth Amendment's excessive-

force standards."[3] AOB 24-26. However, First Amendment retaliation and Fourth Amendment excessive force claims are not mutually exclusive. *See, e.g., Index Newspapers*, 977 F.3d at 829 (federal law enforcement was not likely to succeed in showing that their "shocking pattern of misconduct" was not retaliation, and recognizing that their actions "may well support…claims of excessive force"). That is because, as is the case here, excessive force can be the very tool a repressive government actor uses to retaliate against and silence a disfavored person or group of people.

**1. The district court correctly held that Plaintiffs have standing.**

As the district court correctly explained, plaintiffs seeking injunctive relief may demonstrate standing based on "either 'continuing, present adverse effects due to [their] exposure to defendants' past illegal conduct or 'a sufficient likelihood that [plaintiffs] will again be wronged in a similar way." ER-20 (quoting *Villa*, 856 F.3d at 1229 (additional citations and quotations omitted)). It also correctly noted that Plaintiffs can demonstrate that their injuries are likely to recur "by showing that their injuries stem from the defendants' written policies [ . . . or] 'a pattern of officially

---

[3] Plaintiffs Fourth Amendment claims were stayed despite them being outside the scope of the preliminary injunction currently on appeal. The court should avoid drawing any conclusions as to the Fourth Amendment claims because it lacks jurisdiction to do so. *See supra*, n.2.

sanctioned…behavior, violative of the plaintiffs' rights.'" ER-20 (quoting *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (additional citations omitted)).

The district court did not abuse its discretion by holding that Plaintiffs have standing under either theory. First, Plaintiffs demonstrated present adverse effects because "[a]ll Class Representatives currently are suffering First Amendment chill," which is "'itself, a constitutional injury.'" 1-ER-21 (quoting *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022)). As the Court accurately noted, chill is an "objective inquiry; the question is whether Defendants' actions 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" 1-ER-21 (quoting *Bordheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (cleaned up)). Its finding that "Defendants' conduct—physically harming protesters and journalists without prior dispersal warnings—is objectively chilling," 1-ER-21-22, was based on uncontested facts in the record: the fact that Mr. and Mrs. Eckman are "now afraid to protest at the Portland ICE Building and have modified their 'speech and behavior' to avoid being assaulted," and that Mr. Rios "now only covers the Portland ICE Building from a distance, even though it compromises the quality and detail of his journalism." 1-ER-22 (citation omitted). The other Plaintiffs also testified that they have modified their behavior: Mr. Lake is afraid to return to the Portland ICE Building and Mr. Dickinson has reduced his time there due to the repeated exposure to tear gas. 7-SER-01408—001409 (Dickinson); 7-SER-01466 (Lake). Likewise,

27

many class members submitted declarations to the same effect. *See, e.g.*, 4-SER-00913 (¶ 50); 4-SER-00846 (¶12); 3-SER-00603 (¶39); 3-SER-00560 (¶10); 2-SER-00422 (¶30); 2-SER-00449 (¶27); 2-SER-00462 (¶27); 2-SER-00503 (¶13); 2-SER-00509 (¶15). As such, the Court's holding was not clearly erroneous.

Second, the district court did not abuse its discretion by holding that Plaintiffs demonstrated a sufficient likelihood that they would be wronged again in a similar way. The district court's findings that Plaintiffs suffered injuries from Defendants' prior uses of force were not clearly erroneous—and are undisputed. 1-ER-11-12; 1-ER-13-16 (describing injuries suffered by each named Plaintiff and several unnamed class members). The district court further found, based on the evidence received, that "Defendants have continued to fire less lethal munitions, tear gas, pepper balls, and flash bangs into protestor crowds without warning." 1-ER-23. This finding was based on a flood of facts in the record: numerous videos of tear gas being fired into the crowd, of pepper balls being fired at nonviolent individuals who are not on federal property, and the testimony that the Long-Range Acoustic Device warning—which was not even consistently heard—only sometimes warned that chemical and impact munitions may be used against individuals who "engage[] in imminently dangerous behavior" or take "actions directed at federal law enforcement officers or others" (not the crowd as whole). 23-SER-04466-4467 (language of three available warnings). As the district court noted, such evidence is "'compelling because 'the

28

possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'" ER-23 (quoting *Index Newspapers*, 977 F.3d at 826 (quoting *Thomas v. County of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992))).

Given this expansive evidence, the district court held that "Plaintiffs have presented 'concrete evidence to substantiate their fears' that Defendants' conduct will continue, which is enough to show non-speculative risk of future injury." ER-22 (citing *Index Newspapers*, 977 F.3d at 825 (quoting *Clapper [v. Amnesty Int'l, USA*, 568 U.S. 398,] 420 [(2013)]])). Because it was supported by substantial evidence in the record, the finding was not clearly erroneous. Nevertheless, Defendants point to *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and *Clapper* to argue that the facts cannot support standing. AOB at 18, 21. Neither argument is persuasive.

*Lyons* was a Fourth Amendment case that turned on a speculative chain of causation—the likelihood of its plaintiff someday being arrested for another crime and the contingent likelihood of his being put in an illegal chokehold during arrest. But in the First Amendment retaliation context "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (quotations omitted). As already discussed, the district court made record-supported findings of self-censorship by

29

Plaintiffs. ER-22; *id*. Likewise, as discussed above, the district court found evidence that Defendants' have repeated the offending conduct against Plaintiffs several times, and were likely to again. Thus, the considerations underlying *Lyons* do not apply to this case.

