No. 26-1609

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

JACK DICKINSON, also known as the Portland Chicken; et al,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, President of the United States, in his official capacity; et al,

Defendants-Appellants.

_____

BRIEF OF AMICUS CURIAE STATE OF OREGON

_____

Appeal from the United States District Court
for the District of Oregon

_____

DAN RAYFIELD  #064790
Attorney General
PAUL L. SMITH  #001870
Solicitor General
ROBERT A. KOCH  #072004
Attorney-In-Charge
Civil & Administrative Appeals
JONA J. MAUKONEN  #043540
Assistant Attorney-In-Charge
Civil & Administrative Appeals
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone:  (503) 378-4402
jona.j.maukonen@doj.oregon.gov

Attorneys for Amicus Curiae
State of Oregon

_____
_____

## TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF INTEREST ................................. 1

BACKGROUND .................................................................................... 2

ARGUMENT .......................................................................................... 7

    A.    Crowd-control munitions can pose a substantial danger to human health and may escalate, rather than abate, public unrest. .. 9

    B.    The preliminary injunction is consistent with federal government guidance and policies. ................................................ 13

    C.    The preliminary injunction is consistent with Oregon's use-of-force policies, laws and experience, and the laws of other states. 15

CONCLUSION .................................................................................... 19

## TABLE OF AUTHORITIES

### Cases Cited

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ................................................................... 1

*N.F.I.B. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................... 1

*Terminiello v. City of Chicago,*
    337 U.S. 1 (1949) ....................................................................... 6

### Constitutional and Statutory Provisions

Cal. Penal Code § 13652(b) ............................................................... 17

Cal. Penal Code § 13652(b)(1)-(10) .................................................. 18

Cal. Penal Code § 13652(b)(5) .......................................................... 18

Mass. Gen. Laws ch. 6E, § 14(e) ...................................................... 18

Or. Rev. Stat. § 181A.708 .................................................................. 16

Or. Rev. Stat. § 181A.708(3) .............................................................. 17

i

Or. Rev. Stat. § 181A.708(4)–(5) ........................................................... 17

Or. Rev. Stat. § 181A.708(6) ................................................................. 17

U.S. Const., Amend IV .......................................................................... 2

U.S. Const., Amend. I ................................................. 2, 3, 4, 6, 8, 9, 14, 15, 19

## Other Authorities

Cal. Comm'n on Peace Officer Standards & Training,
Basic Workbook Series, Handling Disputes / Crowd Control (revised
July 2025) ..................................................................................... 18

Dionne Barnes-Proby et al.,
*Improving Protest Policing: Lessons Learned & Recommendations for Law
Enf't & Protest Organizers* (2026) ............................................. 12

Fed. R. App. P. 29(a)(2) ......................................................................... 1

Jack Glaser & May Lim,
*Review of Research on Policing Demonstrations*, Goldman Sch. of Pub.
Policy, Univ. of Cal. Berkeley (July 28, 2020) ........................... 11

Maggie Koerth & Jamiles Lartey,
*Why So Many Police Are Handling the Protests Wrong*, The Marshall
Project (June 1, 2020) .................................................................. 11

The Federalist No. 45 (J. Madison) ......................................................... 1

U.S. Dep't of Interior, Nat'l Park Serv.,
U.S. Park Police, G.O. 2301, Demonstrations & Special Events (June 9,
2022) ............................................................................................. 14

U.S. Dep't of Justice, Civil Rights Division,
*Investigation of the City of Minneapolis and the Minneapolis Police
Department* (2023) ....................................................................... 14

U.S. Dep't of Justice, Office of Cmty. Oriented Policing Servs.,
*After-Action Assessment of the Police Response to the August 2014
Demonstrations in Ferguson, Missouri* (2015) ................................ 11, 13

**BRIEF OF AMICUS CURIAE STATE OF OREGON**
_____

**INTRODUCTION AND STATEMENT OF INTEREST**

This case concerns the right of Oregonians to protest peacefully. After defendants repeatedly used chemical munitions and projectiles without warning or justification on peaceful protestors outside the Immigration and Customs Enforcement (ICE) facility in Portland, Oregon, plaintiffs sued to vindicate, among other claims, their First Amendment freedoms of speech, press, and assembly. The district court entered a preliminary injunction barring defendants from using such munitions or projectiles absent an imminent threat of physical harm, consistent with defendants' own use-of-force policies. (1-ER-2–39).

