No. 26-1609

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JACK DICKINSON, *also known as the Portland Chicken*; LAURIE ECKMAN; RICHARD ECKMAN; HUGO RIOS; MASON LAKE,
*on behalf of themselves and those similarly situated*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *President of the United States, in his official capacity*; MARKWAYNE MULLIN, *Secretary, U.S. Department of Homeland Security (DHS), in his official capacity*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Oregon

## REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney
General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
BRENNA SCULLY
DOUGLAS C. DREIER
*Attorneys, Appellate Staff
Civil Division, Room 7264
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-4452*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ............................................................................ 1

ARGUMENT ............................................................................................................... 2

    I.    Plaintiffs' Arguments with Respect to the Preliminary Injunction Factors Lack Merit. ................................................................................ 3

        A.    Plaintiffs Have Failed to Rehabilitate the District Court's Flawed Standing Analysis and Have Ignored the Supreme Court's Decision in *Murthy v. Missouri*. ......................................... 3

        B.    Plaintiffs Fail to Rebut the Panel's Determination That They Are Unlikely to Prevail on the Merits of Their First Amendment Claim. ................................................................... 5

        C.    Plaintiffs Fail to Grapple with the Panel's Determination That the Injunction Is Overbroad and Unworkable. .................... 14

        D.    Plaintiffs Fail to Rebut the Panel's Determination That the Remaining Equitable Factors Favor the Government. ................. 20

    II.    Plaintiffs Fail to Rebut the Panel's Determination That the Class Certification Order Is Improper. ................................................................. 21

CONCLUSION ......................................................................................................... 26

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Ahmad v. City of St. Louis*,
 995 F.3d 635 (8th Cir. 2021) ...................................................................... 25

*Black Lives Matter L.A. v. City of Los Angeles*,
 113 F.4th 1249 (9th Cir. 2024) ............................................................ 22, 24

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983) ................................................................................... 3, 4

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ................................................................................. 4, 5

*Dickinson v. Trump*,
 --- F.4th ----, No. 26-1609, 2026 WL 1133353 (9th Cir. Apr. 27, 2026) ..... 1, 2, 3, 5,
          6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25

*Hilao v. Estate of Marcos*,
 103 F.3d 767 (9th Cir. 1996) ...................................................................... 25

*Index Newspapers LLC v. U.S. Marshals Serv.*,
 977 F.3d 817 (9th Cir. 2020) ................................................................ 11, 12

*International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*,
 389 U.S. 64 (1967) ................................................................................. 19, 20

*Los Angeles Press Club v. Noem*,
 171 F.4th 1179 (9th Cir. 2026) .................................................................. 16

*Missouri v. Biden*,
 83 F.4th 350 (5th Cir. 2023) ..................................................................... 3-4

*Murthy v. Missouri*,
 603 U.S. 43 (2024) ................................................................................. 3, 4, 5

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
 926 F.3d 528 (9th Cir. 2019) ...................................................................... 21

*Nelson v. City of Davis*,
 685 F.3d 867 (9th Cir. 2012) ........................................................................ 6

*Nieves v. Bartlett*,
 587 U.S. 391 (2019) ............................................................................... 21, 24

*North Carolina v. Covington*,
581 U.S. 486 (2017) ............................................................................ 17

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ........................................................................... 4

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) .................................................... 23, 24

*Puente v. City of Phoenix*,
123 F.4th 1035 (9th Cir. 2024) ..................... 6, 7, 8, 9, 10, 16, 18, 19, 21, 24

*Rodriguez-Zuniga v. Garland*,
69 F.4th 1012 (9th Cir. 2023) ........................................................ 25

*Tincher v. Noem*,
164 F.4th 1097 (8th Cir. 2026) ................................................ 21, 22

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022) ...................................................... 4, 5

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................ 15

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................. 23, 25

**Rules:**

Fed. R. Civ. P. 23 .................................................................. 15, 21, 22, 24

## INTRODUCTION AND SUMMARY

As this Court made clear in granting the government's stay motion, "[t]he First Amendment enshrines the right of the people to peacefully protest our government's policies," "[b]ut the First Amendment does not protect vandalism, criminal trespass, or obstruction of law enforcement." *Dickinson v. Trump*, --- F.4th ----, No. 26-1609, 2026 WL 1133353, at *1 (9th Cir. Apr. 27, 2026). "Such unlawful acts, however, have been commonplace around the U.S. Immigration and Customs Enforcement ('ICE') building in Portland over the past year." *Id.* "Numerous provocateurs—many wielding bats, shields, and strobe lights that disrupt vision—have hurled bricks, smashed security cameras, and blocked the driveway to prevent ICE cars from entering or exiting the building." *Id.* Plaintiffs readily acknowledge that protesters have engaged in "technical violation[s] of the law," which they concede are criminal but recast as "nonviolent form[s] of expression." Br. 16 n.1. "[S]uch unlawful activities are not protected by the First Amendment, and thus the district court erred in handcuffing the government's ability to counter such illegal behavior." *Dickinson*, 2026 WL 1133353, at *1. Plaintiffs' arguments at the merits stage supply no basis for this Court to depart from its conclusion in stay proceedings that the preliminary injunction was improper.