*Clapper*, a pre-enforcement challenge, is similarly inapt. 568 U.S. at 398. There, Plaintiffs sought relief in anticipation of their potential future injury of being surveilled under provisions of the Foreign Intelligence Surveillance Act—surveillance that they had not yet experienced. *Id.* at 401. By contrast, Plaintiffs here challenge an ongoing, definite operation—where Defendants have already repeatedly used violence to silence the speech of Plaintiffs and class members over nearly a year. Indeed, *Clapper* acknowledges that a plaintiff has standing if he has already been subjected to the challenged government action and has demonstrated a concrete risk of being affected again. *Id.* at 420 (citing *Meese v. Keene*, 481 U.S. 465, 467 (1987)). As discussed above, the district court found—upon ample evidence—that Plaintiffs made that showing here. Defendants' arguments against standing therefore fall flat.

### 2. The district court did not abuse its discretion by holding that DHS is acting with retaliatory intent.

The district court correctly explained that "Plaintiffs may prove that their protected activity was a substantial motivating factor [for Defendants' actions] by 'either direct or circumstantial evidence.'" 1-ER-25 (quoting *Index Newspapers*, 977

F.3d at 827). With a robust evidentiary record before it, the district court made several factual findings that support its conclusion that DHS was motivated by retaliation when it inflicted pain on protesters using chemical and impact munitions. None of its findings were clearly erroneous.

        **(a)    The district court found disturbing patterns of violence employed by DHS officers over the course of months that contradicts Defendants' attempt to normalize their behavior.**

First, the district court found DHS engaged in a pattern of violence with eerily similar hallmarks of retaliation as the "shocking pattern of misconduct" the Defendants used against people exercising their First Amendment rights in Portland in 2020. *See Index Newspapers*, 977 F.3d at 829; ER-26. It noted that several protesters and press had been "directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction," while "[o]ther protesters and press describe being targeted in a variety of ways, including being shot while standing apart from others, being attacked after verbally engaging with officers, or having their cameras or recording equipment hit directly by officers." 1-ER-25. It explained that DHS officers were observed "shooting into nonviolent crowds from dangerous angles like the roof of the Portland ICE Building." 1-ER-26. It correctly stated this Court's prior holding that "this type of evidence was 'exceptionally strong evidentiary support for retaliatory intent.'" 1-ER-25 (quoting *Index Newspapers*, 977 F.3d at 829).

31

The district court also credited the "strong evidence from both law enforcement and former law enforcement experts" who testified at the evidentiary hearing. 1-ER-26. One Portland Police Bureau Commander had personally observed DHS use force at the Portland ICE Building that was "startling" and "certainly departed from what he would describe as best practice or legal." 1-ER-26. He testified that "the amount of force used by federal officers at the Portland ICE Building is not a good indication of the level of violence or unrest caused by the protests at that location." 1-ER-26. And while Defendants rely on declaration describing the specific justifications for using force on isolated occasions—such as targeting a person who had crossed onto federal property, or a person who was pouring water on a tear gas cannister to mitigate its effects—none refute the credible testimony by this Police Commander that the level of force used is disproportionate to the threat it's purportedly addressing. Nor did they offer any evidence at the hearing as to why they assaulted any of the Plaintiffs or putative class members.

Additionally, the district court found it to be "strong circumstantial evidence of intent to punish" that protesters across dates discussed "DHS officers shooting into nonviolent crowds from dangerous angles like the roof of the Portland ICE Building." 1-ER-26; *and see, e.g.*, 9-SER-01885 (Miller Ex. H); 9-SER-01912 (Ocon Ex. B); 21-SER-04181 & 21-SER-4184 (officer describing being positioned on the second-story roof on Jan. 19 and firing a PLS at a woman for burning a flag);

24-SER-04834—004835 ("[The Pepper Ball Launcher]...it's not the most accurate, especially as range increases, so it is possible for balls to veer off...").

Further, Defendants fail to grapple with the evidence in the district court record that contradicts their narrative that their officers' violence was driven by "an intent to prevent protesters from trespassing at the ICE facility or otherwise engaging in violent, disruptive, and unlawful activity." AOB at 29; *see also* AOB at 15 (arguing the court's conclusion that Defendants engaged in retaliation was "clearly erroneous because the court ignored an obvious alternative explanation for plaintiffs' past injuries—namely, that they resulted from officers' nonretaliatory attempts to control violent or unlawful protests"). Defendants make misleading statements about the facts. For example, Defendants describe that on September 1, Mr. Rios "was filming protests by the driveway to the ICE facility" and that when officers were deploying pepper balls to clear the crowd, Mr. Rios "was hit." However, Mr. Rios was across the street and filming away from the protest crowd, and it was while officers were returning from pushing protesters down the street that they targeted Mr. Rios with over 20 pepper balls when no others stood near him.

Defendants also ignore and obscure the timeline of events. For example, Defendants describe that on October 4, a heavy object was thrown at an officer, but then cite to Robert Cantu's declaration paragraphs discussing dates in January 2026. *Compare* AOB at 9 *with* 2-ER-126.  The Eckmans were at the early afternoon protest

33

where a single subject in the crowd is alleged to have grabbed an officer. The reports DHS submits about October 4 largely speak to events occurring that night, many hours after the Eckmans were gone. The district court had an accurate understanding of the events of October 4 because it reviewed multiple videos from that date, including one where Mr. Eckman can be seen being helped away from tear gas clouds with his walker while a tear gas cannister trails at his feet well off of federal property and with few others around him. 9-SER-01924. Additionally, Defendants ignore evidence that DHS's reports are unreliable in the first place. *See, e.g* 23-SER-04478. (disagreeing with the Incident Commander's summary of January 19, 2026 describing that "protests turned violent").