The State of Oregon files this amicus brief under Federal Rule of Appellate Procedure 29(a)(2). Oregon has a foundational "interest in the health and well-being of its residents in general," including its residents' constitutional rights and physical safety. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 593 (1982). Under the separation-of-powers principles that underpin our constitutional design, Oregon also retains a sovereign interest in ensuring that law enforcement within its borders respects the "lives, liberties, and properties of the people" who live here. *N.F.I.B. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)). Defendants' unconstitutional tactics

2

directly implicate and undermine those state interests. For that reason, the state also participated as amicus in support of plaintiffs in the district court proceedings.

This Court should affirm the preliminary injunction. The state agrees with plaintiffs' arguments on standing, defendant's retaliatory intent, irreparable harm, and class certification. The state provides this amicus brief to address defendants' contentions that a preliminary injunction is contrary to the public interest, overbroad, and unworkable. It is none of those. The injunction's parameters are supported by the record, best practices on crowd management, and defendants' own policies and guidelines. Such parameters also mirror how the Oregon State Police manage crowds, including at protests, and the policies of other jurisdictions.

## BACKGROUND

Plaintiffs sued defendants after the federal government used chemical munitions, projectiles, and other less-than-lethal force on peaceful protestors and journalists outside the Portland ICE facility. (2-ER-183). They asserted claims based on the First Amendment, Fourth Amendment, Due Process, and the Administrative Procedures Act. (2-ER-220–26). Plaintiffs sought class certification, a temporary restraining order, and then a preliminary injunction based on their First Amendment claims. The district court issued a temporary restraining order (2-ER-150) followed by a preliminary injunction (1-ER-2). The court also provisionally certified a class. (1-ER-40).

3

Before granting the preliminary injunction and provisional class certification, the district court held a three-day evidentiary hearing and issued a 34-page opinion making extensive factual findings about the peaceful nature of the First Amendment activity at issue here, and defendants' concomitant use of chemical munitions and projectiles in response. (1-ER-6). Specifically, the opinion details how various plaintiffs were struck with projectiles and subjected to chemicals from tear gas, pepper balls, pepper spray, and Oleoresin Capsicum (OC) spray while peacefully protesting outside the Portland ICE building. (1-ER-11–16). For example, 85-year-old Laurie Eckman sustained a concussion after being hit in the head with what was likely a pepper ball while she peacefully held a sign outside the building. (1-ER-13). Another plaintiff, Mason Lake, is a video journalist who prominently displays "PRESS" on his clothing and helmet; Lake was shot by a federal officer in the groin with what were likely pepper balls, which caused bruising despite Lake wearing protective gear. (1-ER-14). On another occasion, a federal officer sprayed OC directly into Lake's face and on his video equipment. (1-ER-14).

The district court also found that the incidents of violence by federal officers had been escalating in frequency and randomness until the district court issued its temporary restraining order. (1-ER-16). Importantly, the court explained that "Plaintiffs provided numerous videos, which were received in evidence and

4

unambiguously show DHS officers spraying OC Spray directly into the faces of peaceful and nonviolent protesters engaged in, at most, passive resistance and discharging tear gas and firing pepper-ball munitions into crowds of peaceful and nonviolent protestors." (1-ER-16). The court described the videos as "both unambiguous and disturbing." (1-ER-16).