At the outset, plaintiffs have failed to rehabilitate the district court's flawed standing analysis, which cannot be reconciled with Supreme Court precedent. Moreover, as the stay panel concluded, plaintiffs have failed to establish a key element

of their First Amendment retaliation claim—that the Department of Homeland Security (DHS), as an agency, subjectively intended to use retaliatory force against them. And even if plaintiffs had standing and were entitled to injunctive relief in some form, this injunction should be vacated because it is overbroad and unworkable, in part because the certified class is wholly overbroad and improper.

The remaining equitable factors favor the government. "The preliminary injunction irreparably harms the government by impeding officers' ability to enforce the law and protect themselves and the Portland ICE facility from attack and disruption." *Dickinson*, 2026 WL 1133353, at \*11. The injunction "is not merely unworkable—it is also extremely dangerous to both federal officers and the public." *Id.* at \*12. "Requiring law enforcement officers to go 'hands on' because they do not have crowd-control devices could be a tinder for a wildfire of violence." *Id.*

Accordingly, the Court should vacate the preliminary injunction in full for the reasons the Court set forth in granting the government's stay motion.

## ARGUMENT

As the stay panel persuasively explained, the district court made "critical legal errors" in granting plaintiffs' motions for preliminary injunction and class certification. *Dickinson v. Trump*, --- F.4th ----, No. 26-1609, 2026 WL 1133353, at \*6 (9th Cir. Apr. 27, 2026). Plaintiffs fail to demonstrate that the panel erred, and none of the arguments that they have mustered rehabilitates the district court's flawed

2

orders.  Accordingly, the Court should vacate the preliminary injunction and class certification orders.

**I.     Plaintiffs' Arguments with Respect to the Preliminary Injunction Factors Lack Merit.**

**A.     Plaintiffs Have Failed to Rehabilitate the District Court's Flawed Standing Analysis and Have Ignored the Supreme Court's Decision in *Murthy v. Missouri*.**

In granting the government's stay motion, the panel determined that "[f]or standing purposes at this early stage to the case, we think [plaintiffs] have sufficiently alleged chilling effect to have standing."  *Dickinson*, 2026 WL 1133353, at *5 n.1. Now, with the benefit of full briefing, the Court should conclude that plaintiffs fail to demonstrate standing.

As the government's opening brief explained, the district court's standing analysis cannot be reconciled with decades of Supreme Court precedent.  *See* Opening Br. 21-22 (discussing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and cases applying *Lyons*).  The Court's decision in *Murthy v. Missouri*, 603 U.S. 43 (2024), is illustrative. The *Murthy* plaintiffs alleged that certain government agencies pressured social-media platforms to suppress protected speech in violation of the First Amendment.  *Id.* at 49.  The district court entered a preliminary injunction, which the Fifth Circuit affirmed.  *Id.*  The Supreme Court rejected the Fifth Circuit's holding that the "chilling of the [plaintiffs'] exercise of their First Amendment rights is, itself, a constitutionally sufficient injury" for standing purposes, *Missouri v. Biden*, 83 F.4th 350,

3

368 (5th Cir. 2023) (per curiam), *rev'd sub nom.*, *Murthy*, 603 U.S. 43, explaining instead that *Lyons*, 461 U.S. at 108, and *Clapper v. Amnesty International USA*, 568 U.S. 398, 416 (2013), prevent plaintiffs from "manufactur[ing] standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending," *Murthy*, 603 U.S. at 73 (quoting *Clapper*, 568 U.S. at 416). Even for a First Amendment claim, plaintiffs "must face 'a real and immediate threat of repeated injury,'" which meant in *Murthy* that "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant," not merely that their protected speech has been chilled. *Id.* at 58 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). Because plaintiffs' theory of standing is that they have engaged in "self-censorship in avoiding protests they would otherwise attend," 1-ER-22; *see* Br. 29-30, this case is on all fours with *Murthy*, which compels dismissal.

Plaintiffs fail to cite *Murthy* and instead rely exclusively on Ninth Circuit case law predating that decision. Br. 27. For instance, plaintiffs cite *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), which concerned one aspect of the three-pronged test for "pre-enforcement challenges to laws on First Amendment grounds," *id.* at 1068. This case does not present the same issue. Even if *Tingley* were analogous, the third prong of that test "concern[s] the history of enforcement," which would require the Court to consider the alleged history of plaintiffs being retaliated against for exercising their First Amendment rights to assess the likelihood of whether they would be

4

retaliated against in the future. *Id.* at 1069. Plaintiffs have failed to demonstrate that it "is certainly impending" that they will be retaliated against for exercising their First Amendment rights. *Clapper*, 568 U.S. at 401-02.

As a fallback, plaintiffs urge that the district court made a "holding that Plaintiffs demonstrated a sufficient likelihood that they would be wronged again in a similar way." Br. 28. Plaintiffs cannot demonstrate that there is "a substantial risk that, in the near future," any of them will be retaliated against for exercising their First Amendment rights, *Murthy*, 603 U.S. at 58, as they have not even demonstrated that they have likely been retaliated against for exercising their First Amendment rights in the first place. As the panel recognized, this "standing question substantially overlaps with the merits," *Dickinson*, 2026 WL 1133353, at *5 n.1, and on the merits, as demonstrated below, plaintiffs have failed to demonstrate that their First Amendment rights have been violated.