Based on the entirety of the record, it was more than plausible for the district court to weigh the evidence and conclude that Defendants' actions were likely to successfully be proven to be retaliation, rather than legitimate law enforcement. In any event, the existence of another possible explanation is not clear error. *See Working*, 224 F.3d at 1102.

**(b)    The district court plausibly found DHS directed and ratified their officers' retaliatory violence, including finding DHS has a policy of retaliation.**

"An official retaliatory policy is a particularly troubling and potent form of retaliation…" *Lozman,* 585 at 100. The district court found that DHS maintains an unwritten policy that contradicts their written policies that prohibit excessive force and retaliation. ER-18. In the face of this finding, it is not enough for Defendants to

34

merely point to their written policies. AOB at 28 (arguing there is no direct evidence of institutional retaliation because DHS has a written policy prohibiting retaliation). The finding of an unwritten policy was plausibly premised on a robust record.

First, and as the district court correctly explained, this Court has already held "a policy or custom of retaliation 'may be inferred [from] widespread practices of evidence of repeated constitutional violation and the absence of evidence that [] officers were discharged or reprimanded for retaliatory actions." ER-27 (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir 2005) (internal quotations and citation omitted)). To the point, the district court found that "[r]ather than reprimanding DHS violence against protesters, senior officials have publicly condoned it." 1-ER-28. Deposition testimony from the FPS Region 10 Director reveals that then-Secretary of DHS Kristi Noem praised the work of DHS at the Portland ICE Building during Operation Skip Jack, and that other senior officials have conveyed their belief that DHS is doing a good job there. That is so even though there is substantial video evidence of DHS officers violating their own policies. Indeed, when one officer was directed to answer a question about whether he violated FPS policy, he replied that he "wish[ed] not to," yet still had no concern that he would be reprimanded for that violation. 23-SER-04493. He even stated he would do it again. 23-SER-04493—04494. And while Defendants point to four allegedly ongoing investigations as evidence of their intent to reprimand unlawful behavior,

35

AOB at 20, the details of those investigations (even as to which incidents are being investigated) were withheld from Plaintiffs and the district court. Defendants' reliance on their written policy prohibiting retaliation does not carry any weight: the evidence shows that written policies are not being followed. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) ("[A] plaintiff can show a custom or practice of violating a written policy; otherwise an entity ... always could avoid liability by pointing to a pristine set of policies.").

The district court's finding that DHS itself has a policy or custom of permitting the use of excessive force as a means of retaliation against protesters and journalists at the Portland ICE Building was logical, plausible and supported by the record. It's holding that DHS's actions are substantially motivated by its retaliatory animus toward protesters and journalists at the Portland ICE Building was not an abuse of discretion.

### (c) *Puente* does not foreclose Plaintiffs' retaliation claim.

In the face of the above factual findings that are well supported by the extensive evidentiary record and the holding that naturally followed, Defendants claim that the district court's analysis of retaliatory intent was "flawed." AOB at 26. As a threshold matter, Defendants suggest that it is inappropriate to proceed on First Amendment retaliation claims in the crowd control context, relying on dicta in *Puente*, 123 F.4th at 1063. AOB at 25. However, *Puente* does not foreclose First

36

Amendment retaliation claims in the contexts of protests, and neither is it dispositive of Plaintiffs' claims here. *See, e.g., L.A. Press Club,* 171 F.4th at 1188 (district court did not abuse discretion in finding plaintiffs likely to succeed on merits of First Amendment retaliation claims against DHS based on similar pattern of violence across multiple protests in the Los Angeles area). The district court correctly distinguished *Puente* on the facts and did not need to apply the *Puente* clear-and-present-danger test because that holding applies to a wholly different type of First Amendment claim. *See Puente,* 123 at 1063 (differentiating between clear-and-present-danger claims and retaliation claims). Additionally, the availability or unavailability of a Fourth or Fifth Amendment claim, while possibly bolstering a finding of the impropriety of force that is circumstantial evidence of retaliatory intent, is not dispositive of a First Amendment retaliation claim.

*Puente* is inapplicable this case for at least three reasons:

*First*, the two First Amendment claims in *Puente* involved challenges to the lawfulness of a *dispersal*. *Id.* at 1062. Here, Plaintiffs do not claim that dispersal is Defendants' tool of retaliation. Rather, Plaintiffs challenge Defendants' munitions use as their implement of retaliation.

Defendants' pattern of conduct cannot be explained as dispersal. DHS shot Mrs. Eckman with a pepper ball that caused her to halt her movement. 4-SER-00902. Using projectile weapons is not dispersal. *Sanderlin v. Dwyer*, 116 F.4th 905 (9th

37

Cir. 2024). In the context of a protest, misuse of force becomes a way to punish and deter protected speech. *Id.* at 911-14 (shooting protester without justification sufficient to establish retaliatory intent for First Amendment violation). Many of the other events in the record are not dispersals either. *See, e.g.,* 3-SER-00762 (tear gas so enveloping that Mr. Dickinson had to lay down in the street); 4-SER-00895 (tossed munitions that struck Mr. Eckman's walker); 3-SER-00738—00739 (pepper spray residue that covered Mr. Lake's hair and equipment); 4-SER-00843—00844, (twenty impact rounds striking the body mass of Mr. Rios). Plaintiffs also describe mass tear gas events, like January 31, where thousands were boxed in with tear gas because DHS agents fired munitions from the roof, over the heads of protesters and to the back of the crowd blocks away from the driveway. 3-SER-00600. Indeed, even Defendants' own narratives about some of the events establish that dispersal was not the purpose of some munitions use. 19-SER-04014 (officer fired FN303 at a man on a bicycle "to disable it and stop his movement"); 21-SER-04206—04207 (describing use of pepper balls "to deter" behavior); 23-SER-004489 (describing trying to induce "sneezing, coughing, and mucus drainage" from a protester); *see also Dickinson*, 2026 WL 1133353, at *2 (chemical irritants enable officers "to control" crowds).