The district court first ruled that plaintiffs had standing because they had suffered injury from defendants' tactics, and those tactics were likely to continue and cause further injury. (1-ER-19–21). In particular, plaintiffs had established that they were "currently suffering First Amendment chill" because defendants were "physically assaulting nonviolent and peaceful protestors and journalists." (1-ER-21–22). Paradigmatically, a "chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." (1-ER-21).

The court then ruled that plaintiffs were likely to prevail on their First Amendment retaliation claim. Plaintiffs had engaged in peaceful protests that were clearly protected by the First Amendment. (1-ER-24–25). "Defendants' persistent, excessive, and targeted violence has chilled some protesters and journalists from returning to the Portland ICE Building." (1-ER-25). And plaintiffs' protected activity was a substantial factor in defendants' conduct. (1-ER-25–26). The court noted that plaintiffs could prove that their protected activity was a substantial or motivating factor by either direct or circumstantial evidence.

(1-ER-25). The court rejected, as contravened by both the factual and expert testimony presented, defendants' argument that they were merely enforcing the law and protecting federal property. (1-ER-25).

The court described evidence that supported a retaliatory intent, rather than regular law enforcement activity. That evidence included that officers targeted protesters and journalist, who posed no threat, with force to the head and other parts of the body, attacked protestors who had merely engaged verbally or failed to immediately comply with officers' orders, targeted cameras and recording equipment, and shot into nonviolent crowds from the roof of the Portland ICE Building. (1-ER-25–26). That evidence also included expert testimony that the officers' responses to the protests and particularly the use of tear gas and munitions was disproportionate to the level of violence or unrest associated with the protests and inconsistent with best practices. (1-ER-26–27). The court also explained that rather than reprimanding officers for excessive violence against protestors, senior officials have publicly condoned it. (1-ER-27–28).

The court further found that plaintiffs had suffered irreparable injury and that harm was likely to recur based on defendants' pattern of violence and "statements made by DHS officials and senior federal executives," which "show that the culture of the agency and its employees is to celebrate violent responses over fair and diplomatic ones." (1-ER-28–29). The court also determined that the

6

public interest and balance of equities favored injunctive relief. (1-ER-30–31). The court emphasized the importance of protecting the First Amendment right to protest as "one of the chief distinctions that sets us apart from totalitarian regimes." (1-ER-31 (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)). And the court explained that defendants still could engage in lawful efforts to address protestors, including clearing the way for vehicles to enter the building and citing or arresting people. (1-ER-30).

After additional input on the parameters of an injunction (1-ER-17), the district court entered an injunction that prohibits U.S. Department of Homeland Security agents around the Portland ICE building from using chemical or projectile munitions "unless the specific target of such a weapon or device poses an imminent threat of physical harm to a law enforcement officer or other person." (1-ER-3). It further prohibits agents from firing such munitions "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person." (1-ER-3). And it prohibits agents from using "pepper spray, oleoresin capsicum spray, or other aerosol restraint spray (collectively, 'OC Spray'), unless the specific target of that weapon exhibits, at a minimum, active resistance," as well as from using "OC Spray indiscriminately against groups of people where bystanders foreseeably would be affected." (1-ER-3–4).

In so ordering, the district court recognized that chemical and projectile munitions remained appropriate in some circumstances. The court explained that "OC Spray may be used against specific individuals actively engaged in violent unlawful conduct, actively resisting arrest, or as reasonably necessary in a defensive capacity." (1-ER-4). And federal agents still could make lawful arrests and use proportional force whenever an individual poses an imminent threat of physical harm. (1-ER-4). In addition, federal agents would not be liable for violating the injunction "if a person is incidentally exposed to a crowd-control device" that was deployed consistent with the court's order. (1-ER-4). Finally, the court directed the parties to confer about how federal agents around the Portland ICE building could display their identification. (1-ER-4).