### B. Plaintiffs Fail to Rebut the Panel's Determination That They Are Unlikely to Prevail on the Merits of Their First Amendment Claim.

Plaintiffs' First Amendment claim is likely to fail on the merits for all the reasons identified by the panel in its stay order. *Dickinson*, 2026 WL 1133353, at *5-8. "The district court made two critical legal errors in finding that the plaintiffs likely will prevail on their First Amendment retaliation claim." *Id.* at *6. "First, it erred in assuming that the government cannot use non-lethal munitions in response to imminent lawlessness." *Id.* "Second, even assuming subjective retaliatory intent in

5

some cases, the plaintiffs have not shown an unwritten policy, pattern, or practice of First Amendment retaliation." *Id.* at \*7. Here, "the record reveals law enforcement's response to a substantial degree of violence, obstruction of law enforcement, and unrest—with protesters repeatedly trespassing onto the ICE facility, blockading the facility's gates, vandalizing federal property, and attacking federal officers." *Id.* at \*8. The record does not support plaintiffs' First Amendment claim.

With respect to the first error, the district court relied on a Fourth Amendment case, *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012), to suggest that evidence of purported excessive force in response to imminent lawlessness "is strong circumstantial evidence of Defendants' intent to punish the crowd for their expression." 1-ER-26. As the panel explained, this Court "recently emphasized that law enforcement can use non-lethal force in response to 'imminent lawlessness' by protesters who claim they are exercising their First Amendment rights." *Dickinson*, 2026 WL 1133353, at \*6 (quoting *Puente v. City of Phoenix*, 123 F.4th 1035, 1062 (9th Cir. 2024)). "[L]aw enforcement officers can still use non-lethal munitions to disperse a protesting crowd if there are 'objectively reasonable grounds to conclude that there is a clear and present danger of riot, *disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order*." *Id.* (citation modified) (quoting *Puente*, 123 F.4th at 1062). That is precisely "what law enforcement appears to have done here in response to vandalism, the blocking of street traffic, and the trespassing on

ICE property—all of which are 'immediate threats to public safety, peace, and order.'" *Id.* (citation modified) (quoting *Puente*, 123 F.4th at 1062).

The district court "incorrectly concluded the five plaintiffs were likely being intentionally targeted for their First Amendment rights because there purportedly was no valid reason for the government to use tear gas and other non-lethal munitions." *Dickinson*, 2026 WL 1133353, at *6. "Once that foundational—and faulty—assumption is cast aside, the court's finding of intent to retaliate collapses." *Id.* "We are left with a more plausible explanation of events: As detailed earlier, the five plaintiffs (out of hundreds of protesters) were not intentionally targeted for their First Amendment activity but were rather unfortunate collateral casualties during a chaotic effort to quell disorder." *Id.*

With respect to the second error, the district court's analysis was "influenced by its erroneous legal assumption that law enforcement cannot use non-lethal munitions against protesters unless they pose imminent physical harm to the officers." *Dickinson*, 2026 WL 1133353, at *7; *see also* 1-ER-3 (enjoining the use of crowd-control devices except when there is "an imminent threat of physical harm to a law enforcement officer or other person"). Evidence that the force used by law enforcement was excessive does not suggest that law enforcement was violating the First Amendment in contravention of DHS policy, 2-ER-144, because there may be any number of reasons why force was used, reasons completely divorced from any sort of retaliatory intent. A more granular finding of subjective intent is necessary,

and the district court's decision to conflate allegedly excessive force with the presence of subjective retaliatory intent meant that it was not asking the correct question. *Dickinson*, 2026 WL 1133353, at *7. "[W]hen viewed under [the] proper legal lens, the use of such non-lethal force to disperse crowds engaging in unlawful behavior does not amount to an unwritten policy of retaliation but rather reflects law enforcement." *Id.* The officers were doing their job.

Plaintiffs fail to grapple with the panel's reasons for granting a stay, which faithfully applied the Court's decision in *Puente*. Plaintiffs entirely ignore the key point of the panel's analysis of *Puente*—that proof of excessive force standing alone cannot prove subjective retaliatory intent. *See Dickinson*, 2026 WL 1133353, at *7 ("[E]ven if the officers' actions were not justified, they would not compel the conclusion that the officers acted because of subjective antipathy to First Amendment activity."). That legal error supplies an independent basis for rejecting the district court's First Amendment analysis, and plaintiffs have no response.