*Second*, nothing in *Puente* suggests that the availability or unavailability of Fourth or Fifth Amendment claims is dispositive of a First Amendment retaliation

claim. Retaliation can take forms other than physical violence. The court's First Amendment analyses make no mention of the Fourth or Fifth Amendment claims. That makes sense because the legal claims operate wholly independently.[4] And as a practical matter, dispersing a crowd and using violence because you want that crowd to feel pain and stop their First Amendment activity are not mutually exclusive realities – in this case, facts suggest they go hand-in-hand. *Puente* does not insulate shooting protesters in the head from the protection of the First Amendment because there is a clear and present danger of trespass. *Puente* does not insulate shooting munitions at an 84-year-old Vietnam veteran attempting to leave the area with his walker with the aid of other protesters from the protection of the First Amendment. *See L.A. Press Club*, 171 F.4th at 1189 (listing "[d]eploy[ing] crowd control weapons even when crowds were already dispersing or attempting to comply with orders to disperse" as evidence of retaliatory intent). *Puente* does not insulate from the protection of the First Amendment shooting a journalist standing to the side twenty times with chemical impact rounds from toe to shoulder because there was previously a clear and present danger to disperse a crowd that had already been pushed down the street. And *Puente* does not insulate from the protection of the First

---

[4] Of course, the claims may still operate to bolster each other. *See Index Newspapers,* 977 F.3d at 829 (pattern of misconduct that may very well amount to excessive force is "exceptionally strong" evidence of retaliation).

Amendment lobbing tear gas toward the back of a crowd of thousands of peaceful protesters, including children and elderly, preventing dispersal. That is because these actions exceed the bounds of legitimate law enforcement dispersal tactics as established in this court's precedents and by four experts in this case. *See, e.g., L.A. Press Club*, 171 F.4th 1179 (9th Cir. 2026) (finding that Secretary Noem and DHS targeted protesters and press in Los Angeles with indiscriminate force and emphasizing that even "[t]he presence of some violent actors did not give Defendants *carte blanche* to fire crowd control weapons indiscriminately into crowds of peaceful protesters, legal observers, and members of the press"); *Index Newspapers*, 977 F.3d at 829 (45 instances showing a "shocking pattern of misconduct" in targeting press with force during crowd control, especially when standing apart from the crowd, justified a grant of a preliminary injunction); *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (excessive force to shoot in the eye with a pepper ball a partygoer who posed no threat despite intent to use "area contamination" tactic designed to disperse an unruly party crowd); *Sanderlin*, 116 F.4th at 915 (triable issue as to excessive force when, in the course of implementing a dispersal order, an officer shot an impact round in the groin of a protester holding a sign in front of a dumpster that had been pushed into an intersection and potentially hid other crowd members who had thrown objects at officers); *see also, e.g.*, 6-SER-01128 (PPB Commander Schoening); 6-SER-01170 (PPB Commander Dobson); 6-

40

SER-01219—01220 (Oregon State Police Captain Bailey); 7-SER-01548—01551 (Gil Kerlikowse). Green lighting such dangerous tactics, including potentially lethal ones, by shielding them from First Amendment scrutiny would be absurd.

*Third, Puente* did not involve a history of unnecessary violence against reporters and protesters. *Puente* involved a single, rapidly developing situation, and law enforcement's decisions were driven in part by the need to physically protect President Trump. 123 F.4th 1056. The Court also noted that law enforcement had worked with protesters in advance of the event to ensure the protests were conducted peacefully, that several hours passed that were peaceful, and that law enforcement began with more limited measures before dispersing the crowd. *Id.* The Court held that "no reasonable jury could conclude that <u>the dispersal</u> was in fact subjectively motivated by antipathy to Plaintiffs' political speech." *Id.* (emphasis added). But it did not purport to address whether a pattern of repeatedly misusing crowd control weapons could show intent to suppress First Amendment protected activities. In *L.A. Press Club*, this Court held that it could. 171 F. 4th at 1189.

That factual scenario stands in stark contrast to what has been happening on a near-daily basis at the Portland ICE Building since June 2025. Far from a rapidly deteriorating situation, the events at the Portland ICE Building have been following the same pattern since the beginning of Operation Skip Jack—so much so that officers can't distinguish between the days in their memories. 22-SER-04253 ("It's

41

been a bit of groundhog day out here.") There has been ample time for senior DHS officials to develop a plan to ensure robust First Amendment activity can continue outside the ICE building while maintaining access to the facility. Whereas in *Puente* law enforcement officers responded with more limited measures before dispersing the crowd, DHS officers at the Portland ICE Building have consistently used chemical and impact munitions as a primary means of interacting with crowds, even when facility access was not necessary and there was no threat of harm to the officers or the building.

The stay order suggests that a series of protests "may" increase the justification for use of munitions, making the very obvious factual distinctions between *Puente* and this case "cut the other way." *Dickinson*, 2026 WL 1133353, at *6. However, the district court found a sustained pattern of escalating violence from Defendants and noted that expert testimony made clear that "the amount of force used by federal officers at the Portland ICE Building is not a good indication of the level of violence or unrest caused by protests at that location." 1-ER-26.