## ARGUMENT

Defendants challenge the preliminary injunction on several grounds. They assert that: (1) plaintiffs lack standing; (2) plaintiffs are unlikely to prevail on the merits; (3) plaintiffs' alleged injuries do not constitute irreparable harm; (4) any harm to plaintiffs is outweighed by the harm to the government and public interest; and (5) the injunction is overbroad and unworkable. Defendants also challenge the provisional class certification. The state agrees with plaintiffs' arguments on standing, likelihood of success on the merits, irreparable harm, and class certification. The state focuses on the scope and workability of the injunction and

how it serves the public interest. The preliminary injunction is in the public interest because it protects First Amendment activity and promotes public safety while allowing defendants to respond to disruptions with appropriate force.

Defendants contend that the preliminary injunction is dangerous to federal officers and the public because it "effectively bars DHS officers from deploying crowd-control devises at the Portland ICE facility even when crowds obstruct federal-law enforcement activity, ignore lawful dispersal orders, threaten public safety, and tress pass on or damage federal property." (Def. Br. 35). They argue that the preliminary injunction usurps their decision-making (or that of their officers) and eliminates "key tools for deterring escalation" which could lead to preventable violence, including by violent actors who try to shield themselves with peaceful protestors. (Def. Br. 35–38).

Those arguments are based on a misunderstanding of the preliminary injunction's plain terms. The court found that defendants had targeted those *peacefully* protesting with chemicals and projectiles. Defendants are thus enjoined from using such munitions on *peaceful* protestors. For those few in a crowd who may require a more targeted or forceful response, the plain terms of the injunction do not preclude defendants from responding in a lawful and effective manner. The court's injunction therefore recognizes the harms posed by the indiscriminate use

of munitions and narrows their use to the dangerous circumstances for which they are intended.

Moreover, the injunction is supported by the record, including expert testimony and research, defendants' own use-of-force policies and guidance, and Oregon's experience with crowd-control management.

## A. Crowd-control munitions can pose a substantial danger to human health and may escalate, rather than abate, public unrest.

Crowd management and control is a unique form of policing that implicates the need to protect the rights to free speech, press, and assembly under the First Amendment, while safely addressing unlawful behavior. This form of policing is particularly complex because unlawful conduct, when present, is often interspersed with lawful conduct; group dynamics can range from a peaceful gathering to riotous conduct. Crowd-control munitions are dangerous and blunt tools that have the potential to restrict First Amendment rights, cause serious injury to both perpetrators and innocent bystanders, and inflame unrest. Law enforcement must weigh those possible effects when considering whether munitions are necessary to prevent even greater harm. The district court's preliminary injunction strikes that careful balance.

Crowd-control munitions—including chemical irritants and projectiles—can be dangerous. As expert Dr. Rohini Haar explained, chemical irritants can cause sudden onset and severe burning sensations in the eyes and on skin, vomiting,

coughing and difficulty breathing.  Chemicals that enter the lungs can cause respiratory distress.  In 2020, the American Thoracic Society called for a moratorium on the use of tear gas and other chemical irritants on protestors because of risk to lung health.  Less-lethal projectiles, such as rubber bullets, can cause serious injury—particularly when shot from close range or at sensitive body parts.  And when projectiles are shot from longer range or in multiple rounds, they have unpredictable trajectories risking grave injury.  The pepper ball is a combination of projectile and chemical irritant.  The projectile component poses the risk of bruising, fractures, and internal injuries and the chemicals may come into more direct contact with an individual's body including vulnerable areas like the eyes or open wounds.  "Their dual-action nature increases the likelihood of both immediate injury and longer-term health consequences."  Using chemical and projectile crowd-control devises inappropriately or in the presence of vulnerable individuals such as children and the elderly amplifies harm.  (3-SER-694–710).

Research by the federal government recognizes that crowd-control munitions are not only dangerous, but they can escalate the very protests that they are sometimes used to quell.  After the 2014 shooting of Michael Brown in Ferguson, Missouri, the U.S. Department of Justice found that law enforcement's use of aggressive tactics, including less-lethal projectiles, in response to protests had the "unintended consequence of escalating rather than diminishing tensions."