As the government urged in its opening brief, the Court should "reject[] holding that a 'retaliation claim may properly be asserted in the crowd-dispersal context *in addition* to a clear-and-present-danger claim." Opening Br. 26 (quoting *Puente*, 123 F.4th at 1063). Because a First Amendment retaliation claim must "focus on subjective causation," *Puente*, 123 F.4th at 1063—*i.e.*, what a particular officer intended when responding to the crowd—First Amendment retaliation claims are "a 'poor fit' for the plaintiffs' claims," which attempt to paint with broad strokes the

8

actions of DHS writ large. *Dickinson*, 2026 WL 1133353, at *7 (quoting *Puente*, 123 F.4th at 1063). This disconnect is made even clearer in the City of Portland's amicus brief, which emphasizes that "plaintiff Dickinson testified below that teams of federal officers generally were 'much more aggressive' right after they had arrived in Portland, but that their uses of force subsequently decreased as those officers 'reassessed' the reality on the ground." Portland Amicus Br. 16 (quoting 7-SER-1394-96). Thus, plaintiffs assert that even individual officers' actions toward protesters have not remained constant throughout their deployment, 7-SER-1394-96, rendering it even less appropriate to bring a First Amendment retaliation claim and ascribe a single retaliatory motive to DHS officers who have "consistently faced violent, disruptive, or otherwise unlawful behavior," *Dickinson*, 2026 WL 1133353, at *2. Instead, the proper First Amendment analysis for the crowd-control context is not the mental states of scores of law enforcement officers facing hundreds or thousands of individual incidents, but whether protests are reasonably perceived as creating a clear and present danger of lawlessness so as to justify the use of crowd dispersal techniques.

Plaintiffs' efforts to distinguish *Puente* on other grounds are unavailing.

First, plaintiffs argue that *Puente* involves challenges to the lawfulness of a dispersal and that plaintiffs here "challenge Defendants' munitions use," not a dispersal. Br. 37. That misapprehends the claims in *Puente*, where plaintiffs, including a nonviolent journalist, 123 F.4th at 1059, alleged that law-enforcement officers

9

violated the "First, Fourth, and Fourteenth Amendments by dispersing … protesters through the use of tear gas, other chemical irritants, and 'flash-bang grenades,'" *id.* at 1042.

In any event, DHS officers indisputably deployed crowd-control devices in order to disperse violent or disruptive crowds, as in *Puente*. *See Dickinson*, 2026 WL 1133353, at *4 ("Officers again used crowd-control devices to disperse the crowd and prevent further damage to federal property."); *Puente*, 123 F.4th at 1042; *see also, e.g.*, 2-ER-122 ("[Federal Protective Service (FPS)] uses crowd control chemical munitions to disperse crowds that refuse to comply with dispersal orders."); 2-ER-141 ("[Crowd control devices] permit [U.S. Customs and Border Enforcement (CBP)] law enforcement to successfully disperse certain violent, hostile, or obstructive crowds."); 2-ER-100 ("I deployed a single [tear gas] gas canister in an effort to disperse the group, protect the agents, and create space."); 2-ER-105 (similar); 2-ER-106 (similar); 2-ER-113 (similar). That plaintiffs apparently believe it was unlawful for DHS officers to use such devices for other purposes *Puente* identified as legitimate—such as firing plastic balls at an individual trespassing on federal property who has ignored numerous warnings to stop and was attempting to evade arrest on his bicycle, 19-SER-4014-17—merely underscores that plaintiffs' First Amendment theory is incompatible with this Court's precedent. *See Puente*, 123 F.4th at 1062 (explaining that the proper analysis for determining whether a dispersal violated the First Amendment is whether "there were sufficient objectively reasonable grounds to

establish the requisite 'clear and present danger' of an 'immediate threat to public safety, peace, or order'").

Second, plaintiffs urge that "nothing in *Puente* suggests that the availability or unavailability of Fourth or Fifth Amendment claims is dispositive of a First Amendment retaliation claim." Br. 38-39. That is beside the point. As the panel explained, Fourth Amendment excessive force case law is "legally and factually inapt" to this First Amendment case. *Dickinson*, 2026 WL 1133353, at *6. Plaintiffs cannot use a Fourth Amendment claim that they intentionally decided not to litigate in connection with their preliminary injunction motion "to bolster" their First Amendment claim. Br. 39 n.4. Indeed, plaintiffs acknowledge that this Court "should avoid drawing any conclusions as to [their] Fourth Amendment claims because it lacks jurisdiction to do so," Br. 26 n.3, but that just makes it all the more apparent that the district court could not rely on claims that officers used excessive force in violation of plaintiffs' Fourth Amendment rights to demonstrate First Amendment retaliation.

Plaintiffs cite *Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817 (9th Cir. 2020), but the quotation they mischaracterize does not suggest that a Fourth Amendment violation would provide "exceptionally strong" evidence of a First Amendment violation. *Compare* Br. 39 n.4 (contending that a "pattern of misconduct that may very well amount to excessive force is 'exceptionally strong' evidence of retaliation" (quoting *Index Newspapers*, 977 F.3d at 829)), *with Index Newspapers*,

11

977 F.3d at 829 ("Because the district court's findings include so many instances in which plaintiffs were standing nowhere near protesters while photographing and observing the Federal Defendants' actions, they provide exceptionally strong evidentiary support for the district court's finding that some of the Federal Defendants were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights."). That discussion in *Index Newspapers* was about the specific evidence in that case and cannot be twisted into implying that alleged excessive force is strong evidence of a First Amendment violation.[1] The Fourth Amendment is "legally and factually inapt" to this First Amendment case. *Dickinson*, 2026 WL 1133353, at *6.