Again, while there *could* be an alternative explanation for the use of chemical and impact munitions, that is insufficient to show the court clearly erred. Even assuming Defendants could show there was a clear and present danger of imminent lawlessness justifying dispersal every time Defendants barraged Plaintiffs and class members with munitions, Plaintiffs would not be barred from succeeding on a

42

retaliation claim.[5] No case creates such a bar, and if one analogized to the general probable cause bar in the retaliatory arrest context to create a new one, the Supreme Court has still established logical exceptions to that general rule. *See, e.g. Lozman v. Riviera Beach*, 585 U.S. 87 (2018) (existence of probable cause did not foreclose a retaliatory arrest claim where a city had a policy of intimidation); *cf Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). The reasons for these types of exceptions make sense because, as the Supreme Court explains in *Lozman*:

> "An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer. An official policy also can be difficult to dislodge. A citizen who suffers retaliation by an individual officer can seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation. For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress."

*Id.* at 100. As in *Lozman*, Plaintiffs have shown, and the District Court found, that Defendants have a policy of retaliation being driven by top decisionmakers in the retaliating government body. Defendants fail to show that the court clearly erred in

---

[5] The stay panel relies on *Puente* to conclude that the district court "erred in assuming that the government cannot use non-lethal munitions in response to imminent lawlessness." *Dickinson*, 2026 WL 1133353, at *6. If this Court concludes that that decision is binding and concludes that a clear-and-present-danger analysis was required, it should remand the case to the district court to make findings in the first instance. *But see* AOB at 24 n.3 (arguing that stay panel decisions lack precedential force).

making that finding. Therefore, the Court should decline Defendants' invitation to create broad institutional immunity for retaliation against protesters, leave the court's finding of a policy of retaliation undisturbed, and affirm the district court's conclusion that Plaintiffs are likely to succeed on the merits of their First Amendment retaliation claim.

**B.** **The district court did not abuse its discretion by holding that Plaintiffs will suffer irreparable harm in the absence of the preliminary injunction.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "[U]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (quotations and citation omitted).

The district court explicitly found that "the repeated teargassing and use of OC Spray and other less lethal munitions against nonviolent protesters engaging in, at most, passive resistance at the Portland ICE Building will likely keep recurring against Plaintiffs and the members of the class." 1-ER-29. This finding was supported by specific evidence in the record. There were statements by "DHS officials and senior federal executives [that] show that the culture of the agency and

44

its employees is to celebrate violent responses over fair and diplomatic ones." 1-ER-29. The 61 declarations by civilians covered a range of dates from June 2025 through March 2026, supporting the district court's finding that "Defendants' violence is in no way isolated." 1-ER-29. The district court also found that some protesters are "fully chilled" and will not return to the Portland ICE Building. 1-ER-29. The district court accordingly held that Plaintiffs would suffer irreparable harm absent the injunction.

In a single sentence, Defendants assert that "plaintiffs' allegations of injury are insufficient even to support their standing to obtain injunctive relief, much less demonstrate irreparable injury." AOB at 39.

As already explained above, the district court's finding that Plaintiffs are currently suffering First Amendment chill was not an abuse of discretion. Moreover, this Court has previously held that plaintiffs have demonstrated they will suffer irreparable harm absent a preliminary injunction when the evidence shows "[t]he government's actions have already caused severe and lasting physical injuries and trauma to some Plaintiffs—some on more than one occasion…during different protests." *L.A. Press Club*, 171 F.4th at 1189-90. The evidence shows that is what happened to Plaintiffs at the Portland ICE Building. And just as was true for the plaintiffs in *L.A. Press Club*, "this has had a chilling effect on some Plaintiffs' ability to exercise freedoms protected by the First Amendment." *Id.* The district court did

45

not abuse its discretion in holding that Plaintiffs would suffer irreparable harm absent the injunction under these circumstances.

### C.   The district court did not abuse its discretion by holding that the balance of equities and public interest also favor Plaintiffs.

"When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Plaintiffs raise 'serious First Amendment questions, ... [so] the balance of hardships tips sharply in [their] favor.'" *L.A. Press Club*, 171 F.4th at 1190 (quoting *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (citation omitted)). This Court has "made clear that it is always in the public interest to prevent the violation of party's constitutional rights" and "consistently recognized the significant public interest in upholding First Amendment principles." *Id.* (quotations and citations omitted.).

Defendants assert that "any harms to the plaintiffs are outweighed by the harms the injunction inflicts on the government and the public interest, particularly given the injunction's sweeping breadth and unworkability." AOB at 39. But, as will be explained below, the injunction is workable and appropriately focused on addressing the harm Plaintiffs have suffered. Thus, the district court did not abuse its discretion in holding that these two *Winter* factors weigh in favor of issuing the injunction.

**II.  The district court did not abuse its discretion in defining the scope of the preliminary injunction.**

The Government raises three additional arguments as to why the district court's preliminary injunction was improper. First, it argues that providing relief to non-parties is inconsistent with *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025). Next, it argues that the injunction's provisions lack any basis in the First Amendment. AOB at 33. Finally, it argues that the injunction is unworkable. AOB at 35. None of these arguments are convincing.

**A.  The district court did not abuse its discretion by provisionally certifying a class, so the scope of relief is consistent with *CASA*.**

Defendants argue that it is improper for the injunction to grant relief to anyone except the five named Plaintiffs under *CASA*, 606 U.S. at 831. AOB at 29. They accuse the district court of certifying a provisional class to "evade [] limits on its authority." AOB at 30. And they assert that the class certification order is improper because it "flouts Rule 23's commonality requirement and Rule 23(b)(2)'s indivisibility requirement." AOB at 31.