U.S. Dep't of Justice, Office of Cmty. Oriented Policing Servs., *After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri* ("*Ferguson After-Action Assessment*"), at xiv, 59-60 (2015).[1] Similar research confirms that "[d]eploying weapons (e.g. batons, kinetic impact projectiles, chemical irritants) can, in addition to causing injuries and even death, rapidly escalate conflict." Jack Glaser & May Lim, *Review of Research on Policing Demonstrations*, Goldman Sch. of Pub. Policy, Univ. of Cal. Berkeley, at 2 (July 28, 2020).[2]

Relatedly, when law enforcement unnecessarily employs escalatory tactics, like munitions, it can "create feedback loops, where protesters escalate against police, police escalate even further, and both sides become increasingly angry and afraid." Maggie Koerth & Jamiles Lartey, *Why So Many Police Are Handling the Protests Wrong*, The Marshall Project (June 1, 2020).[3] Indeed, a recent study found that "success in managing protests may depend less on crowd-control tactics than on preparation, communication, and the perception of police legitimacy." Dionne Barnes-Proby et al., *Improving Protest Policing: Lessons Learned &*

---

[1] https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p317-pub.pdf.

[2] https://www.gov.ca.gov/wp-content/uploads/2020/10/Policing-and-Protests-Recommendations.pdf.

[3] https://perma.cc/8Z4Q-PZ86.

12

*Recommendations for Law Enf't & Protest Organizers* (2026).[4]  In other words,

promoting public safety and exercising reasonable restraint in the use of force are

not competing interests; they reinforce one another.

Given those complexities, a measured approach to crowd control is required.

The preliminary injunction is consistent with the expert testimony in this case.  Gil

Kerlikowske has extensive experience overseeing crowd control and developing

policies and training officers to respond appropriately.  Among other things, he is

the former Commissioner of U.S. Customs and Border Protection and former

Seattle Chief of Police.  Kerlikowske explained that teargas should not be

employed for passive resistance—such as refusing to disperse or trespassing.  And

less-lethal munitions, which are capable of killing people, should be targeted only

at specific individuals when other lesser levels of force have failed.  Less-lethal

projectiles should not be shot at a person who is in a crowd because of the risk of

harming others nearby.  That is true even if a specific person in the crowd is doing

something dangerous like throwing fireworks.  (3-SER-663–68).

Kerlikowske explained—consistent with the research discussed above—that

when officers teargas a crowd, that tends to anger people and increase resistance

and violence.  He explained that if federal agents want to clear a path for a vehicle

---

[4]https://www.rand.org/content/dam/rand/pubs/research_reports/RRA4200/RRA4218-2/RAND_RRA4218-2.pdf.

to enter or exit the Portland ICE Building, they should provide direction to people in the way to move out of a specific area. The officers should then explain clearly to people who have not moved that, if they do not move, they will be arrested. If people still do not move, the officers should begin arresting people. Once people see others being arrested, that often works to clear the crowd. And if a person actively resists arrest, it may be appropriate to use pepper spray on the individual, which is much more targeted than teargas and poses less risk to bystanders. (3-ER-670).

The district court's preliminary injunction strikes an appropriate balance: It prohibits the use of munitions and projectiles on peaceful protestors while allowing forceful responses to imminent threats of physical harm. Research and experts confirm the wisdom and necessity of that balance.