Third, plaintiffs note that *Puente* involved only a single protest. Br. 41-44. But as this Court held in granting a stay, "*Puente* did not say that the First Amendment hinges on whether there is a single protest or a series of demonstrations." *Dickinson*, 2026 WL 1133353, at *6. If anything, "[t]he government may be *more* justified in

---

[1] No such evidence was present here. To the extent plaintiffs rely on the plaintiff journalists' testimony to try to create an analogue, it bears emphasis that Mr. Rios was "wear[ing] a helmet and googles" and held his camera in front of his chest in such a way that, at least at certain angles, it may be blocking his "PRESS" badge. 6-SER-1320-21. Likewise, Mr. Lake's testimony cannot demonstrate an intent to target the press. *See, e.g.*, 7-SER-1455 (Mr. Lake testifying that he was "wearing a bulletproof vest as well as having [his] camera on the monopod … and … a ballistic grade helmet on as well"); 7-SER-1473-74 (Mr. Lake testifying he was wearing a "gas mask" and a "dark" uniform at "[n]ighttime" while standing "very close" to officers who were already engaged in a "physical scuffle" with other individuals before he was sprayed).

using tear gas and other non-lethal munitions in Portland to establish order, given the months-long siege of the ICE facility there" in contrast to use at a single protest. *Id.* (emphasis added).

Lastly, plaintiffs assert that *Puente* is inapposite because they have alleged an unwritten policy of retaliation.[2] But the stay panel correctly held that "plaintiffs have not shown an unwritten policy, pattern, or practice of First Amendment retaliation." *Dickinson*, 2026 WL 1133353, at *7. To the contrary, DHS policy prohibits "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." 2-ER-144. Plaintiffs merely rehash arguments already persuasively rejected by the panel. None of the statements they cite establishes an unwritten policy of First Amendment retaliation. For instance, plaintiffs rely on evidence purportedly showing that no DHS law-enforcement officer has been

---

[2] Plaintiffs accuse the government of misrepresenting the timeline, but their assertions are wrong. Br. 33-34. First, the government's cited evidence concerning October 4 was indeed discussing October 4, not protests in January. 2-ER-126. Second, unlawful activity had indeed occurred on October 4 prior to the incident with the Eckmans. *Compare* 2-ER-126 (noting that "approximately 100 demonstrators [were] trespassing on federal property" at "approximately 1:04 p.m."), *with* 6-SER-1250-51 (confirming that the Eckmans were there in the "early afternoon"), *and* 6-SER-1252 (describing a video plaintiffs provided this Court in connection with their motion to transmit physical evidence, file name "0042 – Lucero Exhibit A," which shows the Eckmans and clearly corresponds with the events beginning at approximately 1:04 p.m. that are discussed at 2-ER-126). Third, the government correctly stated that Mr. Rios "was filming the protests by the driveway to the ICE facility," which is not the same as stating that he was "on" the driveway. Opening Br. 8. For further discussion of Mr. Rios, who was "wear[ing] a helmet and googles" and held his camera in front of his chest in such a way that, at least at certain angles, it may be blocking his "PRESS" badge, *see supra* note 1; 6-SER-1320-21.

penalized for excessive use of force or that certain high-level officials "praised the work of DHS."  Br. 35; *see also* Portland Amicus Br. 11-14 (addressing additional statements by high-level officials).  But none of those general statements praises any officer for violating the First Amendment, nor have plaintiffs demonstrated a First Amendment violation in the first place.  *See, e.g.*, 23-SER-4493-94; 24-SER-4640; 24-SER-4648-49.  The cited statements certainly do not purport to override longstanding DHS policy prohibiting officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights."  2-ER-144.  Plaintiffs' allegations that DHS policy is not being followed turn on their erroneous assumption that all instances of purportedly excessive force must be First Amendment retaliation merely because they occurred at a protest.  "And when viewed under [the] proper legal lens, the use of such non-lethal force to disperse crowds engaging in unlawful behavior does not amount to an unwritten policy of retaliation but rather reflects law enforcement."  *Dickinson*, 2026 WL 1133353, at *7.

### C. Plaintiffs Fail to Grapple with the Panel's Determination That the Injunction Is Overbroad and Unworkable.

As the government's opening brief demonstrated, and as the stay panel explained, the preliminary injunction should independently be vacated because it is "grossly overbroad and unworkable."  *Dickinson*, 2026 WL 1133353, at *8.  Plaintiffs again ignore the panel's prior determination.

**1.** First, the injunction improperly grants relief not only to the five named plaintiffs but to anyone protesting or reporting at the Portland ICE facility or even just merely "in the vicinity of" the facility. 1-ER-3. Even if the district court's certification of a class were proper—*but see infra* Part II; *Dickinson*, 2026 WL 1133353, at *9 ("The provisional class was improperly certified because it does not meet Rule 23's commonality requirement.")—the injunction's extension of its protections to non-class-members would still violate *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Plaintiffs offer no response whatsoever to the fact that the injunction is not even tethered to the improperly certified class.