Contrary to Defendants' contention, certifying a class and granting classwide relief is entirely consistent with the holding in *CASA*.[6] In that case, the Supreme

---

[6] The district court's holdings that it could grant relief to a putative class, ER-32 (citing *AARP v. Trump*, 605 U.S. 91 (2005), other citations omitted), and that it can grant complete relief to the individual plaintiffs, ER-33 (citing *CASA*) were also legally sound.

47

Court criticized universal injunctions as "a class-action workaround." *CASA*, 606 U.S. at 850. First, the injunction in this case is far from a universal injunction of the type at issue in *CASA*: it is limited not just to a single city, but to a single address in that city. It is also nonsensical for Defendants to suggest that going through the steps of certifying a class pursuant to Rule 23 is inconsistent with *CASA*. Far from evading limits on its authority, the district court went through the detailed analysis required by Rule 23 before issuing its class certification order. Satisfaction of Rule 23's requirements to certify a class is all *CASA* requires for a district court to provide relief to all class members.

Moreover, class certification was appropriate here under Rule 23. Under Rule 23(a), a party seeking certification of a class must satisfy four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Of these four requirements, Defendants concede three and only challenge commonality. AOB at 40. A party seeking certification must also satisfy the requirements of one of the subsections of Rule 23(b). Plaintiffs obtained certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Defendants also argue that Plaintiffs fail to meet this requirement. AOB at 40.

48

As a preliminary matter, "[w]hen reviewing a grant of class certification, [this Court] accord[s] the district court noticeably more deference than when [it] review[s] a denial of class certification." *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014) (quoting *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 956 (9th Cir.2013) (citation omitted)). And where an extensive factual record establishes that law enforcement actions are part of an ongoing, unified government operation governed by an unwritten policy, the lawfulness of that policy is "plainly suitable for classwide resolution." *See Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 809 (9th Cir. 2020) (distinguishing between "totality of the circumstances" analysis that applies to probable cause and classwide questions raised by government's reliance on database to establish probable cause) (quotation omitted); *Parsons*, 754 F.3d at 682 ("In a civil rights suit such as this one ... commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. Under such circumstances, individual factual differences among class members pose no obstacle to commonality.") (alteration in original, quotation omitted).

*Parsons* is instructive. 754 F.3d 657 (9th Cir. 2020). In that case, plaintiffs were inmates in Arizona's prison system who alleged that "numerous policies and practices of statewide application governing medical care, dental care, mental health care, and conditions of confinement in isolation cells exposed them to a substantial

49

risk of serious harm to which the defendants are deliberately indifferent." *Id.* at 662. They sought declaratory and injunctive relief on behalf of a class as to the healthcare policies and practices. *Id.* Though the claims were vast and varied, they all hinged on one central tenant—they were unconstitutional. *Id.* at 672 (listing ten challenged policies and practices, including, inter alia, failure to provide "care for chronic diseases and protection from infectious diseases," "provision of substandard dental care," and "denial of medically necessary mental health treatment"). Clearly, an individual who was harmed by the failure to provide their medication for a chronic disease has a factually distinct claim from someone who was harmed by the provision of substandard dental care. But this Court affirmed the district court's certification of a class of "[a]ll prisoners who are now, <u>or will in the future be</u>, subjected to the medical, mental health, and dental care policies and practices of the ADC." *Id.* (emphasis added).

Just like Defendants in this case, the defendants in *Parsons* argued that the class failed to meet Rule 23's commonality requirement and Rule 23(b)(2)'s requirement to show the indivisible nature of the remedy for the class. *Id.* at 673-674.

In rejecting the *Parsons* defendants' argument that the class failed to satisfy commonality, this Court applied the Supreme Court's decision in *Wal-Mart v. Dukes*, 564 U.S. 338 (2011). It noted that "plaintiffs' claims 'must depend upon a common

contention' such that 'determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Parsons*, 754 F.3d at 675 (quoting *Wal-Mart*, 564 U.S. at 350) ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (citation omitted).

This Court disagreed with defendants' contention that a systematic constitutional violation of the sort alleged here is a collection of individual constitutional violations, each of which hinges on the particular facts and circumstances of each case." *Id.* (alterations accepted, quotations and citation omitted). Plaintiffs' claims rested on their common exposure to specified statewide policies and practices. *Id.* at 678. This Court found commonality was thus satisfied because those very policies and practices were the "'glue' that holds together the putative class and the putative subclass; either each of the policies and practices is unlawful as to every inmate or it is not." *Id.* at 678 ("That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination."). Thus, the case was "different than *Wal-Mart* in every respect that matters," *id.* at 681, particularly because it involved a challenge to "uniform statewide policies created and overseen by two individuals," not discretionary

51

decisions, and because it involved individuals in "the custody of a single state agency," not individuals "scattered throughout the United States." *Id.* This Court thus held that the district court did not abuse its discretion in certifying the class.

Just like *Parsons*, this case similarly involves claims about a government policy and practice—and that policy and practice is the "glue" that holds the class together. Here, the uniting force between all class members' claims is the policy and practice of retaliation against First Amendment activity at the Portland ICE Building. The district court found that "Plaintiffs have shown by a preponderance of evidence that, under unified FPS command, Defendants have an unwritten policy" that permits using crowd control munitions to suppress the speech of nonviolent protesters at the Portland ICE Building based on evidence regarding the improper use of less lethal munitions, inadequate training, and lack of investigations following the use of force. ER 46. That finding was not clearly erroneous: it is plausible, logical, and supported by the record. *See Parsons*, 754 F.3d at 683 (acknowledging that "utterly threadbare allegations that a group is exposed to illegal policies and practices" are not "enough to confer commonality," then finding commonality because plaintiffs had submitted sufficient evidence to define the policies and practices with "precision and specificity" based on "particular and readily identifiable conduct on the part of the defendants.").