## B. The preliminary injunction is consistent with federal government guidance and policies.

What defendants now decry as unworkable is precisely what the federal government has previously endorsed. For example, in the *Ferguson After-Action Assessment*, the U.S. Department of Justice stressed that "[g]reat restraint of police powers should be used to protect the rights of lawful demonstrators." *Ferguson After-Action Assessment* at 48. In particular, "[t]he use of force via less-lethal weapons should be a last resort to maintain order," deployed only "after alternatives have been reasonably exhausted, after multiple warnings have been

14

given to demonstrators, and in situations when the threat to the safety of persons and protection of property are in imminent jeopardy." *Id.* Similarly, the National Park Service mandates the use of "de-escalation tactics and techniques to bring an incident under control" to serve the central purposes of "promoting the safety of officers and the public," while "also minimizing the need to employ force and the risk of unintended injury or serious property damage." U.S. Dep't of Interior, Nat'l Park Serv., U.S. Park Police, G.O. 2301, Demonstrations & Special Events, at § VIII.C (June 9, 2022).[5] Defendants' assertion of unworkability fails under the federal government's own guidance and policies.

And with respect to unlawful conduct that is interspersed with peaceful protest, the U.S. Department of Justice explained, only three years ago, that "the proper response is to address those who actually engage in such conduct, and not suppress legitimate First Amendment conduct as a prophylactic measure." U.S. Dep't of Justice, Civil Rights Division, *Investigation of the City of Minneapolis and the Minneapolis Police Department*, at 49 (2023) (internal quotation omitted).[6]

What defendants claim is unworkable is also consistent with their own policies that apply to DHS's Federal Protective Service and other agencies

---

[5] https://www.nps.gov/subjects/uspp/upload/General-Order-2301-Demonstrations-and-Special-Events.pdf.

[6] https://www.justice.gov/d9/2023-06/minneapolis_findings_report.pdf

15

supporting it in responding to protests. (5-SER-945). One key policy is to "ensure that people can safely exercise their First Amendment rights at facilities owned, occupied, or secured by the federal government. (5-SER-950). Another is to "facilitate de-escalation" and respond proportionality to the risks and threats presented. (5-SER-950). Accordingly, "[i]mpact projectiles shall not be fired indiscriminately into crowds." (5-SER-958). And OC Spray may only be used on "specific violence individuals" and not "indiscriminately against groups of people where bystanders would be reasonably affected, or against passively resistant individuals." (5-SER-959). The record in this case demonstrates that defendants were violating their own policies and the injunction imposes conditions consistent with defendants' stated guidelines, based on experience with significant protests, and with their written policies.

## C. The preliminary injunction is consistent with Oregon's use-of-force policies, laws and experience, and the laws of other states.

As a sovereign that exercises plenary police power under our Constitution, Oregon also has experience with responding to demonstrations and employing crowd-control measures. Contrary to defendants' claims, the injunction is neither overly broad nor unworkable. Rather, it furthers the public interest by permitting lawful law-enforcement activity while protecting and promoting public safety.

The Oregon State Police have been involved in crowd management, including during recent rallies near the Portland ICE building, and they have done

16

so consistently with the terms of the district court's preliminary injunction. Captain Cameron Bailey commands the state police's Criminal Investigations Division and has 20 years of law enforcement experience. Captain Bailey was incident commander for several recent events around the Portland ICE building where the Portland Police Bureau requested assistance from the state police. In a sworn declaration, Captain Bailey explained that federal agents can effectively manage protest crowds with a limit on the use of chemical munitions and projectiles. Such crowd-control munitions can serve to escalate, rather than deescalate, protests. Instead, other crowd management and deescalation tactics can "effectively respond to any crimes that may occur, and any threats to public safety, that might arise at a protest." (2-SER-374–76).

Oregon law on crowd-control management further underscores the inherent workability of the district court's preliminary injunction. Oregon enacted new crowd-control laws in the wake of protests after the murder of Geoge Floyd in Minnesota in 2020. Oregon law now provides similar (if not greater) limits on the use of chemical munitions and projectiles for crowd control than the district court's injunction, and those limits have proven to be workable. Or. Rev. Stat. § 181A.708.