Here, the district court certified a class covering "[a]ll people who, since" June 2025, "have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." 1-ER-53 (quotation marks omitted). The injunction makes no distinction between class members and individuals covered by the injunction who happen to be "in the vicinity of" the ICE facility. 1-ER-3. Both as a matter of simple logic and common experience, an individual can be "in the vicinity of" the ICE facility, 1-ER-3, without "hav[ing], desir[ing] to, or … nonviolently protest[ing] against or report[ing] on DHS activities at" that facility, 1-ER-53 (quotation marks omitted); *see also Dickinson*, 2026 WL 1133353, at *8 ("[L]ike the injunction that *Los Angeles Press Club* deemed overbroad, the injunction here improperly extends not merely to the five plaintiffs but to anyone in the world who

15

wishes to protest at the Portland ICE facility." (citing *Los Angeles Press Club v. Noem*, 171 F.4th 1179 (9th Cir. 2026))). Thus, the injunction is not limited to class members.

**2.** The injunction is also unmoored from plaintiffs' First Amendment retaliation claims because it is based on Fourth Amendment standards. "By conflating these inquiries, the district court only reinforced *Puente*'s conclusion that the First Amendment retaliation framework is a 'poor fit' for the plaintiffs' claims." *Dickinson*, 2026 WL 1133353, at *7 (quoting *Puente*, 123 F.4th at 1063).

As the government previously explained (Opening Br. 33-35), plaintiffs' retaliation claims would not justify categorically prohibiting DHS officers from deploying common law-enforcement tools such as tear gas, flashbangs, and pepper balls except when "the specific target … poses an imminent threat of physical harm." 1-ER-3. They also would not justify categorically prohibiting DHS officers from deploying pepper spray except when "the specific target of that weapon exhibits, at a minimum, active resistance" (whatever that means). 1-ER-3-4. And they certainly would not authorize the district court to design the uniforms of federal law-enforcement officers, as the court asserted the power to do. 1-ER-4-5. While it is undoubtedly true that any "relief 'must be tailored to remedy the specific harm alleged,'" *Los Angeles Press Club*, 171 F.4th at 1190, the harm alleged here is not the use of crowd-control devices for any reason but, rather, the allegedly "chilling use of chemical and impact munitions against nonviolent people exercising their First Amendment rights" by officers harboring a subjective retaliatory motive. Br. 3.

16

Accordingly, even if an injunction were proper, it would still be improper for this injunction to prohibit conduct not connected to any sort of subjective motivation to retaliate against an individual for exercising his or her First Amendment rights.

**3.** Further, the district court failed to account for "what is workable," as foundational equitable principles demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (quotation marks omitted). As the panel determined, the injunction "is not merely unworkable—it is also extremely dangerous to both federal officers and the public." *Dickinson*, 2026 WL 1133353, at *12; *see* 2-ER-129-31; 2-ER-141. That conclusion was correct, and plaintiffs fail to persuade otherwise.

First, plaintiffs assert that the injunction is workable based on testimony from certain state or local police officers and a former CBP commissioner. Br. 57-59. But their opinions all rest on the assumption that crowd-control devices should be used only in extremely limited circumstances. *See, e.g.*, 1-SER-222 ("[T]respassing and failing to disperse are just minor offenses. As inconvenient and annoying as it might be, the proper course in this situation is to ask people to move, warn them, and arrest them if they fail to clear the way."); 2-SER-349 (similar); Oregon Amicus Br. 11-13, 16-17. That assumption cannot be reconciled with *Puente*, as made clear by the stay panel here, and these witnesses' mere policy preferences do not bind the federal government. *See Dickinson*, 2026 WL 1133353, at *10 ("[T]he First Amendment allows officers to use crowd-control munitions if protesters block the street,

17

criminally trespass on government property, or thwart law enforcement efforts." (citing *Puente*, 123 F.4th at 1062)).

Second, plaintiffs assert that "Defendants' leadership" deemed the injunction "safe and workable." Br. 59 (citing 24-SER-4817). That is not true. The deponent whom plaintiffs cite answered counsel's question about the temporary restraining order's workability only under the assumption that "the current level of activity" "continues." 24-SER-4817. The deponent understood that the then-current level of activity might not continue, in which case the temporary restraining order causes "an increased risk of injury to both the law enforcement officers and the … crowd." 24-SER-4818; *see also Dickinson*, 2026 WL 1133353, at *12 (explaining that the injunction "is not merely unworkable" but "also extremely dangerous to both federal officers and the public" because "prohibiting the use of crowd-control devices in response to anything except imminent violence 'forces officers to rely on physical intervention (hands on tactics) to manage breaches or remove individuals, greatly increasing the risk of injury to both officers and protesters, as physical confrontations are more likely to result in accidental harm, escalation, or use of higher levels of force.'" (citation modified) (quoting 2-ER-130)). The injunction is both unworkable and dangerous.

Third, plaintiffs suggest that the injunction is simply an order to follow FPS policy. Br. 58-59 (citing 7-SER-1546). That is wrong. For one, the cited testimony from plaintiffs' expert describes the injunction in *Los Angeles Press Club*, not this one.