Indeed, the class at issue here is less varied than the class in *Parsons*. The class in *Parsons* covered all inmates in Arizona's entire prison system. In this case, class members are only individuals who have, desire to, or will protest at a very specific location: the Portland ICE Building located at 3410 Southwest Macadam. Notably, the discrete location limitation on the class definition here makes it considerably more narrow than *Parsons*, as well as other class actions that have been questioned as too broadly defined.

For example, in *Tincher v. Noem*, the Eighth Circuit opined that the class had "*no* chance of getting certified" because the allegations showed "federal agents responding in various ways" to "different conduct, by different officers, at different times, in different places, in response to different behavior." 164 F.4th 1097 (8th Cir. 2026) (per curiam). In contrast, here, DHS officers admit that the days are essentially indistinguishable because they are so similar: it is the exact same behavior by officers (deploying chemical and impact munitions), under the same unified FPS command, in the exact same city block, in front of the exact same building, in response to what DHS officers admitted in depositions was, essentially, the exact same behavior by individuals standing on or near federal property. This case is not seeking sweeping relief on behalf of all protesters who have encountered DHS behavior around the city of Portland or the entire State of Oregon. It is focused on the specific policy and pattern of using chemical and impact munitions with animus

53

against crowds and at nonviolent individuals who are exercising their First Amendment rights at the Portland ICE Building.

Defendants also point to *Black Lives Matter Los Angeles*, 113 F.4th at 1249, to argue that Plaintiffs in this case cannot satisfy the commonality requirement. AOB at 42. But in that case, the district court never identified a common question for the (b)(2) class, so the Court remanded the case for it to do so. 113 F.4th at 1258. At most, the Court concluded that the common questions found for a *Monell* damages class cannot be imputed to a (b)(2) injunctive relief class; a separate analysis must be conducted. This case does not raise the same issue. There is no damages class, and the district court found an unwritten policy of using excessive force on the (b)(2) class members for the purpose of chilling their First Amendment activities. 1-ER-46. Additionally, despite only needing a single common question, the district court identified at least two. 1-ER 49-50.

Turning back to the analysis in *Parsons*, the harm alleged by the plaintiffs in that case was also more varied than the harm suffered by Plaintiffs in this case. The harms encountered by the *Parsons* plaintiffs included lack of access to prescribed medications, inadequate dental care, denial of basic mental health care to suicidal prisoners, and the like. Here, the Plaintiffs all suffer the same harm: exposure to chemical and impact munitions and resulting First Amendment chill. And just as the *Parsons* plaintiffs' claims could be resolved in a single stroke by a determination of

54

whether prison policies and practices were unconstitutional, the Plaintiffs' claims here can be resolved by a single stroke in deciding whether DHS has an unwritten policy or practice of First Amendment retaliation against protesters and journalists at the Portland ICE Building. Additionally, determining whether DHS's policy and pattern is objectively chilling can be singularly determined for all class members. These questions "can be answered "yes" or "no" in one stroke as to the entire class," and "dissimilarities among class members do not impede the generation of [a] common answer[] to th[e] question[], [so]… the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted." *Id.* at 684 (citing *Wal–Mart*, 564 U.S. 350). Thus, the district court did not abuse its discretion in holding that Rule 23's commonality requirement is met.

The *Parsons* defendants, like Defendants here, also challenged whether Rule 23(b)(2)'s indivisible remedy requirement was met. *Id.* at 686. This Court noted that "the primary role of this provision has always been the certification of civil rights classes." *Id.* (citing Wright & Miller, *7AA Fed. Prac. & Proc. Civ.* § 1776 (3d ed.) ("[S]ubdivision (b)(2) was added to Rule 23 in 1966 in part to make it clear that civil-rights suits for injunctive or declaratory relief can be brought as class actions")). This Court held that the provision's "requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole."

55

*Id.* at 688. Thus, it held the district court had not abused its "broad discretion" in holding plaintiffs met the requirement. *Id.*

The same is true here. Plaintiffs seek injunctive relief from DHS's uniform policy and practice of using chemical and impact munitions to retaliate against protesters and journalists at the Portland ICE Building. That policy is applicable to the class as a whole, so the district court did not abuse its broad discretion in holding that Rule 23(b)(2)'s indivisible remedy requirement was met. That means the district court did not abuse its discretion in holding that all of Rule 23's requirements were met and certifying the class.

## B. The provisions of the preliminary injunction are closely tethered to the harm, as required.

"[D]istrict courts have "considerable discretion in fashioning suitable relief and defining the terms of an injunction,' [but] such relief 'must be tailored to remedy the specific harm alleged.'" *L.A. Press Club*, 171 F.4th at 1190 (quoting *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025)).

Defendants argue that the preliminary injunction's provisions "operate like a detailed law-enforcement manual" and are "unmoored from plaintiffs' First Amendment retaliation claims because it is based on Fourth Amendment standards." AOB at 33.