Oregon law allows the use of tear gas for crowd management only when it is a reasonable means to defend against a dangerous situation, and only after

reasonable deescalation alternatives have been used; in addition, a commanding officer must authorize its use following two announcements to evacuate the area. Or. Rev. Stat. § 181A.708(3). Oregon law generally prohibits the use of "kinetic impact projectiles" for crowd management, allowing their use only when physical force is justified, and only allowing them to be shot at an individual's head when the situation would justify the use of deadly force. Or. Rev. Stat. § 181A.708(4)–(5). Further, "when it is safe and possible to do so," law enforcement agencies "shall minimize the incidental impact of the agency's use of handheld chemical incapacitants, tear gas and kinetic impact projectiles on bystanders, medical personnel, journalists and other unintended targets." Or. Rev. Stat. § 181A.708(6). As Captain Bailey explained, those legal constraints have proven workable when the Oregon State Police have been charged with crowd-control management. (2-SER-375).

Oregon's law is not unique. For example, in California crowd-control munitions may only be used "if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control." Cal. Penal Code § 13652(b). Even then, deployment is only authorized if several other prerequisites are met, including: (1) attempted de-escalation or other alternative measures; (2) repeated and detailed warnings; and

(3) efforts to ensure that projectiles only impact persons engaged in violent acts and are not used indiscriminately. Cal. Penal Code § 13652(b)(1)-(10). California law also directs that projectiles may be "used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable." Cal. Penal Code § 13652(b)(5). California guidelines further clarify that crowd-control projectiles can only be used "where, absent intervention, there is an imminent threat under the totality of the circumstances to overtake and/or exceed law enforcement capabilities and on-scene resources." Cal. Comm'n on Peace Officer Standards & Training, Basic Workbook Series, Handling Disputes / Crowd Control at 4-9 (revised July 2025).[7]

As another example, in Massachusetts, during protests law enforcement may not use chemical irritants or projectiles unless (1) de-escalation attempts have failed or are not feasible; and (2) the measure employed are "necessary to prevent imminent harm" and the measure used is "proportionate to the threat of imminent harm." Mass. Gen. Laws ch. 6E, § 14(e). If chemical weapons or projectiles are used, the agency must file a report detailing de-escalation efforts employed prior to use. *Id.*

---

[7]https://post.ca.gov/portals/0/post_docs/basic_course_resources/workbooks/LD_24-V5.0.pdf.

19

In short, there is nothing unworkable or overbroad about the district court's preliminary injunction. The record is replete with instances of defendants deploying chemical munitions and projectiles on peaceful protestors and journalists exercising their rights under the First Amendment. In turn, the district court imposed reasonable limits on the use of such munitions consistent with crowd-control studies, the federal government's own research and use-of-force policies, and Oregon law and practice.

## CONCLUSION

The Court should affirm the district court's injunction.

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
PAUL L. SMITH  #001870
Solicitor General
ROBERT A. KOCH  #072004
Attorney-In-Charge
Civil & Administrative Appeals

/s/  Jona J. Maukonen
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
JONA J. MAUKONEN  #043540
Assistant Attorney-In-Charge
Civil & Administrative Appeals
jona.j.maukonen@doj.oregon.gov

Attorneys for Amicus Curiae
State of Oregon

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Brief of Amicus Curiae State of Oregon is proportionately spaced, has a typeface of 14 points or more and contains 3,918 words.

DATED:  May 19, 2026

/s/  Jona J. Maukonen
_____
JONA J. MAUKONEN  #043540
Assistant Attorney-In-Charge
Civil & Administrative Appeals
jona.j.maukonen@doj.oregon.gov

Attorney for Amicus Curiae
State of Oregon

# CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2026, I directed the Brief of Amicus Curiae State of Oregon to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Jona J. Maukonen
_____
JONA J. MAUKONEN  #043540
Assistant Attorney-In-Charge
Civil & Administrative Appeals
jona.j.maukonen@doj.oregon.gov

Attorney for Amicus Curiae
State of Oregon

JJM:kw5/1020466325