18

*See* 7-SER-1546 ("The injunction in Los Angeles has been in existence for a number of months."). And, of course, that injunction has now been vacated by this Court. *Los Angeles Press Club*, 171 F.4th at 1192. Even with respect to that injunction, the witness did not testify that it mirrors FPS policy. *See* 7-SER-1546 ("But frankly, everything that you read about, and *almost* everything that you read in it, *pretty much* mirrors not only -- FPS has all the right language." (emphases added)). And as the FPS declarant confirmed, "[i]n conjunction with its public order policing operations at the Portland ICE building, FPS uses crowd control chemical munitions to disperse crowds that refuse to comply with dispersal orders." 2-ER-122. Regardless as to what plaintiffs' witness may say, the injunction undoubtedly prohibits that. 1-ER-3.

Finally, to the extent plaintiffs imply that this injunction is merely a follow-the-law injunction, it is not. *See Dickinson*, 2026 WL 1133353, at *6 ("[L]aw enforcement can use non-lethal force in response to 'imminent lawlessness' by protesters who claim they are exercising their First Amendment rights." (quoting *Puente*, 123 F.4th at 1062)). Regardless, even if the injunction had done no more than direct DHS officers to follow the First Amendment, that is itself a fatal defect. *See International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 74 (1967) (rejecting a decree containing "only an abstract conclusion of law"). Such an injunction would have been hopelessly vague, making "DHS officers' real-time judgments … subject to judicial second-guessing in contempt proceedings based on whether officers complied with the injunction's vague terms." *Dickinson*, 2026 WL 1133353, at *12. "The

judicial contempt power is a potent weapon," and "[w]hen it is founded upon a decree too vague to be understood, it can be a deadly one." *Id.* (quoting *Longshoremen's*, 389 U.S. at 76). Accordingly, the injunction must be vacated because it is overbroad and unworkable.

### D. Plaintiffs Fail to Rebut the Panel's Determination That the Remaining Equitable Factors Favor the Government.

The injunction should also be vacated because the remaining equitable factors decisively favor the government. Plaintiffs rest the entirety of their irreparable harm argument on the alleged violation of their First Amendment rights, Br. 44-46, but, as demonstrated above, those harms are insufficient even to support their standing, *supra* Part I.A, and on the merits, plaintiffs have failed to demonstrate that their First Amendment rights have likely been violated, *supra* Part I.B.

It is instead the government that is "irreparably harm[ed]" by the injunction because it "imped[es] officers' ability to enforce the law and protect themselves and the Portland ICE facility from attack and disruption" and "transgresses the separation of powers by 'effectively establishing the district court as the supervisor of all Executive Branch activity' near the ICE facility." *Dickinson*, 2026 WL 1133353, at *11 (citation modified). The injunction is "extremely dangerous to both federal officers and the public." *Id.* at *12. Therefore, the balance of equities and public interest strongly favor vacatur of the injunction.

20

## II. Plaintiffs Fail to Rebut the Panel's Determination That the Class Certification Order Is Improper.

As the stay panel further held, the Court should independently vacate the district court's order certifying a hopelessly broad class of "[a]ll people who, since [June 2025], have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." 1-ER-53 (quotation marks omitted). Plaintiffs' contrary arguments lack merit.

1.      As an initial matter, because plaintiffs lack standing, the class must be decertified on that basis. *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019).

Even if plaintiffs had standing to sue, the class should be decertified because it violates Rule 23(a)'s commonality requirement. *See* Fed. R. Civ. P. 23(a)(2). As the stay panel explained, "First Amendment retaliation claims must be evaluated based on 'all of the circumstances' (including the mental state of the federal officers who acted)," and "[t]hese 'fact-specific' and 'individualized considerations' require 'separate analyses' and are therefore not 'amenable to class treatment.'" *Dickinson*, 2026 WL 1133353, at *10; *see also Puente*, 123 F.4th at 1063 (confirming that a First Amendment retaliation claim must "focus on subjective causation," which "will often raise 'particularly difficult' causation questions" (quoting *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019))); *cf. Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) (per curiam) (rejecting theory that class certification would be appropriate given the fact-specific

21

inquiries that must occur where "observers and protestors [were] engaging in a wide range of conduct, some of it peaceful but much of it not").[3]

*Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249 (9th Cir. 2024), compels this conclusion. As the panel explained, *Black Lives Matter* confirms that First Amendment retaliation claims are "'fact-specific'" and depend on "'individualized considerations,'" which "require 'separate analyses' and are therefore not 'amenable to class treatment.'" *Dickinson*, 2026 WL 1133353, at \*10 (quoting *Black Lives Matter*, 113 F.4th at 1258-60). The individualized nature of this inquiry, with its focus on the subjective motivation of the particular officer committing an act of alleged retaliation, prevents such claims from being amenable to class certification.