This argument misses the mark. The terms of preliminary injunction must be closely tied to the <u>harm</u> alleged, not the claims asserted. *L.A. Press Club*, 171 F.4th

at 1190. The robust evidentiary record decidedly shows that the force of DHS's chemical and impact munitions is the primary mechanism Defendants use to retaliate against Plaintiffs. Thus, limiting how Defendants deploy it is necessary to remove the fear their conduct has created. Such relief easily falls within a court's broad remedial powers. A court may even "order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation." *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986) (citing *N.C. State Bd. of Ed. v. Swann*, 402 U.S. 43, 46 (1971) and *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15–16 (1971)).

### C. The district court's holding that the injunction is workable and safe was not an abuse of discretion.

Defendants also argue that the district court's preliminary injunction "failed to account for what is workable." AOB at 35 (quotations and citation omitted). In making this argument, Defendants ask this Court to rely on written declarations of two DHS supervisors who are not experts in public order policing—one of whom admitted he's not a use of force expert. AOB at 35; 12-SER-02414; 7-SER-01504 (Gil Kerlikowske, former CBP Commissioner, describing that "the border patrol is not trained or experienced or knowledgeable about policing protests").

Defendants ignore that the district court's holding that the scope of relief was appropriate based, in part, on the declarations and live testimony of two commanders from the Portland Police Bureau, an Oregon State Police captain, and a former CBP

Commissioner who all agreed that the terms of the injunction are safe and workable. 6-SER-01223—01224; 6-SER-001139; 2-SER-00337; 2-SER-00344; 2-SER-00372; 1-SER-00215. At the hearing, the district court even took feedback from the experts as to how to improve the workability of the terms of the temporary restraining order, including by loosening restrictions imposed on the use of pepper spray. 1-ER-17 ("The court has incorporated that suggested improvement in the [preliminary injunction]."). The experts also described how policing theory and trends are moving away from the "mob mentality" policing tactics that were born out of the 1800s. 6-SER-001172—001173. That is because modern policing recognizes that things like police showing up in tactical gear and using excessive force actually escalates a crowd, rather than deescalates it to make it safer for everyone. 6-SER-01170—01172. These law enforcement professionals with decades of crowd control experience provided robust expert opinions that the district court relied on to carefully craft the terms of the injunction.

Expert and former CBP Commissioner Gil Kerlikowske opined that the injunction was safe and workable. He pointed to the fact that Defendants had complied with the terms for 28 days when they were subjected to the TRO. 7-SER-01545. The same defendants were also subject to a similar injunction in Los Angeles for months. 7-SER-01546. Likewise, he supports the FPS policy as written and recognized that there is a need for FPS to actually follow those policies. 7-SER-

01546. The injunction mirrors the FPS policy, and Mr. Kerlikowske describes that "[p]olice departments operate in this way all the time." 7-SER-01546. Defendants also speculate that the injunction is "ripe for abuse," but offer no evidence that any abuse actually occurred. AOB at 36; 24-SER-04817 ("with the current level of activity we have seen, then no, I have not seen any harm"). In fact, even Defendants' leadership confirmed that similar terms dictated by the district court's temporary restraining order were safe and workable. 24-SER-04817 ("With the current level of activity, if that continues, then, yes, by all means it's safe to comply."). This makes sense, because as the district court found, the terms of the injunction are "quite close" to restrictions on force found in DHS's written policies. 1-ER-18. In fact, for restrictions on tear gas, the agency directing Operation Skip Jack and generally tasked with securing federal facilities in the face of protest does not even authorize the use of tear gas at all under its written policy. 5-SER-00961.[7] However, FPS does not require cross-designated officers who exercise FPS's authority at the Portland ICE Building to cease or avoid using their tear gas munitions.

Defendants' policy preference for using chemical and impact munitions to assault individuals at the Portland ICE Building does not make an alternative approach unworkable. Indeed, "the proper response to potential and actual violence

---

[7] The Portland Police Bureau also has significantly restricted its use of tear gas, and has not deployed any since the fall of 2020. 6-SER-01167.

59

is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Collins v. Jordan,* 110 F.3d 1363, 1372 (9th Cir. 1996) (citing *Cox v. Louisiana,* 379 U.S. 536, 551 (1965)). Defendants cannot rely on "undifferentiated fear or apprehension of disturbance ... to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969). The record provides ample support for the district court's holding that the terms of the injunction are workable and safe, and the terms requiring alteration of the uniforms are appropriate to ensure accountability. Drafting the terms of the preliminary injunction to largely mirror DHS's own written policies (that were not being followed) was not an abuse of discretion.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order issuing the preliminary injunction and order certifying the class.

Dated: May 13, 2026          Respectfully submitted,

ACLU FOUNDATION OF
OREGON

By: _____ */s/ Kelly Simon* _____
Kelly Simon

SINGLETON SCHREIBER LLP

60

By: _____ */s/ Kimberly Hutchison* _____
Kimberly Hutchison


BRAUNHAGEY & BORDEN LLP

By: */s/ Matthew Borden* _____
Matthew Borden

ALBIES & STARK LLP

By: _____ */s/ J. Ashlee Albies* _____
J. Ashlee Albies


PEOPLE'S LAW PROJECT

By: _____ */s/ Jane L. Moisan* _____
Jane L. Moisan

*Attorneys for Plaintiffs-Appellees Jack Dickinson, Laurie Eckman, Richard Eckman, Mason Lake and Hugo Rios*

61

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 27(d)(2)(A) and 32(a)(5)-(6), and Circuit Rules 27-1(d) and 32-3, the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and contains **13,930** words.

Dated: May 13, 2026          Respectfully submitted,

SINGLETON SCHREIBER, LLP

By: */s/   Kimberly S. Hutchison*
          Kimberly S. Hutchison