Plaintiffs argue that the certified class satisfies Rule 23's commonality requirement because the multitude of First Amendment retaliation claims covered by the class are allegedly "indistinguishable." Br. 53. But as the stay panel explained and as plaintiffs entirely ignore, "[t]he provisional class … includes (a) protesters who

---

[3] Plaintiffs attempt to distinguish *Tincher*—which similarly sought certification of a class of "'[a]ll persons who do or will in the future record, observe, and/or protest against'" "the ongoing immigration-enforcement effort in the Twin Cities," 164 F.4th at 1098—because "'federal agents [were] responding in various ways' to 'different conduct, by different officers, at different times.'" Br. 53. But that is precisely the case here. Plaintiffs cannot stretch evidence of officers not remembering precise days in depositions as somehow demonstrating that all days were identical. Plaintiffs acknowledge, for instance, that "two thirds" of the time, they were "allowed to basically protest with no intervention." 2-ER-77. And the differences between different federal agents working for different federal components in response to different protesters doing different things cannot be waved away.

peacefully hold signs on the sidewalk 250 feet away from the ICE facility, (b) people who block the ICE driveway to prevent cars from entering or exiting the building, (c) people who 'passively' resist arrest by trespassing, refusing to abide by law enforcement orders, and 'going dead weight,' and (d) even those who vandalize the ICE building." *Dickinson*, 2026 WL 1133353, at *9. "[T]here is little in common between an Antifa provocateur who destroys the security camera at the ICE facility and a peaceful protester who holds a sign several hundred feet away on the public sidewalk." *Id.* Further, DHS did not uniformly respond to protesters by deploying crowd-control devices; indeed, as the lead plaintiff here testified, for the majority of the 150 protests that he attended, protesters were "allowed to basically protest with no intervention." 2-ER-77. "Simply put, the plaintiffs here have not shown the existence of common evidence that can resolve in 'one stroke' the class members' claims that hinge on a wide array of facts." *Dickinson*, 2026 WL 1133353, at *9; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("[Class members'] claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

Plaintiffs' extensive reliance on *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), is misplaced. Br. 49-56. That case challenged "systemic Eighth Amendment violations"

23

in Arizona state prisons; it was not a First Amendment case. *Parsons*, 754 F.3d at 662. First Amendment retaliation claims, which are "'fact-specific'" and depend on "'individualized considerations,'" "require 'separate analyses' and are therefore not 'amenable to class treatment.'" *Dickinson*, 2026 WL 1133353, at *10 (quoting *Black Lives Matter*, 113 F.4th at 1258-60); *see also Puente*, 123 F.4th at 1063 (confirming that First Amendment retaliation claims, which "focus on subjective causation," "will often raise 'particularly difficult' causation questions" (quoting *Nieves*, 587 U.S. at 402)). Accordingly, plaintiffs have failed to demonstrate commonality.

 **2.** Even if plaintiffs could establish commonality, the class must be decertified because plaintiffs cannot satisfy Rule 23(b)(2)'s indivisible-remedy requirement. Plaintiffs' cursory discussion of this requirement relies exclusively on *Parsons*, a readily distinguishable Eighth Amendment case. Br. 55-56 (citing *Parsons*, 754 F.3d at 686-88). Again, *Parsons* turned on Eighth Amendment case law, which is not at issue here. 754 F.3d at 687 (collecting authorities). But even *Parsons* confirms that the indivisible-remedy inquiry focuses on "whether 'the party opposing the class has acted or refused to act on grounds that apply generally to the class.'" *Id.* at 688. That is not the case here.

 Here, the proposed class would encompass (1) putative class members who assert a variety of First Amendment injuries caused by a wide array of allegedly unlawful conduct; (2) members who assert only some of those injuries, or who were exposed to only a subset of that allegedly unlawful conduct; and (3) members who

24

protested, observed, recorded, or reported on the Portland ICE Facility without any basis to allege injury. Plaintiffs "attempt to aggregate a plethora of discrete claims" of constitutional injury "into one super-claim" against defendants "without demonstrating that the class members have been harmed in essentially the same way." *Ahmad v. City of St. Louis*, 995 F.3d 635, 644 (8th Cir. 2021) (quotation marks omitted). Consequently, because the individual class members were harmed differently or not at all, each class member "would be entitled to a different injunction or declaratory judgment against" defendants or no relief whatsoever. *Wal-Mart*, 564 U.S. at 360. The fact that no single, indivisible injunction could properly provide relief to the class as a whole further demonstrates that the class-certification order must be reversed.[4]

---

[4] In a footnote of their brief's procedural background section, plaintiffs state that "the prior panel's decision to stay all district court proceedings … was improper." Br. 20 n.2. But plaintiffs cannot contest the Court's stay decision in their response brief defending the district court's preliminary injunction. And to the extent plaintiffs intended to challenge that aspect of the stay decision, their arguments are forfeited. *See, e.g.*, *Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1023 (9th Cir. 2023) (deeming forfeited "reference, found only in her background section and not directly connected with any argument"); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir. 1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal."). In any event, a stay of district court proceedings was warranted. *Dickinson*, 2026 WL 1133353, at *13. Further, the appeal is moving promptly and given the case's posture, the stay of district court proceedings will become moot once this Court resolves this appeal.

## CONCLUSION

For these reasons and the reasons set forth in the government's opening brief, the district court's preliminary injunction and class-certification orders should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST E. FLENTJE
MICHAEL SHIH
BRENNA SCULLY

<u>s/ Douglas C. Dreier</u>
DOUGLAS C. DREIER
*Attorneys, Appellate Staff*
*Civil Division, Room 7264*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4452*
*douglas.c.dreier@usdoj.gov*

June 2026

26

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,487 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Douglas C. Dreier*
DOUGLAS C. DREIER